STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

CASE TYPE: OTHER CIVIL

---

Carlson, Inc.,

                Plaintiff,

        v.

International Business Machines Corporation,

                Defendant.

Civil File No. _____

**COMPLAINT**

**TO BE FILED UNDER SEAL**

---

Plaintiff Carlson, Inc. (formerly known as Carlson Companies, Inc. and referred to herein as "Carlson"), for its Complaint against Defendant International Business Machines Corporation ("IBM"), states and alleges as follows:

## THE PARTIES, JURISDICTION AND VENUE

1.    Carlson is a Minnesota corporation with its principal place of business and corporate headquarters at 701 Carlson Parkway, Minnetonka, Minnesota.

2.    IBM is a New York corporation with its principal place of business at Route 100, Somers, New York and its corporate headquarters at One New Orchard Road, Armonk, New York. IBM, through its business group, IBM Global Services (collectively, IBM) provides business infrastructure, consulting, and support services relating to computer and information technology.

3.    This Court has personal jurisdiction over IBM because IBM regularly conducts business in the State of Minnesota and because IBM has committed tortious acts, including fraud and breach of fiduciary duty, in this judicial district. Jurisdiction over IBM is also proper because IBM irrevocably submitted to the sole and exclusive jurisdiction of the federal and state courts in

81610494.1

SCANNED

NOV 0 5 2010

U.S. DISTRICT COURT MPLS

Minnesota in personam, generally and unconditionally with respect to any action, suit or proceeding brought against it.

4.     Venue is proper pursuant to Minn. Stat. § 542.09 in that the causes of action arose within this county.

## FACTUAL BACKGROUND PERTINENT TO CARLSON'S COMPLAINT

5.     In the late summer of 2005 Carlson entered into what was supposed to be a ten year Master Services Agreement (Agreement) with IBM. Under the Agreement, IBM was to handle, among other things, Carlson's finance and accounting and technology management services (collectively, the "Services").

6.     This Agreement was the culmination of events which began with Carlson's recognition that it needed to fully transform its business to remain at the apex of competition. The quest for transformation was not the issue. The question was whether Carlson would address these issues internally or outsource critical planning, decision-making and core business functions of these Services. This decision was momentous.  In order to gain the benefits of greater expertise, capabilities and efficiencies from an outsourcer, hundreds of jobs of trustworthy Carlson employees would likely be lost.

7.     To assure that it was gaining the right partner, Carlson allowed unprecedented access to its inner-workings.  IBM, for example, conducted an extensive and thorough due diligence of Carlson's operations, goals and objectives. Following IBM's due diligence, IBM represented to Carlson that it had performed all of the due diligence IBM deemed necessary.

8.     To further assure that it was getting the right partner, Carlson also asked IBM myriad questions regarding its capabilities, past experiences and specifics on what IBM would do for Carlson. The answers to these questions were critical in continuing to pursue the path to an Agreement. Indeed, the IBM due diligence process itself placed Carlson in a position where

- 2 -

many of its most highly valued and sought-after employees began to self-select positions outside the company as the potential for outsourcing grew.

      9.      But IBM knew exactly what to say to Carlson in order to move forward toward the execution of an Agreement. IBM unambiguously told Carlson what IBM's capabilities were, what IBM would do for Carlson and how IBM could be trusted with its words and actions:

- *"IBM is the only company able to provide leading expertise in all of the scope areas under consideration."* (IBM's response to Carlson's RFP, "Executive Summary - Total Solution," dated May 11, 2005, at p. 4);

- With respect to F&A, *"...we would continue the transformation of the finance and accounting operations using the numerous tools and techniques from our consulting expertise and by applying the operational scale and excellence of our BTO delivery organization."* (IBM response to Carlson's RFI, dated February 15, 2005, at p. 7);

- With respect to IT, *"IBM has developed a comprehensive approach and solution for the outsourcing of Carlson's Information Technology. Our approach will satisfy the current needs and will position Carlson to take advantage of potential business opportunities, realignments, and emerging technologies."* (IBM's response to Carlson's RFP, "Infrastructure Services Solution Summary," dated May 11, 2005, at p. 9);

- *"IBM's capabilities... can not be surpassed . . ."* (IBM's response to Carlson's RFI, dated February 15, 2005, at p. 14);

- *"IBM is uniquely positioned to deliver the full scope described in the RFI and thus the selection of IBM as a single vendor will mitigate or eliminate the potential adverse impact on Carlson..."* (IBM's response to Carlson's RFI, dated February 15, 2005, at p. 14);

- IBM would *"provide Carlson with a solution that fully meets your overall objectives in terms of savings, business transformation, speed, quality, controls, service levels, employee sensitivity and future flexibility."* (IBM's response to Carlson's RFI, dated February 15, 2005, at p. 13);

- *"Success in achieving target savings and results is not an option with IBM; it is a given."* (IBM's response to Carlson's RFI, dated February 15, 2005, at p. 13);

- IBM's *"value proposition to Carlson will include providing equal to or higher quality service at a lower cost than the client can deliver internally."* (IBM's response to Carlson's RFI, dated February 15, 2005, at p. 7);

81610494.1

- *"IBM's proposed solution will accelerate the transformation of Carlson's IT operations."* (IBM's response to Carlson's RFP, "Infrastructure Services Solution Summary", dated May 11, 2005, at p. 6);

- IBM's "BTO [business transformation outsourcing] strategic statement is unambiguous and reads as follows: We will be the Global leader, *trusted to collaborate with our clients to transform their business and trusted to operate portions of their value chains to drive significant, sustainable business performance improvements."* (IBM's response to Carlson's RFI, dated February 15, 2005, at p. 22);

- "For nearly 100 years, *the IBM name has stood for trust and integrity* in all that we do." (IBM's response to Carlson's RFI, dated February 15, 2005, at p. 73).

10.     These representations by IBM were not off the cuff, out of context, puffery. Rather IBM's representations were representations of fact made in responses to direct questions posed by Carlson in a formal "Request for Information" and "Request for Procurement," evidencing IBM's knowledge of and Carlson's reliance upon IBM's responses as material representations to Carlson. IBM knew that, by making such affirmative representations of fact of its present capabilities, Carlson would rely on IBM's representations and would presume that IBM was not lacking the requisite capabilities. IBM never corrected or clarified its prior misleading statements regarding its capabilities, and the truth about IBM's capabilities was something only IBM could or should have known.

11.     Based on this entire due diligence process, Carlson decided that it would outsource its transformation needs and, among other things, its core Services of Finance and Accounting (F&A) and Information Technology infrastructure management (IT). And it decided that IBM would be the selected partner. The Agreement between Carlson and IBM was entered into on August 31, 2005, effective the following day. The face-page of the Agreement itself

- 4 -

captured the fact that this was supposed to be a trusted, intimate arrangement, as it acknowledged that even the Agreement itself was proprietary to both Carlson and IBM.

12. Further, the Agreement demonstrated such trust in IBM in that Section 13.4 contemplated that IBM would receive and possess other "proprietary information" including information that is designated as "vital trust" information, and other information such as: (a) "Carlson Data," which is defined in Schedule A as including "data and information with respect to the businesses, customer, operations, facilities, products, rates, regulatory compliance, competitors, consumer markets, assets, expenditures, mergers, acquisitions, divestitures, billings, collections, revenues and finances of Carlson . . . ."; (b) "Carlson Personal Data," which is defined in Schedule A as "that portion of Carlson Data that is subject to any Privacy Laws, Carlson privacy policies, or is otherwise attributable to a named individual person, living or deceased"; (c) other "Proprietary Information" such as "materials and information identified as attorney-client privileged materials or attorney work product, customer lists, customer contracts, customer information, rates and pricing, information with respect to competitors, strategic plans, account information, rate case strategies, research information, chemical formulae, product formulations, plant and equipment design information, catalyst information, information identified as trade secrets, financial/accounting information (including assets, expenditures, mergers, acquisitions, divestitures, billings collections, revenues and finances), human resources and personnel information, marketing/sales information, business plans or operations, third party contracts, licenses, internal or external audits, law suits, regulatory compliance . . . plans for changes in Carlson's or an Eligible Recipient's facilities, business units and product lines, plans for business mergers, acquisitions or divestitures, rate information, plans for the development

- 5 -

and marketing of new products, financial forecasts and budgets, technical proprietary information, employee lists and company telephone or e-mail directories."

13.     IBM's prior representations gave Carlson no reason to question IBM's integrity or capabilities. Nor did the Agreement itself. Indeed, during contract negotiations and as confirmed in the Agreement IBM represented, warranted and covenanted that:

*"(i) the Services shall be rendered with promptness, due care, skill and diligence; and*

*(ii) the Services shall be executed in a workmanlike manner, in accordance with ......the best practices of leading providers of services that are the same as or similar to the Services;*

*(iii) IBM shall use adequate numbers of qualified individuals with suitable training, education, experience, know-how, competence and skill to perform the Services;*

*(iv) IBM shall provide such individuals with training as to new products and services prior to the implementation of such products and services in the Carlson/Eligible Recipients environment; and*

*(v) IBM shall have the resources, capacity, expertise and ability in terms of Equipment, Software, know-how and personnel to provide the Services."*

14.     With the promised expertise and capabilities of IBM solidified, Carlson also assured itself in the Agreement of IBM's honesty and integrity – given the fiduciary aspects of Carlson's business that IBM would be assuming, accordingly, IBM represented, warranted and covenanted that, in the performance of its work and obligations, it would comply with the Carlson Code of Ethics. By adopting Carlson's Code of Ethics, IBM agreed to conduct itself "in fairness and in honesty."

15.     But instead of bringing trust, expertise and capabilities to Carlson, IBM delivered the opposite. IBM lowered rather than raised service quality. IBM significantly increased rather than decreased business risk.  IBM eroded rather than improved operating processes.  IBM degraded rather than upgraded process discipline. IBM increased rather than lowered costs.

-6-

16.     The quality of services IBM provided to Carlson for both IT and F&A were so abysmal that in 2007, after just one year of IBM's services, Carlson commenced the termination of all of F&A services as well as certain critical IT functions. Carlson would eventually, as quickly as it could, wind down the remaining IBM services. In 2009 Carlson gave notice of final and complete termination -- five years prior to the expected 10 year term.

17.     Instead of providing the claimed expertise, capabilities, and trustworthiness, IBM failed to provide more than 30% of the IT and F&A services it contracted to provide. Even as to the F&A and IT services IBM did provide, many of these and most of the critical F&A and IT services IBM performed were not only performed inexpertly, these services were often performed incorrectly and were fundamentally lacking in reliability, capability and proficiency. In sum, they were not provided in an even minimally competent fashion. This is described in great detail in Exhibit A. Transformation was non-existent. IBM's work for Carlson was not just incompetent. More critically, IBM was not honest. Carlson was fraudulently induced into entering the Agreement based upon IBM's claimed expertise, capabilities and trustworthiness. But during the performance of the Agreement, IBM further defrauded and breached its fiduciary duties to Carlson. IBM prepared and sent monthly invoices to Carlson which reflected the fee for the work IBM was to have done during that time. IBM's invoices in no way revealed that it was not performing much of what IBM had agreed to do in the Agreement and associated documents. Only later would Carlson learn that the monthly fee for which IBM was billing Carlson made no deductions for work and products never provided by IBM.

18.     The discovery of this fraudulent invoicing led Carlson to look back at what IBM had earlier represented about IBM's previous experience. And what Carlson discovered was further fraud. As part of Carlson's diligence, IBM was specifically asked to disclose "all

- 7 -

significant litigations during the past 5 years and all pending litigations the company is party to"
and to state "whether the litigation involves outsourcing services provided by your organization
of the type contemplated by the Carlson in-scope areas." (Carlson's RFI, dated February 4, 2005,
at 10.)

19.    IBM's response in 2005 was that it was "not currently involved as a defendant in
any proceeding that could reasonably be expected to have a material adverse impact on IBM's
delivery of services to Carlson." (IBM's response to Carlson's RFI, dated February 15, 2005, at
20.)

20.    IBM's response did not disclose at least the following cases which were pending
against IBM at the time of the request to IBM and which involved allegations of fraud for the IT
services IBM was providing to these customers:

(1)   *Evans Industries, Inc. v IBM*, et al., Civil Action No. 01-0051 (E.D. La.)

(2)   *M. Block & Sons, Inc. v. IBM*, Civil Action No. 04C 0340 (N.D. Ill.)

(3)   *Irwin Seating Co. v. IBM*, et al., Civil Action No. 01:04-cv-00568 (W.D.
Mich.)

21.    IBM's fraudulent omission of at least these matters deprived Carlson of an
opportunity to ask others about these claims but, perhaps more importantly, underscores IBM's
intentionally misleading answers to what Carlson asked before it entered into the Agreement.

22.    IBM's fraud, by commission and by omission, and breaches of fiduciary duty and
of the Agreement caused enormous damage to Carlson, now determined to be well over $200
million with interest, the more specific breakdown of damages having been previously
communicated to IBM, in compliance with the Agreement, through a demand letter to IBM prior
to the filing of this Complaint.

23.    Carlson has complied with Section 19 of the Agreement in attempting to

- 8 -

informally resolve this dispute with IBM. Attached to this Complaint as Exhibit A is the 46-page

mainly single spaced letter delivered to IBM which sets out in great detail the basis for Carlson's

claims. This letter is incorporated by reference. In it, Carlson offered to meet with IBM to

attempt to resolve whatever dispute may exist if IBM denied Carlson's claim, suggesting that

this process should take no longer than 30 days, and requesting that if this is the course of action

IBM wishes to take, IBM should promptly contact Carlson to coordinate this process. Since over

$8 million was being held in escrow, as part of Carlson's claim for setoff of $13,391,749,

Carlson further stated that if IBM elected to engage in this dispute resolution process but was not

willing to release the funds held in escrow to Carlson, then Carlson required that this dispute

resolution process be expedited in accordance with Section 12.4(e) of the Agreement. While

IBM has asserted that Carlson is contractually obligated to pay such monies, Carlson denies such

claims and is not in breach of the Agreement because of Carlson's right to setoff and because

Carlson terminated for cause. Instead of expediting the dispute resolution process, only after 31

days had passed from the time IBM received Carlson's letter did IBM send a response which

comprised a demand for the monies withheld, a two sentence denial of Carlson's claims, with no

explanation, and an offer to meet. IBM failed to provide a good faith response and comply with

its Section 19.1 obligations to respond as required and negotiate in good faith in an effort to

resolve the dispute. During this same period, IBM used its procurement arm to threaten harm

against Carlson by informing Carlson's hotel business executives that, as a result of what IBM

referenced as "potential litigation": (1) IBM would not send Hotels owned, leased, managed or

franchised by wholly owned subsidiaries of Carlson, ("Carlson Hotels") the annual IBM RFP, as

IBM had in the past, pursuant to which Carlson Hotels have been and can again seek to be

approved as IBM preferred Hotels and, thus preventing Carlson Hotels from being approved for

- 9 -

calendar year 2011 and, (2) Carlson Hotels would be intentionally excluded from the opportunity to obtain normal meetings and events business. IBM is Carlson Hotels' single largest corporate client and, on information and belief, is the single largest purchaser of business travel in the world. IBM's conduct with respect to Carlson's wholly owned subsidiaries' hotel business relationships, which are completely unrelated to this dispute, was in direct response to Carlson exercising its legitimate legal rights as a result of IBM's fraudulent conduct described above. IBM had no other basis for its actions other than to economically damage Carlson. On information and belief, IBM's actions were taken for the sole purpose of bringing pressure to bear on Carlson by causing and threatening to cause Carlson's subsidiaries, their franchisees and owners of Carlson managed hotels, economic harm and undermining the relationships with them and prospective franchisees and Hotel owners. IBM has not only failed to negotiate in good faith, IBM has acted in bad faith and in contravention of the trust that Carlson placed in IBM throughout the relationship. IBM's actions with respect to Carlson Hotels will mean a significant loss of revenue for Carlson Hotels and are extremely harmful to Carlson's business reputation and the relationships Carlson and its subsidiaries have with these independent hotel owners. IBM has breached its Section 19.1 obligations, and its obligations to act in good faith with Carlson. As a result, IBM has forgone and waived its Section 19.1 rights, and under these circumstances IBM must be held accountable for its actions.

## CAUSES OF ACTION

### COUNT I: FRAUDULENT INDUCEMENT

24.     Carlson restates and realleges all foregoing allegations contained in this Complaint.

25.     As described above, IBM: (i) made specific representations of present facts to Carlson; and (ii) concealed facts, which as to (i) and (ii) were both susceptible of knowledge on the part of IBM, on the dates indicated to induce Carlson to enter into the Agreement.

26.     IBM's representations described above were false, and the non-disclosures were misleading. On information and belief, IBM either knew that the representations were false, and knew that the non-disclosures were misleading, when it made them or made the representations as of its own knowledge without knowing whether they were true or false.

27.     On information and belief, IBM intended for Carlson to rely and to act on the representations and non-disclosures.

28.     IBM's representations and non-disclosures were material to Carlson, and justifiably and reasonably relied upon by Carlson. Carlson was induced into the Agreement by the representations and non-disclosures described above. IBM is estopped from denying that these representations and non-disclosures were material or relied upon by Carlson.   The representations were provided as part of a formal Request for Information and RFP process, and during contract negotiations, in which IBM appreciated or should have appreciated the gravity and solemnity with which the questions and the materiality of the answers presented.

29.     As shown by its requests for the representations, and by entering into the Agreement, Carlson intended to and did rely on IBM's representations, and Carlson intended to and did rely on IBM's omission of the truth on the presumption that the facts did not exist. As explained above, IBM failed to deliver the expert services it promised, including failing to perform more than 30% of the F&A and IT services it had contracted to provide and even as to the F&A and IT services IBM did provide, many of these and most of the critical F&A and IT services IBM performed were not only performed inexpertly, these services were often

- 11 -

performed incorrectly and were fundamentally lacking in reliability, capability and proficiency. In sum, they were not provided in an even minimally competent fashion. This is described in great detail in Exhibit A. Transformation was non-existent. Had IBM· told Carlson it was not competent to provide the services, would not bring its expertise to the Carlson project and would lie to Carlson in invoicing, for example, Carlson would not have entered into the Agreement with IBM but would have undertaken the transformation on its own.

30.     As a direct, foreseeable, and proximate result of IBM's conduct, Carlson has sustained injury in excess of $50,000, the more specific breakdown having been previously communicated through the attached demand letter to IBM prior to the filing of this Complaint, and the actual amount to be fully determined by the Court at trial.

## COUNT II: FRAUD IN PERFORMANCE

31.     Carlson restates and realleges all foregoing allegations contained in this Complaint.

32.     As described above, IBM made false material representations of fact, by omission, to Carlson in its monthly Invoices that IBM sent to Carlson from 2006 through 2009. IBM's representations were susceptible of knowledge on the part of IBM.

33.     IBM's representations were false in that IBM's Invoices billed Carlson for the monthly fee but in no way indicated a deduction for services and products that had not been provided by IBM.

34.     On information and belief, IBM knew or should have known at the time it prepared and sent the Invoices to Carlson that the false and misleading invoices represented amounts for which IBM had not provided services and products, or prepared and sent the Invoices as of its own knowledge without regard to whether they were true or false.

-12-

81610494.1

35.   On information and belief, IBM prepared and sent the false and misleading invoices with the intention that Carlson would rely on and be induced to act on the invoices and would pay IBM for the stated amounts.

36.   In justified and reasonable reliance on the truth of IBM's false and misleading invoices, Carlson made payments to IBM.

37.   As a direct, foreseeable, and proximate result of IBM's misrepresentations, Carlson has sustained injury in the amount of $75.8 million, not including interest or attorneys fees for this litigation, the actual amount being reasonably ascertainable at the time and having been previously communicated through a demand letter to IBM prior to the filing of this Complaint, and the actual amount to be fully determined by the Court at trial.

## COUNT III: BREACH OF CONTRACT FOR FAILURE TO PROVIDE AGREED UPON SERVICES AND PRODUCTS, FOR BREACH OF CODE OF ETHICS AND BEST PRACTICES AND FOR OVERCHARGES

38.   Carlson restates and realleges all foregoing allegations contained in this Complaint and asserts this Count in the alternative.

39.   The Agreement between IBM and Carlson was entered into effective September 1, 2005.

40.   IBM has failed to perform its obligations under the Agreement and breached the Agreement by not providing the services and products it agreed to provide and by overcharging and invoicing Carlson for services not provided.

41.   IBM's failures constitute material breaches under the Agreement.

42.   In addition, IBM represented, warranted and covenanted that it would comply with the Carlson Code of Ethics, including that it would conduct itself "in fairness and in honesty."

- 13 -

81610494.1

43.     IBM materially breached this representation, warranty, and covenant through IBM's words and actions, and omissions and inactions, described above.

44.     In addition,   IBM agreed to use industry best practices and policies and procedures as outlined in the agreed upon Policy and Procedure Manual. IBM breached those obligations at least as follows:

a)     IBM failed to implement a consistent Release Management process, which led to servers with old operating systems unable to be 'patched' in order to prevent information security attacks.

b)     IBM failed to follow Asset Management processes, resulting in incomplete documentation describing the environment and, making it impractical for personnel to perform their role consistently and efficiently.

c)     IBM failed to follow industry standard Configuration Management processes, resulting in inaccurate information about components directly leading to increased down-time, increased security risks, and overcharges for decommissioned servers.

d)     IBM failed to conduct industry standard Change Management processes leading to chronic failure of changes and business disruption.

e)     IBM failed to conduct industry standard Problem Management processes that prevented discovery of root causes and resolution of chronic problems.

f)     IBM failed to perform industry standard Capacity Management processes allowing Carlson IT infrastructure components to fail due to reaching capacity limits.

g)    IBM failed to build servers to documented specifications leading to inefficient performance, additional downtime, and increased risk to Carlson business operations.

h)    IBM failed to follow Best Practices and other processes agreed to in the Policy and Procedures Manual including, but not limited to Database Management, Backup & Recovery, Procurement, Security Management, Software Distribution, and Tape Operations.

45.    These breaches were material to the performance of the Agreement.

46.    IBM's failure to meet these obligations represents not only a breach of the contract, but willful, wanton and intentional misconduct.

47.    As a direct, foreseeable, and proximate result of IBM's breaches, Carlson sustained injury in excess of $50,000, the actual amount having been previously communicated through a demand letter to IBM prior to the filing of this Complaint, and the actual amount to be fully determined by the Court at trial.

48.    Carlson has further sustained uncapped monetary injury for breach of contract in the amount of $75.8 million under Section 18.3 of the Agreement for invoiced charges that Carlson was not obligated to pay under this Agreement because such charges are attributable to services not provided by IBM, the actual amount to be fully determined by the Court at trial.

## COUNT IV: FRAUDULENT INDUCEMENT INTO A FIDUCIARY RELATIONSHIP AND FRAUDULENT BREACH OF FIDUCIARY DUTIES

49.    Carlson restates and realleges all foregoing allegations contained in this Complaint.

50.    IBM knew full well, or should have known as a result of its due diligence, that the work it wanted to and did undertake for Carlson represented the lifeblood of Carlson's business.

81610494.1

The power, authority and discretion which IBM induced Carlson to give IBM and which IBM assumed from Carlson placed Carlson in a vulnerable and inferior position as to knowing how its most critical functions were being treated or mistreated. Carlson would never have allowed IBM to assume such a role had IBM told Carlson that it could not be trusted.

51.     The unique nature of the business arrangement created between IBM and Carlson constitutes a fiduciary relationship. As part of this fiduciary arrangement, IBM gained access to and became responsible for the planning, operation, and execution of some of Carlson's most critical business functions and outside relationships. In undertaking these services, IBM replaced hundreds of capable, loyal, honest and trusted employees at Carlson, each of whom was obligated to comply with Carlson's Code of Ethics. To accomplish its takeover of Carlson's business, IBM represented, covenanted and warranted in Section 15.7 (b) of the Agreement that it would comply with the same standards of ethics as the hundreds of Carlson employees it would replace, including the basic code of honesty.

52.     Carlson placed its special trust, confidence, and reliance on IBM in this regard. IBM knowingly accepted this special trust, confidence, and reliance and gave Carlson no reason to believe otherwise. As a fiduciary, therefore, IBM owed Carlson the utmost duty of trust, loyalty, good faith and care in performing its obligations, using its discretion and represented greater knowledge and expertise.

53.     IBM not only breached its fiduciary duties to Carlson, but induced Carlson to enter into this fiduciary arrangement with IBM based upon its claims of trustworthiness, capabilities and expertise, and the fraudulent inducement described above. IBM pulled Carlson into an arrangement through its fraudulent representations, by commission and by omission, where Carlson trusted IBM and paid IBM hundreds of millions of dollars based upon that trust.

- 16 -

What Carlson received back was a byzantine and myriad series of shocking failures, fraud, bad faith conduct, and breaches. IBM's response when confronted with this truth was denial, arrogance and a further abuse of power notwithstanding the fact that IBM had been at the time a fiduciary, impressed with the duties of loyalty, fairness, and to act in good faith.

54.    IBM's breach of fiduciary duties includes, but is not limited to, IBM's fraudulent misrepresentations and non-disclosures regarding its capabilities to meet Carlson's specific goals and objectives and IBM's false Invoice billings to Carlson for services and products that had not been provided by IBM. The breaches of its fiduciary duties by IBM were fraudulent, willful, wanton and constitute intentional misconduct.

55.    Further, during this fiduciary relationship, IBM defrauded Carlson through the acts and omissions previously alleged above. Not only would this constitute fraud for a mere provider of services; as a fiduciary, IBM is held to an even higher standard of care. As a fiduciary, IBM owed Carlson duties, including a duty of loyalty, trust, and good faith. IBM not only breached its fiduciary duties, IBM committed fraud in so doing.

56.    IBM's inducement of Carlson into this fiduciary relationship with the attendant and utmost duties of trust, loyalty, and care, created the utmost duty on IBM to be fully forthcoming and truthful in its representations to Carlson.

57.    As a direct and proximate result of IBM's breach of fiduciary duties and its fraudulent inducement of Carlson into this fiduciary relationship, Carlson has suffered damage in excess of $50,000, and in an amount to be determined by the Court at trial considering the lost value of assets, the profit of which Carlson was deprived, and the improper financial gains and ill-gotten profits of IBM.

-17-

## COUNT V: DECLARATORY JUDGMENT

58.      Carlson restates and realleges all foregoing allegations contained in this Complaint.

59.      This action is within the jurisdiction of this Court and Carlson is entitled to declaratory judgment under the Minnesota Declaratory Judgment Act, Minn. Stat. § 555.01 et seq., and applicable law.

60.      Under Section 12.3 of the Agreement, "[w]ith respect to any amount to be paid or reimbursed by Carlson . . . Carlson may set off against such amount any amount that IBM is obligated to pay Carlson . . . provided that IBM notifies IBM in writing of the amount and basis for such set off."

61.      Under Section 12.4 of the Agreement, "Carlson may withhold payment of particular Charges that Carlson reasonably disputes in good faith" provided that Carlson notifies IBM and provides a description of the particular Charges in dispute and an explanation of the reason why Carlson disputes such Charges. Further, under Section 12.4, if such withheld Charges reach a threshold amount, any excess amounts disputed by Carlson shall be placed in an interest-bearing escrow account pending resolution of the dispute.

62.      After Carlson gave IBM notice of termination, IBM continued to charge Carlson for all of the services Carlson was forced to take back and IBM ceased to provide by the end of 2009. In addition, IBM sought payment of termination charges for services not yet terminated. When Carlson objected, IBM threatened to terminate ongoing ERP services, knowing that Carlson was not then in a position to undertake these services itself. Rather than risk this disastrous result, pursuant to and in compliance with Section 12.4 of the Agreement, Carlson placed into escrow $8,260,009 in disputed charges for services Carlson was performing

- 18 -

and termination charges for services not yet terminated in excess of a threshold amount of $5,131,740.

63.     On May 14, 2010, in the letter described in paragraph 23 above and attached hereto as Exhibit A, and pursuant to and in compliance with Section 12.3 of the Agreement, Carlson notified IBM that its claims, losses and rights of recovery set forth in the letter form the basis for Carlson's claim for setoff of $13,391,749 of which $8,260,009 is held in Escrow.

64.     IBM claims that Carlson is in breach of contract for, among other things, non-payment of funds based upon this withholding and escrow.

65.     Carlson has fully complied with every provision of the Agreement and is not in breach and has not breached the Agreement.

66.     This action presents a ripe and justiciable controversy because a genuine and present and continuing dispute and controversy exists between Carlson and IBM, parties with truly concrete and adverse interests, with respect to whether Carlson has the right to set off against IBM's Charges and escrow disputed funds, as described above, and otherwise fully complied with the terms of the Agreement.

67.     Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

68.     For the reasons explained above, the Court should enter an Order that, based on IBM's conduct and the circumstances of this case, Carlson is entitled to set off against IBM's Charges and escrow disputed funds, as described above, and that Carlson is not in breach of any provision of the Agreement based on such set off and escrow of disputed funds.

WHEREFORE, Carlson hereby requests that this Court grant the following relief:

81610494.1

1.     Awarding to Carlson and assessing against IBM damages in an amount to be determined at trial in excess of $50,000 as well as an equitable amount to be determined by the Court in its discretion;

2.     Awarding to Carlson and assessing against IBM damages in the amount of $75.8 million for overcharges and breach of contract;

3.     Declaring that based on IBM's conduct and the circumstances of this case, Carlson is entitled to set off against IBM's Charges and escrow disputed funds, as described above, and that Carlson is not in breach of any provision of the Agreement based on such set off and escrow of disputed funds;

4.     Awarding to Carlson and assessing against IBM interest, costs, disbursements, and reasonable attorneys' fees incurred in connection with this action; and

5.     Awarding Carlson such other and further relief the Court deems just, equitable, and proper.

Dated: July 22, 2010                    **ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

                                        By: _____
                                        Martin R. Lueck (MN# 155548)
                                        David W. Beehler (MN# 190792)
                                        Christopher A. Seidl (MN# 313439)

                                        2800 LaSalle Plaza
                                        800 La Salle Avenue
                                        Minneapolis, MN 55402
                                        Telephone: (612) 349-8500
                                        Facsimile: (612) 339-4181

                                        **Attorneys for Carlson, Inc.**

- 20 -

81610494.1

## ACKNOWLEDGEMENT REQUIRED BY
## MINN. STAT. § 549.211, SUBD. 2

The undersigned hereby acknowledges that, pursuant to Minn. Stat. § 549.211, subd. 2, costs, disbursements, and reasonable attorney and witness fees may be awarded to the opposing party or parties in this litigation if the Court should find the undersigned acted in bad faith, asserted a claim or defense that is frivolous and that is costly to the other party, asserted an unfounded position solely to delay the ordinary course of the proceedings or to harass, or committed a fraud upon the Court.

Dated: July 22, 2010

_____
Attorney for Carlson, Inc.

- 21 -

81610494.1



CARLSON

IBM Global Services                                    May 14, 2010
650 3rd Ave S
Minneapolis, MN 55402
Attention: IBM Project Executive


IBM Global Services General Counsel
Route 100
Somers, NY 10589
. Attention: IBM Global Services General Counsel

> Subject: Claims made pursuant to the Dispute Resolution Process set out in the Master
> Services Agreement (the "MSA") effective as of September 1, 2005 between Carlson
> Companies, Inc. ("Carlson") and International Business Machines Corporation ("IBM"),
> as amended

Dear Sir or Madam:

Set out below are our claims against IBM related to the MSA and a description of the basis
therefor.

## SUMMARY

In the Fall of 2004, Carlson was in the process of evaluating how best to install and operate new,
sophisticated financial technology software, Enterprise Resource Planning ("ERP") and
transform its finance and accounting ("F&A") services and technology infrastructure
management ("IT") services. As part of this process, Carlson engaged expert consultants, issued
Requests for Information ("RFI"s) and Requests for Proposals ("RFP"s) to and conducted due
diligence reviews of several outsourcing providers. IBM was one of the companies considered.

Seeking to obtain a long term agreement and hundreds of millions of dollars in fees, IBM
endeavored to induce Carlson to outsource all of these services and award this business to IBM.
To this end, IBM made various claims as to its expertise, including claims of transformative
expertise and that it could not only effectively and better manage, but accelerate the planned and
desired improvements in these critical and essential operations, which Carlson had no reason to
doubt.

-1-

Relying on the claims of IBM as to its expertise and capabilities, Carlson entered into this ten year outsourcing agreement for IT, F&A and ERP services with IBM in late August of 2005, an agreement that would generate hundreds of millions of dollars for IBM.

However, IBM failed to deliver the expert services it promised. In fact, IBM failed to perform a significant fraction of the F&A and IT services it had contracted to provide, at all. Even as to the F&A and IT services IBM did provide, many of these and most of the critical F&A and IT services IBM performed were not only performed inexpertly, these services were often performed incorrectly and were fundamentally lacking in reliability, capability and proficiency. In sum, they were not provided in an even minimally competent fashion. The problems caused by IBM's inadequacies were so great and of such grave risk to the enterprise that:

- Carlson was forced to notify IBM that it would take back all of the finance and accounting services and most of the highly skilled IT services, less than two years into the agreement and give notice of termination of the entire contract before four years.

- Carlson found it necessary to take this drastic action notwithstanding the fact that Carlson no longer had the hundreds of qualified and experienced people necessary to perform these complex tasks, would suffer transition costs in the millions and risk incurring early termination penalties under the MSA.

Rather than enabling Carlson to achieve cost savings and take advantage of potential business opportunities, realignments, and emerging technologies with respect to IT and F&A, IBM precluded Carlson from achieving any improvement in systems, technology and costs, during the period IBM provided IT and F&A services.

As to the IT and F&A services, IBM's claims proved to be unequivocally misleading. Under Minnesota law, the applicable law under the MSA, misrepresentations describing the qualities of services or products to be delivered, especially when made by an expert like IBM, constitute fraudulent misrepresentations.

In addition, IBM submitted materially misleading invoices. IBM charged Carlson for and Carlson paid more than $75 million for services and equipment IBM was to have performed and provided and did not.

As a direct consequence of IBM's fraud, Carlson suffered losses, which, including the fraudulent $75 million overcharges and interest, exceed $226 million.

IBM fraudulently induced Carlson to permit IBM to serve as a fiduciary. IBM was not honest and it fraudulently breached its fiduciary duties. Carlson is, therefore, alternatively, entitled to recover IBM's improper financial gains with respect to the IT and F&A services under the MSA, which, with interest, amount to $301 million.

What follows is a description of the context for this matter, the role of the outsource provider as a fiduciary, the claims and promises IBM made to induce Carlson to enter into the MSA and this fiduciary relationship, the reliance Carlson placed in IBM as a result of these promises as

Carlson entered into the MSA, Carlson's experience under the MSA, IBM's fraudulent acts and omissions and the losses suffered by Carlson as a result. In addition Appendix I provides greater detail of the type of problems caused by IBM and Appendix II provides greater detail on the losses Carlson suffered as a result of IBM's fraud. And attached is a draft complaint based on these facts.

## I   Background

In late 2004, Carlson was seeking to improve its business processes. As part of this transformation effort, Carlson was in the process of centralizing F&A[1] and IT[2] and planned to install a sophisticated ERP system to manage and assist with its F&A processes.

One key consideration was whether Carlson should outsource any elements of these operations or the transformation and provision of all these services to better effect and more rapidly complete this transformation and improve and increase the cost effectiveness of these operations. However, the latter course of action would mean (i) placing the transformation and operation of these highly complex, large volume services, services absolutely essential to the functioning of the enterprise, into the hands of a third party; (ii) entering into a $100 million per year outsourcing contract, and (iii) eliminating the positions for five hundred highly skilled, experienced and trusted professionals.

The determination as to whether to outsource and the selection of any such outsource provider was a very significant decision for Carlson.

Such an outsourcing decision, once made, would be very problematic to reverse and carry with it tremendous inertia against a change of course, for the following reasons:

- This outsourcing would result in the elimination of the positions of five hundred experienced and long time Carlson professionals. Such a loss of talent and experience

---

[1] At the time, Carlson comprised one of the world's largest business travel management companies, a large leisure travel business, a major, global, hotel enterprise, a large, international chain of owned and franchised restaurants, one of the world's largest marketing companies and a luxury cruise business. The annual gross revenues of Carlson's separate businesses ranged, from tens of millions to tens of billions of dollars. F&A systems processed, tracked, controlled and properly accounted for a constant and significant stream of payments, charges and other related transaction fees and costs, on a real-time basis, to serve customers, ensure accurate books of account and to provide necessary support to each business unit.

[2] Technology was and is a key component of Carlson's business. IT infrastructure, computers, networks, software and other components, and associated services are the foundation from which business functionality and business process automation are enabled. At Carlson, as with most businesses today, technology capability is at the center of nearly all business processes and customer interaction. Much of Carlson's business required an ability to provide service to its customers, in real-time. Such service obligations, whether to create a travel itinerary, make a reservation for a hotel guest, facilitate redemption of loyalty points, obtain supplies for restaurants, pay suppliers and employees, meet information security requirements or meet contractual commitments, require stable and reliable technology at all times.

would mean that (i) it would be extremely difficult and take years for Carlson to take back these services and recreate the proper processes and operating environment, and (ii) in any such circumstance, there would be significant uncertainty as to when they could again be performed reliably and at what cost. These factors in and of themselves would pose tremendous barriers to terminating such a massive outsourcing arrangement.

This was even more critical, if IBM were to be selected, because:

- IBM would only enter into an agreement which called for the imposition of significant penalties for early termination for all or a portion of the services; and,

- A partial take back of services would result in cost increases for the remaining services, as IBM's overhead was spread over a reduced group of services.

All of this meant that Carlson would have to place great trust in whomever Carlson chose as an outsourcing provider, especially if IBM were to be the party selected.

## II  Fiduciary Status

Among other responsibilities, the outsourcing service provider was to take responsibility for the following:

- The lifeblood of the organization, the timely, accurate and reliable provision of these critical and essential IT and F&A services;
- Replacing the work of hundreds of capable, experienced, skilled and loyal employees of Carlson;
- Transforming the provision of these services to foster and enable Carlson's competitive position;
- Managing, controlling and handling billions of dollars annually of Carlson's and its clients' funds as IBM independently issued invoices, received payments, processed invoices, made payments and had the responsibility to reconcile these accounts on behalf of Carlson and its clients;
- Countervailing accounting controls;
- The security of hundreds of millions of Credit Card numbers;
- IT security;
- Passwords for all of Carlson's IT systems under the control of IBM;
- Ensuring Payment Card Industry ("PCI") security compliance; and,
- Protecting the confidentiality of Carlson's and its client's proprietary and trade secret information, including customer facing IT systems.

The position IBM sought was one in which IBM was to literally hold the keys to Carlson's technology, operations and treasury. This was a position of great trust in which the provider of these services would clearly act as a fiduciary. Among other fiduciary responsibilities, the service provider would owe Carlson a duty of loyalty, complete trust and utmost good faith, including performing its functions with a high level of competence and thoroughness and to manage these services with competence and expertise, in the best interests of Carlson.

### III  IBM's Claims and Promises

#### A.  Capability and Expertise

In the course of trying to convince Carlson to outsource and award this business to IBM and enable IBM to obtain hundreds of millions of dollars in fees, IBM represented that it had (i) the expertise and capabilities to provide these large, complex and essential services on time and as required, (ii) the requisite transformative expertise, and (iii) the ability to accelerate this transformation process. Some of IBM's factual claims, representations, assurances, pledges, guarantees and declarations in this regard are set out below:

- Its *"value proposition to Carlson will include providing equal to or higher quality service at a lower cost than the client can deliver internally."* (IBM's response to Carlson's RFI, dated February 15, 2005, at p. 7);

- *"...we would continue the transformation of the finance and accounting operations using the numerous tools and techniques from our consulting expertise and by applying the operational scale and excellence of our BTO[3] delivery organization."* (IBM's response to Carlson's RFI, dated February 15, 2005, at p.7);

- *"IBM has developed a comprehensive approach and solution for the outsourcing of Carlson's Information Technology. Our approach will satisfy the current needs and will position Carlson to take advantage of potential business opportunities, realignments, and emerging technologies."* (IBM's response to Carlson's RFP, "Infrastructure Services Solution Summary", dated May 11, 2005, at p. 9);

- It would *"provide Carlson with a solution that fully meets your overall objectives in terms of savings, business transformation, speed, quality, controls, service levels, employee sensitivity and future flexibility."* (IBM's response to Carlson's RFI, dated February 15, 2005, at p. 13);

- *"Success in achieving target savings and results is not an option with IBM; it is a given."* (IBM's response to Carlson's RFI, dated February 15, 2005, at p. 13);

- *"IBM's capabilities... can not be surpassed . . ."* (IBM's response to Carlson's RFI, dated February 15, 2005, at p. 14);

- *"IBM is uniquely positioned to deliver the full scope described in the RFI and thus the selection of IBM as a single vendor will mitigate or eliminate the potential adverse impact on Carlson..."* (IBM's response to Carlson's RFI, dated February 15, 2005, at p. 14);

---

[3] BTO stands for business transformation outsourcing.

- *"IBM is the only company able to provide leading expertise in all of the scope areas under consideration."* (IBM's response to Carlson's RFP, "Executive Summary - Total Solution", dated May 11, 2005, at p. 4);

- *"IBM's proposed solution will accelerate the transformation of Carlson's IT operations."* (IBM's response to Carlson's RFP, "Infrastructure Services Solution Summary", dated May 11, 2005, at p. 6).

- IBM also represented, warranted and covenanted in Section 15.1 of the MSA that:

  *"(i) the Services shall be rendered with promptness, due care, skill and diligence; and.*

  *(ii) the Services shall be executed in a workmanlike manner, in accordance with ......the best practices of leading providers of services that are the same as or similar to the Services;*

  *(iii) IBM shall use adequate numbers of qualified individuals with suitable training, education, experience, know-how, competence and skill to perform the Services;*

  *(iv) IBM shall provide such individuals with training as to new products and services prior to the implementation of such products and services in the Carlson/Eligible Recipients environment; and*

  *(v) IBM shall have the resources, capacity, expertise and ability in terms of Equipment, Software, know-how and personnel to provide the Services."*

As part of the bidding and negotiation process, IBM conducted an in-depth review of the operations to be transformed and outsourced. In the course of the negotiations with Carlson, IBM represented that it had carefully reviewed Carlson's requirements and performed all due diligence it deemed necessary. These claims were made with full knowledge of Carlson's F&A and IT needs and operations or were never modified on the basis of what IBM later learned.

## B. Trustworthiness

In making these claims and in seeking this position of great trust, this fiduciary responsibility, IBM represented:

- *"For nearly 100 years, the IBM name has stood for trust and integrity in all that we do."* (IBM's response to Carlson's RFI, dated February 15, 2005, at page 73);

- *"Our BTO (business transformation outsourcing) strategic statement is unambiguous and reads as follows:*

    *We will be the Global leader, trusted to collaborate with our clients to transform their businesses and trusted to operate portions of their value chains to drive*

*significant sustainable business performance improvements."* (IBM's response to Carlson's RFI, dated February 15, 2005, at page 22);

- *IBM would comply with the same standards of ethics as the hundreds of Carlson employees it would replace.* Section 15.7 (b) of the MSA. Among other things, the Carlson Code of Ethics requires simple honesty.

As part of Carlson's due diligence process Carlson asked IBM to "list ........ all pending litigations the company is party to and specify whether your company is the plaintiff or defendant." At the time of receiving Carlson's RFI, IBM was a defendant in the following cases:

- *Evans Industries, Inc. v IBM, et al., Civil Action No. 01-0051 (E.D. La.)*
- *M. Block & Sons, Inc. v. IBM, Civil Action No. 04C 0340 (N.D. Ill.)*
- *Irwin Seating Co. v. IBM, et al., Civil Action No. 01:04-cv-00568 (W.D. Mich.)*

Each of these cases involved allegations of fraud against IBM arising out of the IT services it provided to these customers. Such allegations are by their very nature material to the issue of trust. However in response to this due diligence question, to "list ........ all pending litigations the company is party to...." IBM did not list these cases. Instead, IBM provided this unresponsive and misleading answer:

"IBM is not currently involved as a defendant in any proceeding that could reasonably be expected to have a material adverse impact on IBM's delivery of services to Carlson."

Carlson was unaware that IBM was a defendant in any of these cases.

## IV  Reliance

In addition to receiving IBM's claims and reviewing IBM's responses to Carlson's RFI and RFP, Carlson:

- Conducted an in-depth due diligence review of IBM, site visits and reference checks, none of which contradicted IBM's claims and promises;
- Allowed IBM full access to Carlson's facilities, operations and staff;
- Engaged a leading consultant on outsourcing, Technology Partners International, to assist in the selection process and in setting up this outsourcing arrangements; and,
- Proposed and negotiated detailed Service Level Agreements ("SLAs") and statements of work ("SOWs").

Carlson did not learn anything that called into question IBM's claims.

Carlson had every right to trust what IBM said with respect to expertise, capabilities and its trustworthiness, and to presume that, if there were any issues, IBM would be totally candid with respect thereto. Certainly Carlson had no reason to doubt that IBM could do what it claimed and had no reason to presume that IBM lacked the requisite expertise and capabilities. Therefore,

relying on these claims and understandings, Carlson entered into the MSA and IBM undertook its role as a fiduciary.

Carlson would never have entered into the MSA without such a belief and understanding. IBM's expertise, capabilities and its trustworthiness were an absolutely fundamental requirement and material to Carlson and a transaction of this nature.

## V  Summary of MSA Experience

### A.  *General Experience*

Carlson paid IBM more than $300 million under the MSA. In addition, after a costly transition period in which Carlson was required to pay IBM millions for preparing to undertake these services and incur millions in transition costs itself, Carlson found that it had to retain a large staff to supplement and backup IBM, because IBM proved to be incapable of providing these essential F&A and IT services as required by the MSA. The additional costs incurred by Carlson in this context were in excess of $14 million.

IBM performed less than 70% of the IT services IBM contracted to provide and failed to perform many F&A services.

Even as to the F&A and IT services IBM did provide, many of these and most of the critical F&A and IT services IBM performed were, not only performed inexpertly and not capably, these services were not rendered with even minimal competence.

Instead of bringing expertise to meet all of Carlson's transformational and performance objectives, IBM actually delivered the opposite. IBM:

- Did not provide the promised transformation;
- Instead of improving, service quality; service quality declined significantly;
- Significantly increased, instead of decreasing, business risk;
- Abandoned, instead of improving, operating processes;
- Eliminated, instead of improving process discipline; and,
- Increased, instead of reducing, Carlson's costs.

The end result, not only did IBM fail to introduce process transformation, it did not implement and follow standard industry practices, leading to one failure after another.

### B.  *F&A Failures*

These failures occurred notwithstanding in excess of $6 million spent by Carlson in supplementing work IBM was solely responsible to perform.

A few examples:

- Solely as a result of IBM's inability to perform the most basic of accounting services, simple account reconciliation, Carlson's outside auditor, Deloitte & Touche issued a *finding of a material weakness* with respect to internal financial controls, in its fiscal year 2006 audit report for Carlson – the only such finding, ever, in Carlson history.

- In addition IBM:

  o Failed to make payroll on a Carlson cruise ship.
  o Erroneously sent a $1.8 million check to a local lawn service.
  o Failed to pay wage garnishments, causing a sheriff to threaten to close a Carlson restaurant.
  o Processed a batch of payments twice, including payments to hotels in China, resulting in duplicate payments of $5.7 million.
  o Repeatedly attached backup detail of one client's invoices to the invoice of another client which was a competitor, revealing confidential, sensitive pricing information of one of Carlson's customers to its major competitor.
  o Incorrectly stated lease related expenses by millions of dollars due to recording expenses twice and other related accounting errors.
  o Forced a $1.7 million write-off to Carlson because leases were not properly set up in the lease accounting system.
  o Failed to pay property taxes leading to threatened seizure of restaurants by taxing authorities.
  o Did not respond to 1099 reporting error notices resulting in the IRS levying fines for 161 reporting errors.
  o Did not deposit or record hundreds of refund checks from vendors.
  o From March '06 through December '07, IBM missed more than 20% of its performance measurement commitments for F&A; and,
  o Did not perform a significant and substantial fraction of its contracted duties, while charging for them.

Additional details of some of these and other major performance failures are set out in Appendix I.

## C. *IT*

IBM, through its profound failures, froze Carlson's IT capabilities in time, preventing Carlson from obtaining the proficiencies required to grow its business and performing the most basic functions required to service its existing businesses and customers. These failures occurred notwithstanding over $8 million spent by Carlson in supplementing IBM's efforts.

1.   Service Level Agreement (SLA) Failures

From March '06 through December '07, IBM missed 393, 20%, of the SLA performance measurements IBM had carefully negotiated. Of the 393 SLA breaches in this two year period, 73 were with respect to Critical Service Levels.

In most IT dependent companies, such as Carlson, 2-3 Critical Service Levels (those service levels, which if not met, would significantly and adversely impact the company's business and customers) errors a year would be viewed as a major failure of the IT organization. IBM's Critical Service Level failures were more than 12 times greater. These critical problems included major outages of Carlson's entire hotel reservation system, the customer database for Carlson Wagonlit Travel, the world's largest business travel management company, and Carlson's core financial system.

Compounding these problems, IBM was slow in responding to, and, in many cases, incapable of resolving service failures in a timely manner.

In some cases, IBM created the problem by not following its own standard operating procedures.

Instead of an improvement, IBM's performance represented an intolerable decrease in the stability of Carlson's environment.

2.   Information Security Failures

IBM failed to secure Carlson's environment as prescribed by Carlson's Information Security Framework (ISF). As a result, Carlson was exposed to significant business risk due to the lack of IBM's ability to maintain fundamental operating procedures such as ensuring authorized user access to critical systems.

There are numerous examples where fundamental security controls were not in place, such as:

- Anti-virus (AV) software on all computing devices (some of these were internet facing posing an even greater security threat) was not up to date despite IBM's representation in the fourth quarter of 2007 that it was 100% compliant.
- IBM did not deploy patches to computing devices on a timely basis to close known security gaps, unnecessarily exposing Carlson data to hackers.
- In many cases IBM utilized equipment that was beyond its useful life with no ability to close the security gaps.
- IBM had 30,000+ system access IDs that could not be linked to a valid user or a current employee; and,
- There was no active monitoring of the Active Directory (AD) infrastructure or vulnerability scanning against the domain controllers.

In sum, the state of security for which IBM was responsible was grossly inadequate. Additional examples are set out in the Appendix.

3.  Basic Management Practice Failures.

IBM promised to transform and improve Carlson's technology environment by employing industry best processes and practices as documented within the Policy and Procedure Manual (PPM). However, IBM generally failed to implement contracted process management practices, including the following processes:

- Consistent Release Management;
- Asset Management;
- Industry standard Configuration Management;
- Industry standard Change Management;
- Industry standard Problem Management;
- Industry standard Capacity Management; and,
- Building servers to documented specifications.

In addition, IBM failed to follow the processes agreed to and specified in the Policy and Procedures Manual including those relating to: Database Management, Backup & Recovery, Procurement, Security Management, Software Distribution, and Tape Operations. Details of these failures are set out in the Appendix.

These management failures caused and contributed to many of the IT system instability issues, a vulnerable security environment and a complete failure to improve and transform IT processes.

4.  Failure to Provide Contracted Services

IBM provided a mere two thirds of the IT services it committed to provide in the first two years of the MSA and less than 75% in the following year, after a major take back of IT services, by Carlson. (Details of these undelivered services are set out in the Appendix).

In general, the services IBM did not provide were services which required the highest levels of skill.

IBM charged Carlson as if it fully performed all services and the services IBM failed to perform were mainly backroom and/or administrative services, most of which were not visible to Carlson. Carlson had no reason to believe that IBM was billing for work it had never done or never intended to complete.

## VI  Take Back

Notwithstanding Carlson's supplementation and remediation efforts, IBM's failures were so damaging, widespread and recurring that Carlson was forced to take back all F&A and some of the most critical IT services in 2007, followed by a complete take back of all IT services by the end of 2009. Carlson was forced to take these steps, despite the sunk costs, termination charges, the costs of termination and transition, and the significant uncertainty and the difficulty of estimating the replacement costs to do so and associated with taking back these essential services without the hundreds of skilled and experienced employees who used to manage and perform these services.

## VII   CLAIMS

Carlson is entitled to recovery from IBM for the following causes of action:

### A.  Fraud in the Inducement

IBM fraudulently induced Carlson to enter into the MSA both through intentional misstatements and fraudulent nondisclosure by not correcting the record and not disclosing, something only IBM could or should have known - when it came to providing both F&A and IT services - IBM did not know that it would be able to supply just the expertise and ability to simply provide these services or knew that it probably could not.

### B.  Fraud in the Performance

Only after an in-depth review of the state of affairs following the take back of services in 2009 did Carlson learn that it had been charged and had paid for over $75 million for IT and F&A services that IBM had not performed and equipment that IBM had not refreshed. These invoices were materially misleading.

### C.  IBM Fraudulently Induced Carlson to Enter into this Fiduciary Arrangement

IBM fraudulently induced Carlson to permit IBM to occupy this position of great trust and undertake this role as a fiduciary both through intentional misstatements and fraudulent nondisclosure by not correcting the record and not disclosing something only IBM could or should have known, IBM did not know that it would be able to serve with honesty and loyalty to Carlson and, as to the provision of both IT and F&A services, do so with competence, and expertise or knew that it probably could not.

### D.  In its Capacity as a Trusted Fiduciary, IBM Defrauded Carlson

One would expect that IBM would require its employees to be honest and forthright regarding any failure to perform and to notify Carlson immediately of any failures that were occurring so as to eliminate the attendant business risks. Certainly Carlson would expect this from its employees. IBM did not do this for Carlson.

Of an even more serious nature, IBM charged Carlson over $75 million for IT and F&A services that IBM had not performed and equipment that IBM had not refreshed. IBM was not honest.

Not only would this constitute fraud for a mere provider of services; as a fiduciary, IBM is held to an even higher standard of care. As a fiduciary, IBM owed Carlson a duty of loyalty, complete trust and utmost good faith, including performing its functions with a high level of competence and thoroughness. IBM not only breached its fiduciary duties, IBM committed fraud in so doing.

### E.   Other Causes of Action

While Carlson has focused on the fraudulent actions of IBM, IBM breached its fiduciary duty obligations, overcharged Carlson, breached the MSA and is liable to Carlson pursuant to the other causes of action set out in the attached complaint or which may otherwise lie.

Finally, Carlson notes that it is on the basis of the foregoing that Carlson has terminated the MSA for cause.

### VIII   Damages and Rights of Recovery

The damages and losses Carlson has suffered and Carlson's rights of recovery from IBM as a result of IBM's Fraud, Fraudulent Breach of Fiduciary duty and the other violations of law and contract set out in Section VII are detailed below.

### A.   Carlson's Losses Due to IBM's Fraud

The consequences of being fraudulently induced into entering into this agreement and the resulting fraudulent performance by IBM have been financially devastating for Carlson. Under Minnesota law, damages for fraud must fairly and adequately compensate the victim for the damages caused by relying on those misrepresentations. But for these misrepresentations, Carlson would have done what it is doing now, performing these services and operating these systems, itself. The direct, measurable losses Carlson has sustained as a result of IBM's fraud, with interest, are approximately $226 million. Had Carlson not entered into the MSA -

- Carlson could have avoided in excess of $51 million in transition costs for F&A and IT;
- Carlson would not have needed to spend $14.7 million to buttress IBM to avoid even greater and more catastrophic failures;
- Carlson could not only have performed the IT and F&A work satisfactorily, it could have saved more than $62 million by undertaking the IT and F&A work actually performed by IBM; and,
- Carlson would have avoided paying IBM over $75 million for F&A and IT services IBM never performed and equipment not purchased, but included in IBM's charges to Carlson.

A breakout of these losses, by category, is set out below and additional detail is set out in Appendix II.

| Description                                       | (USD millions) | IT | F&A | Total |
|---------------------------------------------------|------------------|--------|--------|---------|
| Transition Costs                                  |                  | 33.7   | 17.9   | 51.6    |
| IBM charges in excess of Carlson costs            |                  | 54.4   | 7.9    | 62.3    |
| Carlson costs to perform or remediate IBM services |                  | 8.5    | 6.2.   | 14.7    |
| IBM Charges for Services not performed            |                  | 68.9   | 4.2    | 73.1    |
| IBM Charges for equipment not received            |                  | 2.7    | •      | 2.7     |
| Payment adjustment                                |                  | (4.5)  | (8.1)  | (12.6)  |
| Interest                                          |                  | 28.3   | 6.1    | 34.4    |
| Total Damages for Fraud  through 5/30/10          |                  | 192.0  | 34.2   | 226.2   |

## B.  Rights of Recovery for Fraudulent Breach of Fiduciary Duty

Normally, for breach of fiduciary duty, alone, one is entitled to recover the fiduciary's improper financial gains. Carlson has paid IBM approximately $255 million for IT and F&A services under the MSA. Thus, for breach of fiduciary duty Carlson is entitled to claim $255 million plus interest of approximately $46 million.

This claim is not subject to any cap under the MSA because claims for fraud are not capped.

Carlson is, therefore, alternatively entitled to recover all payments made to IBM for IT and F&A services, plus interest, or $301 million, for fraudulent breach of fiduciary duty.

## C.  Exemplary Damages

Instead of being concerned and seeking to correct for and mitigate the harm IBM caused and while fraudulently overcharging Carlson, IBM's attitude can best be summed up by the following two examples:

1.  After a continuing series of abysmal failures by IBM necessitated the take back by Carlson of more than half of the IT services IBM continued to provide in 2008, IBM and Carlson had to reach an equitable price adjustment for much of the ongoing services IBM continued to provide in 2009. IBM's demands with respect to an Equitable Price Adjustment were overreaching and without justification. As these negotiations dragged on for months, IBM continued to charge Carlson for all of the services it had altogether ceased to provide, until Carlson acceded to IBM's price demands. Only then did this

-14-

billing for services IBM was not providing, cease and was this billing corrected. Had it not granted this concession, Carlson would have had to pay into an escrow account tens of millions of dollars for charges for services Carlson, not IBM, was performing.

2.  Again this year, IBM continued to charge for all of the services Carlson was forced to take back and IBM ceased to provide by the end of 2009. In addition, IBM sought payment of termination charges for services not yet terminated. When Carlson objected, IBM threatened to terminate the ongoing ERP services, knowing that Carlson was not then in a position to undertake these services itself. Rather than risk this disastrous result, Carlson ended up escrowing $8,260,009 in disputed charges for services Carlson was performing and termination charges for services not yet terminated.[2]

In sum, IBM not only (i) committed fraud by inducing Carlson to enter into this Agreement in order to obtain revenues in the hundreds of millions and to permit IBM to act as a trusted fiduciary, (ii) committed fraud in the performance of this contract by charging Carlson more than $75 million for services it knew it did not perform, and (iii) fraudulently breached its fiduciary duties, in so doing, IBM did so with manifest arrogance and callousness. Such actions cry out for the imposition of exemplary damages; for only through such penalization can IBM be dissuaded from engaging in such fraud again. Attorneys' fees as well as exemplary damages will additionally be sought.

### D.  Other Losses and Claims

We note that the losses set out above do not reflect the reputational harm and loss of profits Carlson suffered, as customers, having lost confidence in Carlson's ability to protect their confidential information and reliably operate critical IT systems to support their businesses, have awarded tens of millions of dollars in business to competitors of Carlson. Nor do they capture the losses Carlson has suffered as it lost ground to its competitors as a consequence of IBM's acting as a barrier to, instead of leading, transformation critical to Carlson's businesses and the time lost, post take back, in remediating and restoring systems IBM was paid to maintain and improve, but did not.

Carlson has not determined the extent and magnitude of these damages. It will engage the necessary expertise in order to make this determination and this will form part of its claim.

## IX  PAYMENT & NEXT STEPS

Without waiving any of its other claims, Carlson demands immediate payment of $301,229,668, which is inclusive of Carlson's claim for setoff[3].

If IBM is unwilling to make this payment, prior to filing litigation, Carlson is willing to meet with IBM to attempt to resolve whatever dispute may exist and to jointly engage a mediator to

---

[2] The claims, losses and rights of recovery set forth in sections VII & VIII form the basis for Carlson's claim for setoff of $13,391,749 of which $8,260,009 is currently held in Escrow.

[3] See footnote 2, supra.

assist in such an attempted resolution. That process should take no longer than 30 days. If this is the course of action IBM wishes to take, IBM should promptly contact me to coordinate this process.

If IBM elects to engage in this dispute resolution process but is not willing to drop its demand for payment of the sums withheld by Carlson[4] and instruct the escrow agent to immediately release the funds held in escrow to Carlson, together with interest thereon, then Carlson requires that this dispute resolution process be expedited in accordance with Section 12.4 (e) of the MSA.

Very Truly Yours,

William Van Brat

William A. Van Brunt
Executive Vice President,
General Counsel and Secretary

Phone: 763 212 3777
Email: bvanbrunt@carlson.com

---

[4] See footnote 2, supra.

## APPENDIX I

### Examples of IBM Failures

#### *Finance and Accounting*

1. **Examples of Lack of F&A Competence**

Far from "transforming" the finance and accounting operations using "tools and techniques from consulting expertise" or "applying the operational scale and excellence of IBM's delivery organization" to deliver "equal to or higher quality service at a lower cost than the client can deliver internally," IBM's personnel could not even perform the most basic of accounting and finance functions, for example, IBM:

- IBM failed to properly reconcile accounts which caused Carlson's outside auditor, Deloitte & Touche, to issue a material weakness finding with respect to internal controls over financial reporting – the first ever in Carlson history – in the fiscal year 2006 audit report:
- In addition IBM:
  - o Failed to make payroll on a cruise ship;
  - o Erroneously sent a $1.8 million check to a local lawn service;
  - o Failed to pay wage garnishments causing a sheriff to threaten to close a Carlson restaurant;
  - o Processed a batch of payments twice, including payments to hotels in China, resulting in duplicate payments of $5.7 million.
  - o Repeatedly attached backup detail of one client's invoices to the invoice of another client which was a competitor, revealing confidential, sensitive pricing information of one of Carlson's customers to its major competitor;
  - o Incorrectly stated lease related expenses by millions of dollars due to recording expenses twice and other related accounting errors;
  - o Forced a $1.7 million write-off to Carlson because leases were not properly set up in the lease accounting system;
  - o Failed to pay property taxes leading to threatened seizure of restaurants by taxing authorities;
  - o Did not respond to 1099 reporting error notices resulting in the IRS levy of fines for 161 reporting errors;
  - o Did not deposit or record hundreds of refund checks from vendors;
  - o Failed to research or resolve hundreds of returned checks;
  - o Failed to complete billings, resulting in lost revenue and/or write offs for Carlson; and,
  - o Failed to reconcile inventory account and backlog of invoicing back up caused write offs.

2.  <u>**Service Level Misses**</u>

From March '06 through December '07, IBM missed more than 20% of its performance measurement commitments for F&A as shown below.



## *Information Technology*

### *1. Failure to Provide Contracted IT Services*

While charging for these services, IBM failed to provide more than 30% of the IT services and equipment refresh it committed to provide. Carlson was unaware of these failures, at the time, because IBM charged Carlson as if it fully performed these services. Typically these were the services requiring the highest levels of skill.

Carlson paid for services that IBM did not provide including many of the elements within the Towers and subject areas listed below:

    *a.  Servers & Mainframe*

- Performance Monitoring
- Performance and System Tuning
- Capacity Planning & Management
- Configuration Management
- Database Management
- Storage Management
- Change Management
- Backup and Recovery
- Security Patching
- Release Management

    *b.  Network*

- Planning and Design
- Performance Monitoring and optimization
- Refresh Technology

    *c.  Voice Services*

- Planning and Design
- New Service Development
- Mobile Device Management
- Contact Center Support
- Billing Administration

    *d.  End User Computing*

- Procurement Catalog
- Software and Equipment Configuration
- Asset Tracking (HW & SW)

- Remote Management

e. *Project Support*

- Project Planning & Project Management
- Project Reporting
- Project Implementation

f. *ADM Support*

- Standards and Architecture
- Planning and Analysis
- Design and Build Services
- Application Testing
- Implementation Management
- Project Management
- Problem Management
- Application Productivity

g. *Security*

- Logical Security Administration
- Access Monitoring and Management
- Security Audits
- Vulnerability Assessments
- Security Compliance

h. *Cross Functional Services and Processes*

- Long Range Planning
- Refresh and Technical Currency
- Procurement Services
- Asset and Inventory Management
- Equipment and Software Maintenance
- Problem Management
- Quality Assurance
- Configuration Management
- Release Management
- Collaborative Applications Support
- Enterprise Application Integration (EAI)
- Availability Management
- Application Hosting Management

i. *Equipment Refresh Paid For But Not Received*

-4-

The contract called for certain equipment refresh to occur; however, the refresh did not occur. The contracted equipment refresh is set forth in Schedule J1-5 of the MSA.

### j. *Services underprovided*

All too often, for those services it did provide, IBM failed to make the necessary resources available. For example, IBM was contractually obligated to provide 4640 hours of project work each month for Application Development. IBM never once met this commitment. As the data for September 2006 through September 2007, shown below, demonstrates, on average, IBM delivered only 62% of these promised services.



### 2. *Transformation*

While Carlson competitors became increasingly more efficient and capable, IBM failed to transform Carlson's IT Infrastructure in any meaningful way from 2005 to 2009. In addition to the significant opportunities lost while entrapped in IBM's failures, Carlson is now faced with updating its IT infrastructure during the most significant economic downturn in a generation. Carlson has had to take millions of dollars away from initiatives aimed at growing its business and devote them to doing the work that should have already been accomplished by IBM and for which Carlson has already paid.

### 3. *Request for Service*

Beyond IBM's inability to perform industry standard IT infrastructure management, IBM was unable to deliver technology solutions to new requests, whether small or large, in a complete and timely manner. This failed Request for Service process not only led to chronic failure by IBM to meet its Service Level commitments, but forced Carlson personnel to create infrastructure estimates for new efforts. Delivery times for product and service enhancements increased by 30 to 90 days. IBM's conduct led to the absurd result of Carlson having to contract with other providers to deliver services and to Carlson having to purchase equipment itself, instead of using contracted IBM procurement – even for IBM equipment.

### 4. Service Level Agreement (SLA) Failures

IBM agreed to a set of over 100 specific service level agreements (SLAs). From March '06 through December '07, IBM missed 20% of these performance measurements. IBM's record of Service Level Agreement failures for IT is depicted in the graph below.



Of the 393 SLA breaches in this 2 year period, 73 were with respect to Critical Service Levels (those service levels, which if not met, would significantly and adversely impact Carlson's business and customers). These critical problems included major outages of Carlson's entire hotel reservation system, the customer database for Carlson Wagonlit Travel, the world's largest business travel management company, and Carlson's core financial system.

In some cases, IBM created the failure by not following its standard operating procedures.

Compounding these problems, IBM was slow in responding to, and in many cases incapable of resolving, service failures in a timely manner.

### 5. Standard Operating Processes

IBM had promised to maintain the quality of services that Carlson had handed to them in an equal or better manner by using industry best practices and following agreed to policies and procedures as outlined in the Policy and Procedure Manual. Yet, Carlson discovered that:

- IBM failed to implement a consistent *Release Management* process leading to servers with old operating systems unable to be 'patched' in order to prevent information security attacks.

- IBM failed to follow *Asset Management* processes resulting in no or incomplete documentation describing the environment and, making it nearly impossible for IBM personnel to perform their role consistently and efficiently.
- IBM failed to follow industry standard *Configuration Management* processes resulting in inaccurate and missing information about components in the environment directly leading to increased down-time, increased security risks, and overcharges for decommissioned servers.
- IBM failed to conduct industry standard *Change Management* processes leading to chronic failure of changes and business disruption.
- IBM failed to conduct industry standard *Problem Management* processes that prevented discovery of root causes and ultimately resolution of chronic problems.
- IBM failed to perform industry standard *Capacity Management* processes allowing Carlson IT infrastructure components to fail due to reaching capacity limits.
- IBM failed to build servers to documented specifications leading to inefficient performance, problem incidents, additional downtime, and increased risk to Carlson business operations.

In addition to its failure to follow the processes listed above, IBM failed to follow other processes agreed to in the Policy and Procedures Manual including, but not limited to; Database Management, Backup & Recovery, Procurement, Security Management, Software Distribution, and Tape Operations.

Some of the problems identified in the sections which follow came as a direct result of not following these procedures.

### 6. Infrastructure Environment

IBM was obligated to 'refresh' and 'maintain' Carlson's environment. Carlson was unable to see the impact to its IT environment caused by IBM's failure to follow processes until IBM transitioned services back to Carlson. It was only some time after IBM transitioned IT services back to Carlson, that Carlson discovered many critical issues requiring urgent attention, including equipment IBM had permitted to age significantly (3-4 years) beyond industry standards and the schedule that IBM promised for replacing that equipment. This resulted in increased downtime and maintenance costs. In addition, many systems and applications were not current. Some examples:

#### a. Hardware

- 50 Unix servers in service were older than 5 years.
- 45 Wintel servers were at the end of their useful lives and the end of their manufacturer support.
- Many Exchange (email) servers running on equipment that is over 4 years old.
- Unix - 17 servers with obsolete JNI Fibre Channel HB for which no vendor hardware or driver support was available.
- Network switches that connect to the Internet were at the end of their useful lives and the end of their manufacturer support on July 1, 2007.
- Vendor/extranet WAN router were at the end of their useful lives and the end of their manufacturer support on January 1, 2007. Outages occurred as a result.

- Hardware that supports user VPN (iPass) and Intranet VPN (internal site to internal site) were at the end of their useful lives and the end of their manufacturer support.
- Hardware that supports extranet VPN (internal network to vendor network) hardware was at the end of their useful lives and the end of their manufacturer support.
- The NAS filer (H, J, and Y drives) was five major revisions behind on firmware and was not supported by the vendor at its current level.
- 14.7 terabytes of shared storage was at the end of their useful lives and the end of their manufacturer support.
- 97% of SQL servers were at the end of their useful lives and the end of their manufacturer support, with no security patching available due to July 1, 2007 service pack retirement.
- Warranty information was not provided on two thirds of Carlson's Wintel servers. These warranties are presumed to have lapsed.

b. _Operating Systems_

- 773 Windows 2003 servers were within 90 days of losing all Microsoft support. Carlson was unable to receive Microsoft patches or security patches because the service packs level had lapsed, increasing Carlson's risk to viruses.
- 161 Windows 2000 servers were patchable (meaning still supportable by Microsoft), but not all security patches had been applied increasing Carlson's risk to viruses and lack of support from the vendor.
- 130 workstations had outdated Windows XP operating systems and could not receive Microsoft patches or security patches because the service pack level was out of date.
- There were 29 instances of the Windows NT 4.0 that were outdated and not patchable.
- Unix server environments were behind schedule for functional and security patch updates as well as behind in adopting major vendor Operating System lifecycle changes, such as Solaris10 and HP-UX 11.30.
- Solaris 7 was at the end of life/end of support and was not receiving security patches impacting 6 servers, including Configuration Management Database (CMDB) server.
- Unix - 2 Solaris7 servers were supported only with best efforts support from Sun.
- Unix - 28 Solaris8 servers were 2+ major OS versions behind current.
- Unix - 10 HP-UX 11.0 servers were supported only with best efforts support from HP.

c. _Applications_

- Citrix Applications were not patchable.
- Operating obsolete Exchange 5.5.
- SMS infrastructure was not supported by Microsoft because the service pack was retired April 1, 2007, leaving Carlson with no automated ability to distribute releases, including security patches, to workstations and servers.
- Software that controls the world-wide dial-up infrastructure was at the end of its useful life as of January 1, 2007.
- The virus scanning engine for the NAS filer was at the end of its useful life and the end of support.

- Replication software (Repliweb R1) used to promote all web sites/web code from Development to QA to Production and to replicate Carlson software worldwide via the Software Distribution Server (SDS) was at the end of its useful life and the end of support on October 1, 2007.
- Carlson should have been on release 11 for Oracle upgrades but was still on release 9.
- Several Unix servers were using Veritas Volume Manager 3.5, which was at the end of its useful life and the end of support.
- 50 Unix servers were running Veritas Volume Manager 3.5 and older environments with best efforts only support from Symantec (Veritas).

### d. *Configuration Management*

IBM was obligated to 'maintain' the Configuration Management Database (CMDB) according to the agreed procedures in the Policy and Procedure Manual. CMDB is the critical record or information hub representing Carlson's infrastructure environment. The CMDB is critical to, among other things, quickly responding to and remediating technology problems/failures. IBM's failure to follow the Configuration Management processes resulted in the following:

- 700+ (or two thirds) of the Wintel server population were found to be incorrectly described within the Configuration Management database (CMDB).
- Inadequate maintenance of run book documentation at the physical and logical layers for SAN, storage, and backup architectures and platforms. No accurate, current information existed to describe these environments.
- One third of the 90 Unix Server builds were not performed according to documented process and specifications resulting in poor performance, data errors and unnecessary alarms.
- Numerous newly installed servers had no "grid location", no record of their location or existence within the data center.
- There were 41 Wintel servers with incorrect grid locations.
- 10 new Unix servers were not flagged "In Service".
- 10 Unix servers had no grid location.
- 100+ Wintel servers were listed as "active" yet had been decommissioned. IBM billed Carlson for supporting these non-existent assets.
- 261 production network devices in CMDB did not have an IP address and had an invalid CI name (no DNS resolution). These devices were listed as active but could not be found on the network.
- DMZ 3 F5 had FIPS hardware cards installed, but not configured. Carlson was charged for hardware IBM was not using.
- More than 100 network devices did not have Carlson standard management configurations. This included no standard passwords, AAA configuration, VTY ACL, SMNP ACL, etc. These devices not properly monitored, managed or maintained.

### e. *Database Management*

Oracle and SQL database environments were so seriously neglected and poorly managed it took Carlson over 4,000 hours to remediate.

f. *Backup & Recovery*

- Incomplete or non-existent back-up of critical data and applications created tremendous risk of business failure.
- In excess of 100 servers were not backed up.
- Legato tape backup system lacked the capacity necessary to effectively backup the current storage capacity. Legato capacity was not increased in correlation with storage increases.
- Servers flagged in CMDB for backup were not actually being backed up.

g. *Capacity Management*

IBM did not perform industry standard Capacity Management processes allowing Carlson IT infrastructure components to fail due to reaching capacity limits. Specifically Carlson discovered:

- Lack of capacity management on shared drives.
- Lack of tools to predict when Carlson will run out of space for department shares on the Filer and, lack of tool to locate files that have not been accessed in the last 3 years.
- MetroMirror imbalance on SVC clusters.
- Mailbox capacity is such that a new mailbox server was needed.

h. *Problem Management*

IBM did not conduct industry standard Problem Management processes that prevented discovery of root causes and ultimately resolution of chronic problems.

- Servers were found to be in disrepair with failed internal components that created the potential for single points of failure, where there were to have been inherent redundancies.
- IBM was unable to respond to problems surrounding core network components, completely shutting down significant elements of Carlson's business.
- IBM failed to consistently establish severity levels. All Control-M tickets checked against SOC/EMA for correct severity levels due to inconsistent data between SOC/EMA and Tivoli.
- Severity 2 ticket transfer process was de-automated, requiring phone call transfer rather than automated notification.
- Active Directory - Lack of strategic deployment and placement of Domain Controllers.
- Significant backup failures each day with no reporting or inaccurate reporting - tickets closed without action.
- Wintel - 55 server events with critical hardware failures, requiring immediate attention.
- Wintel - 383 server events with major hardware failures that needed to be addressed.

- Carlson saw a 28% decline in the number of problems after Carlson transitioned problem and incident management back from IBM.

i. *Best Practices*

- 100+ servers had at least one component failure (i.e., power source, fans, etc.), significantly compromising or eliminating system redundancy.
- IBM replaced several automated processes Carlson had established and replaced with manual processes.
- IBM removed monitoring on SQL server database instances and removed auto events requiring manual validation of severity levels from SOC/EMA to Tivoli.
- Peoplesoft backup was not documented. (The configuration is highly complex and prone to failures. The sequence of Control-M jobs that manage the business processes between the primary production copy, many backup copies as well as Q/A, Dev and Reporting copies is serial in nature and runs over 7 nights. A failure at any one step will lead to failures on later nights even after the failed step is corrected.)
- Several Wintel servers did not have monitoring and management tools installed.
- Backlog of the certification lab of over 2,000 hours.
- The SAN Switches were not maintained to best practice standards.
- Zones were not removed as servers have been removed resulting in many warning alerts.
- Tape library tapes were found simply stacked in a room and difficult to locate.
- Batch scheduling process was ad-hoc and failed job re-run requests made through email.
- The SAN switch infrastructure relied on an outdated version of disk frame firmware that contains known bugs that also caused failures. One, in particular, caused a failure at least once every other month that required 2 to 3 specialists to address.
- 2 of 3 Ironport anti-SPAM and anti-virus appliances were end of life on 12/31/08.
- Wintel Exchange servers built without cache module.
- There were inconsistencies in the use of redundant power supplies on F5's (one installed when two are supported).
- The PeopleSoft backup configuration ran on servers with SAN HBAs manufactured by a company that had gone out of business.
- 30 non-standard Navigant servers remain and require manual services and management.
- Support integration for Navigant services was not completed.
- When the DMZ 3 F5 was replaced due to failure, the configuration was not fully restored.
- Missed management routes to enable LDAP authentication and missed port mirroring configuration for the CWT Tea Leaf application.

j. *Information Security*

IBM did not operate Carlson's computing environment to the information security standard required by the MSA. Carlson was exposed to significant business risk because IBM did not maintain fundamental operating procedures such as ensuring user IDs on the system were for people who needed access. Upon taking this service back Carlson found and deleted thousands (30,000+) of IDs that could not be linked to a valid user. These IDs could have been used inappropriately and result in material losses to Carlson. This is just one example

of pervasive critical audit findings identified by Carlson internal as well as external auditors. Additional findings discovered after Carlson transitioned work back included:

- Oracle, SQL and Web portions of the 2007 GSD 331 plan were never fully implemented.
- On October 19, 2007, IBM represented that it had completed 100% for Windows 2000 and Windows 2003, which should have included antivirus (AV) per GSD 331. Despite this representation, initial analysis showed that 93 servers did not have correct AV or were absent AV protection. Some of these were internet facing causing an even greater security threat.
- Active Directory – There was no active monitoring of the AD infrastructure or vulnerability scanning against the domain controllers.
- Anti-Virus - Symantec antivirus client versions vary across server systems.
- Anti-Virus - Symantec antivirus endpoint not current version.
- Active Directory - Critical AD replication and domain controller configuration were left with issues that had to be resolved.
- Active Directory – There were many errors and failures with AD replication.

In sum, the state of security in which IBM managed for Carlson was found to be extremely inadequate. IBM did not deploy patches to computing devices on a timely basis to close known security holes, unnecessarily exposing Carlson data to hackers. In many cases IBM operated on equipment that was beyond its useful life with no ability to close the security holes. There are numerous examples where fundamental security controls were not in place such as the lack of monitoring anti-virus software to ensure the latest code was installed.

IBM did not maintain a level of reasonable security nor perform due diligence in communicating information security risk to Carlson management. Overall, it is apparent that IBM had no regard for information security as it pertained to the operating processes utilized in conjunction with the services it delivered to Carlson.

k. *Data Center Management*

Carlson found key tape storage stacked and strewn around the data center rather than managed per industry tape library standards. IBM was unable to locate components within the data center in order to respond in a timely fashion to problems.

## APPENDIX II

## FINANCIAL SUMMARY

### *Finance and Accounting*

1. <u>Transition Costs - $17.9 million</u>

Transition costs consist of the amount paid or expected to be paid to transition the work to IBM and then to transition the work back from IBM.

    a. *Outsourcing Transition Costs*

    These include:
- Transition costs paid to IBM as part of the stated costs of the contract based on the amounts in the Original Contract Schedule J2-1 of the MSA; and,
- Costs related to the elimination of 193 positions.

    b. *In-Sourcing Transition Cost*

    These include costs for:
- Redundant IBM and Carlson costs,
- Employee procurement,
- Consulting fees
- Computers.

2. <u>Losses Resulting from IBM charges in excess of Carlson costs - $7.9 million</u>

Savings opportunity losses are the difference between the amount that IBM charged Carlson and the amount that it would have cost Carlson to perform the services.

3. <u>Carlson Costs to Perform Services and Losses Incurred Due to Poor Performance - $6.2 million</u>

These include:

- Amounts incurred by Carlson Companies for staff to perform the services that IBM was to have provided; and,
- Billing errors, write-offs due to failing to invoice, and cost of money losses due to untimely collections.

## 4. Services Paid For But Not Received - $4.2 million

Carlson paid for services that IBM did not provide including, for example, the items listed below:

- Oversight management; and,
- Personnel for special projects were less than the amount delineated as available.

### *Information Technology*

**1.  Transition Costs - $33.7 million**

Transition costs consist of the amount paid or expected to be paid to transition the work to IBM and then to transition the work back from IBM.

> a.  *Outsourcing Transition Costs*

These include -
- Transition costs paid to IBM as part of the stated costs of the contract based on the amounts in the Original Contract Schedule J1-1 of the MSA;
- Total costs related to elimination of 304 positions; and,
- Costs for consulting fees, legal fees, and travel expenses to establish the arrangement with IBM.

> b.  *In-Sourcing Transition Cost*

These include -
- Redundant IBM/staff costs, employee procurement, consulting fees and computers.
- Costs incurred and estimated future costs; and,
- Estimated costs related to potential IBM Termination Penalty as set for in Schedule N-1 of the MSA.

**2.  Losses Resulting from IBM charges in excess of Carlson costs - $54.4 million**

These losses are the difference between the amount that IBM charged Carlson and the amount that it would have cost Carlson to perform the services.

**3.  Carlson Costs to Perform or Remediate Services that IBM was Paid For - $8.5 million**

These include -
- Amounts incurred for staff and equipment to perform the services that IBM was to have provided; and,
- Amounts incurred by Carlson Companies for staff time to remediate equipment and processes when Services were transitioned from IBM back to Carlson.

**4.  Services Paid For But Not Received - $68.9 million**

Carlson paid for services that IBM did not provide including many of the elements within the Towers and subject areas listed below:

> a.  *Servers & Mainframe*

- Performance Monitoring

- Performance and System Tuning
- Capacity Planning & Management
- Configuration Management
- Database Management
- Storage Management
- Change Management
- Backup and Recovery
- Security Patching
- Release Management

b. *Network*

- Planning and Design
- Performance Monitoring and optimization
- Refresh Technology

c. *Voice Services*

- Planning and Design
- New Service Development
- Mobile Device Management
- Contact Center Support
- Billing Administration

d. *End User Computing*

- Procurement Catalog
- Software and Equipment Configuration
- Asset Tracking (HW & SW)
- Remote Management

e. *Project Support*

- Project Planning & Project Management
- Project Reporting
- Project Implementation

f. *ADM Support*

- Standards and Architecture
- Planning and Analysis
- Design and Build Services
- Application Testing
- Implementation Management
- Project Management

- Problem Management
- Application Productivity

g. *Security*

- Logical Security Administration
- Access Monitoring and Management
- Security Audits
- Vulnerability Assessments
- Security Compliance

h. *Cross Functional Services and Processes*

- Long Range Planning
- Refresh and Technical Currency
- Procurement Services
- Asset and Inventory Management
- Equipment and Software Maintenance
- Problem Management
- Quality Assurance
- Configuration Management
- Release Management
- Collaborative Applications Support
- Enterprise Application Integration (EAI)
- Availability Management
- Application Hosting Management

## 5. Equipment Refresh Paid For But Not Received - $2.7 million

The contract called for certain equipment refresh to occur; however, the refresh did not occur. Amounts paid for equipment refresh are set forth in Schedule J1-5 of the MSA.

## Payment Adjustments

These adjustments for ($12.6M) were for –

- Amendment 30 credits; and
- Service level penalties credited by IBM to Carlson.

Carlson Companies, Inc.,

          Plaintiff,

                                  **COMPLAINT**

      v.

International Business Machines Corporation,

          Defendant.

Plaintiff Carlson Companies, Inc. (Carlson), for its Complaint against Defendant International Business Machines Corporation (IBM), states and alleges as follows:

## THE PARTIES, JURISDICTION AND VENUE

1.      Carlson is a Minnesota corporation with its principal place of business and corporate headquarters at 701 Carlson Parkway, Minnetonka, Minnesota.

2.      IBM is a New York corporation with its principal place of business at Route 100, Somers, New York and its corporate headquarters at One New Orchard Road, Armonk, New York. IBM, through its business group, IBM Global Services (collectively, IBM) provides business infrastructure, consulting, and support services relating to computer and information technology.

3.      This Court has personal jurisdiction over IBM because IBM regularly conducts business in the State of Minnesota and because IBM has committed tortious acts, including fraud and breach of fiduciary duty, in this judicial district. Jurisdiction over IBM is also proper because IBM irrevocably submitted to the sole and exclusive jurisdiction of the federal and state courts in Minnesota in personam, generally and unconditionally with respect to any action, suit or proceeding brought against it.

1

4.      Venue is proper pursuant to Minn. Stat. § 542.09 in that the causes of action arose within this county.

## FACTUAL BACKGROUND PERTINENT TO CARLSON'S COMPLAINT

5.      In the late summer of 2005 Carlson entered into what was supposed to be a ten year Master Services Agreement (Agreement) with IBM.  Under the Agreement, IBM was to handle, among other things, Carlson's finance and accounting and technology management services (collectively, the "Services").

6.      This Agreement was the culmination of events which began with Carlson's recognition that it needed to fully transform its business to remain at the apex of competition. The quest for transformation was not the issue. The question was whether Carlson would address these issues internally or outsource critical planning, decision-making and core business functions of these Services. This decision was momentous.  In order to gain the benefits of greater expertise, capabilities and efficiencies from an outsourcer, hundreds of jobs of trustworthy Carlson employees would likely be lost.

7.      To assure that it was gaining the right partner, Carlson allowed unprecedented access to its inner-workings.  IBM, for example, conducted an extensive and thorough due diligence of Carlson's operations, goals and objectives. Following IBM's due diligence, IBM represented to Carlson that it had performed all of the due diligence IBM deemed necessary.

8.      To further assure that it was getting the right partner, Carlson also asked IBM myriad questions regarding its capabilities, past experiences and specifics on what IBM would do for Carlson. The answers to these questions were critical in continuing to pursue the path to an Agreement. Indeed, the IBM due diligence process itself placed Carlson in a position where many of its most highly valued and sought-after employees began to self-select positions outside the company as the potential for outsourcing grew.

2

9.      But IBM knew exactly what to say to Carlson in order to move forward toward the execution of an Agreement. IBM unambiguously told Carlson what IBM's capabilities were, what IBM would do for Carlson and how IBM could be trusted with its words and actions:

- *"IBM is the only company able to provide leading expertise in all of the scope areas under consideration."* (IBM's response to Carlson's RFP, "Executive Summary - Total Solution," dated May 11, 2005, at p. 4);

- With respect to F&A, *"...we would continue the transformation of the finance and accounting operations using the numerous tools and techniques from our consulting expertise and by applying the operational scale and excellence of our BTO delivery organization."* (IBM response to Carlson's RFI, dated February 15, 2005, at p. 7);

- With respect to IT, *"IBM has developed a comprehensive approach and solution for the outsourcing of Carlson's Information Technology. Our approach will satisfy the current needs and will position Carlson to take advantage of potential business opportunities, realignments, and emerging technologies."* (IBM's response to Carlson's RFP, "Infrastructure Services Solution Summary," dated May 11, 2005, at p. 9);

- *"IBM's capabilities... can not be surpassed . . ."* (IBM's response to Carlson's RFI, dated February 15, 2005, at p. 14);

- *"IBM is uniquely positioned to deliver the full scope described in the RFI and thus the selection of IBM as a single vendor will mitigate or eliminate the potential adverse impact on Carlson..."* (IBM's response to Carlson's RFI, dated February 15, 2005, at p. 14);

- IBM would *"provide Carlson with a solution that fully meets your overall objectives in terms of savings, business transformation, speed, quality, controls, service levels, employee sensitivity and future flexibility."* (IBM's response to Carlson's RFI, dated February 15, 2005, at p. 13);

- *"Success in achieving target savings and results is not an option with IBM; it is a given."* (IBM's response to Carlson's RFI, dated February 15, 2005, at p. 13);

- IBM's *"value proposition to Carlson will include providing equal to or higher quality service at a lower cost than the client can deliver internally."* (IBM's response to Carlson's RFI, dated February 15, 2005, at p. 7);

- *"IBM's proposed solution will accelerate the transformation of Carlson's IT operations."* (IBM's response to Carlson's RFP, "Infrastructure Services Solution Summary", dated May 11, 2005, at p. 6);

- IBM's "BTO [business transformation outsourcing] strategic statement is unambiguous and reads as follows: We will be the Global leader, *trusted to collaborate with our clients to transform their business and trusted to operate portions of their value chains to drive significant sustainable business performance improvements.*" (IBM's response to Carlson's RFI, dated February 15, 2005, at p. 22);

- "For nearly 100 years, *the IBM name has stood for trust and integrity* in all that we do." (IBM's response to Carlson's RFI, dated February 15, 2005, at p. 73).

10.     These representations by IBM were not off the cuff, out of context, puffery. Rather IBM's representations were responses to direct questions posed by Carlson in a formal "Request for Information," evidencing IBM's knowledge of and Carlson's reliance upon IBM's responses as material representations. IBM knew that, by making such affirmative claims of its capabilities, Carlson would rely on IBM's representations and would presume that IBM was not lacking the requisite capabilities. IBM never corrected or clarified its prior misleading statements regarding its capabilities, and the truth about IBM's capabilities was something only IBM could or should have known.

11.     Based on this entire due diligence process, Carlson decided that it would outsource its transformation needs and, among other things, its core Services of Finance and Accounting (F&A) and Information Technology infrastructure management (IT). And it decided that IBM would be the selected partner. The Agreement between Carlson and IBM was entered into on August 31, 2005, effective the following day. The face-page of the Agreement itself captured the fact that this was supposed to be a trusted, intimate arrangement, as it acknowledged that even the Agreement itself was proprietary to both Carlson and IBM.

12.     Further, the Agreement demonstrated such trust in IBM in that Section 13.4 contemplated that IBM would receive and possess other "proprietary information" including information that is designated as "vital trust" information, and other information such as: (a) "Carlson Data," which is defined in Schedule A as including "data and information with respect to the businesses, customer, operations, facilities, products, rates, regulatory compliance, competitors, consumer markets, assets,

expenditures, mergers, acquisitions, divestitures, billings, collections, revenues and finances of Carlson . . . ."; (b) "Carlson Personal Data," which is defined in Schedule A as "that portion of Carlson Data that is subject to any Privacy Laws, Carlson privacy policies, or is otherwise attributable to a named individual person, living or deceased"; (c) other "Proprietary Information" such as "materials and information identified as attorney-client privileged materials or attorney work product, customer lists, customer contracts, customer information, rates and pricing, information with respect to competitors, strategic plans, account information, rate case strategies, research information, chemical formulae, product formulations, plant and equipment design information, catalyst information, information identified as trade secrets, financial/accounting information (including assets, expenditures, mergers, acquisitions, divestitures, billings collections, revenues and finances), human resources and personnel information, marketing/sales information, business plans or operations, third party contracts, licenses, internal or external audits, law suits, regulatory compliance . . . plans for changes in Carlson's or an Eligible Recipient's facilities, business units and product lines, plans for business mergers, acquisitions or divestitures, rate information, plans for the development and marketing of new products, financial forecasts and budgets, technical proprietary information, employee lists and company telephone or e-mail directories."

13.    IBM's prior representations gave Carlson no reason to question IBM's integrity or capabilities. Nor did the Agreement itself. Indeed, in the Agreement IBM represented, warranted and covenanted that:

> *"(i) the Services shall be rendered with promptness, due care, skill and diligence; and*
>
> *(ii) the Services shall be executed in a workmanlike manner, in accordance with ......the best practices of leading providers of services that are the same as or similar to the Services;*
>
> *(iii) IBM shall use adequate numbers of qualified individuals with suitable training, education, experience, know-how, competence and skill to perform the Services;*

*(iv) IBM shall provide such individuals with training as to new products and services prior to the implementation of such products and services in the Carlson/Eligible Recipients environment; and*

*(v) IBM shall have the resources, capacity, expertise and ability in terms of Equipment, Software, know-how and personnel to provide the Services."*

14.     With the promised expertise and capabilities of IBM solidified, Carlson also assured itself in the Agreement of IBM's honesty and integrity – given the fiduciary aspects of Carlson's business that IBM would be assuming, accordingly, IBM represented, warranted and covenanted that, in the performance of its work and obligations, it would comply with the Carlson Code of Ethics. By adopting Carlson's Code of Ethics, IBM agreed to conduct itself "in fairness and in honesty."

15.     But instead of bringing trust, expertise and capabilities to Carlson, IBM delivered the opposite. IBM lowered rather than raised service quality. IBM significantly increased rather than decreased business risk. IBM eroded rather than improved operating processes. IBM degraded rather than upgraded process discipline. IBM increased rather than lowered costs.

16.     The quality of services IBM provided to Carlson for both IT and F&A were so abysmal that in 2007, after just one year of IBM's services, Carlson commenced the termination of all of F&A services as well as certain critical IT functions. Carlson would eventually, as quickly as it could, wind down the remaining IBM's services. In 2009 Carlson gave notice of final and complete termination -- five years prior to the expected 10 year term.

17.     IBM's work for Carlson was not just incompetent. More critically, IBM was not honest. Carlson was fraudulently induced into entering the Agreement based upon IBM's claimed expertise, capabilities and trustworthiness. But during the performance of the Agreement, IBM further defrauded and breached its fiduciary duties to Carlson. IBM prepared and sent monthly invoices to Carlson which reflected the fee for the work IBM was to have done during that time. IBM's invoices in no way revealed that it was not performing much of what IBM had agreed to do in the Agreement and

6

associated documents. Only later would Carlson learn that the monthly fee for which IBM was billing Carlson made no deductions for work and products never provided by IBM.

18.     The discovery of this fraudulent invoicing led Carlson to look back at what IBM at earlier represented about IBM's previous experience. And what Carlson discovered was further fraud. As part of Carlson's diligence, IBM was specifically asked to disclose "all significant litigations during the past 5 years and all pending litigations the company is party to" and to state "whether the litigation involves outsourcing services provided by your organization of the type contemplated by the Carlson in-scope areas." (Carlson's RFI, dated February 4, 2005, at 10.)

19.     IBM's response in 2005 was that it was "not currently involved as a defendant in any proceeding that could be reasonably be expected to have a material adverse impact on IBM's delivery of services to Carlson." (IBM's response to Carlson's RFI, dated February 15, 2005, at 20.)

20.     IBM's response did not disclose at least the following cases which were pending against IBM at the time of the request to IBM and which involved allegations of fraud for the IT services IBM was providing to these customers:

      (1)    *Evans Industries, Inc. v IBM*, et al., Civil Action No. 01-0051 (E.D. La.)

      (2)    *M. Block & Sons, Inc. v. IBM,* Civil Action No. 04C 0340 (N.D. Ill.)

      (3)    *Irwin Seating Co. v. IBM*, et al., Civil Action No. 01:04-cv-00568 (W.D. Mich.)

21.     IBM's fraudulent omission of at least these matters deprived Carlson of an opportunity to ask others about these claims but, perhaps more importantly, underscores IBM's intentionally misleading answers to what Carlson asked before it entered into the Agreement.

22.     IBM's fraud, by commission and by omission, and breaches of fiduciary duty and of the Agreement caused enormous damage to Carlson, now determined to be well over $200 million with

7

interest, the more specific breakdown of damages having been previously communicated to IBM, in compliance with the Agreement, through a demand letter to IBM prior to the filing of this Complaint.

23.    Carlson has complied with Section 19 of the Agreement in attempting to informally resolve this dispute with IBM. Attached to this Complaint as Exhibit A is Carlson's written notice to IBM, which is incorporated by reference.

## CAUSES OF ACTION

## COUNT I: FRAUDULENT INDUCEMENT

24.    Carlson restates and realleges all foregoing allegations contained in this Complaint.

25.    As described above, IBM made the specific representations to Carlson, and concealed facts, on the dates indicated to induce Carlson to enter into the Agreement.

26.    IBM either knew that the representations were false, and knew that the non-disclosures were misleading, when it made them or made the representations without knowing whether they were true or false.

27.    IBM intended for Carlson to rely on the representations and non-disclosures.

28.    IBM's representations and non-disclosures were material and relied upon by Carlson. IBM is estopped from denying that these representations and non-disclosures were material or relied upon by Carlson. The representations were provided as part of a formal Request for Information process in which IBM appreciated or should have appreciated the gravity and solemnity with which the questions and answers were presented.

29.    As shown by its requests for the representations, Carlson intended to and did rely on these representations, and Carlson intended to and did rely on IBM's omission of the truth on the presumption that the facts did not exist. Had IBM told Carlson it was not competent to provide the services, would not bring its expertise to the Carlson project and would lie to Carlson in invoicing, for

8

example, Carlson would not have entered into the Agreement with IBM but would have undertaken the transformation on its own.

30. As a direct, foreseeable, and proximate result of IBM's conduct, Carlson has sustained injury in excess of $50,000, the more specific breakdown having been previously communicated through the attached demand letter to IBM prior to the filing of this Complaint.

## COUNT II: FRAUD IN PERFORMANCE

31. Carlson restates and realleges all foregoing allegations contained in this Complaint.

32. As described above, IBM made false material representations, by omission, to Carlson in its monthly Invoices that IBM sent to Carlson from 2006 through 2009.

33. IBM's representations were false in that IBM's Invoices billed Carlson for the monthly fee but in no way indicated a deduction for services and products that had not been provided by IBM.

34. IBM knew or should have known at the time it prepared and sent the Invoices to Carlson that the invoices represented amounts for which IBM had not provided services and products, or prepared and sent the Invoices without regard to whether they were true or false.

35. IBM prepared and sent the invoices with the intention that Carlson would rely on the invoices and would pay IBM for the stated amounts.

36. In reliance on the truth of IBM's invoices, Carlson made payments to IBM.

37. As a direct, foreseeable, and proximate result of IBM's misrepresentations, Carlson has sustained injury in the amount of $75.8 million, not including interest or attorneys fees for this litigation, the actual amount being reasonably ascertainable at the time and having been previously communicated through a demand letter to IBM prior to the filing of this Complaint.

9

## COUNT III: BREACH OF CONTRACT FOR FAILURE TO PROVIDE AGREED UPON SERVICES AND PRODUCTS, FOR BREACH OF CODE OF ETHICS AND BEST PRACTICES AND FOR OVERCHARGES

38.     Carlson restates and realleges all foregoing allegations contained in this Complaint and asserts this Count in the alternative.

39.     The Agreement between IBM and Carlson was entered into effective September 1, 2005.

40.     IBM has failed to perform its obligations under the Agreement and breached the Agreement by not providing the services and products it agreed to provide and by overcharging and invoicing Carlson for services not provided.

41.     IBM's failures constitute material breaches under the Agreement.

42.     In addition, IBM represented, warranted and covenanted that it would comply with the Carlson Code of Ethics, including that it would conduct itself "in fairness and in honesty."

43.     IBM materially breached this representation, warranty, and covenant through IBM's words and actions, and omissions and inactions, described above.

44.     In addition, IBM agreed to use industry best practices and policies and procedures as outlined in the agreed upon Policy and Procedure Manual. IBM breached those obligations at least as follows:

a)     IBM failed to implement a consistent Release Management process, which led to servers with old operating systems unable to be 'patched' in order to prevent information security attacks.

b)     IBM failed to follow Asset Management processes, resulting in incomplete documentation describing the environment and, making it impractical for personnel to perform their role consistently and efficiently.

10

c)       IBM failed to follow industry standard Configuration Management processes, resulting in inaccurate information about components directly leading to increased down-time, increased security risks, and overcharges for decommissioned servers.

d)       IBM failed to conduct industry standard Change Management processes leading to chronic failure of changes and business disruption.

e)       IBM failed to conduct industry standard Problem Management processes that prevented discovery of root causes and resolution of chronic problems.

f)       IBM failed to perform industry standard Capacity Management processes allowing Carlson IT infrastructure components to fail due to reaching capacity limits.

g)       IBM failed to build servers to documented specifications leading to inefficient performance, additional downtime, and increased risk to Carlson business operations.

h)       IBM failed to follow Best Practices and other processes agreed to in the Policy and Procedures Manual including, but not limited to Database Management, Backup & Recovery, Procurement, Security Management, Software Distribution, and Tape Operations.

45.      These breaches were material to the performance of the Agreement.

46.      IBM's failure to meet these obligations represents not only a breach of the contract, but willful, wanton and intentional misconduct.

47.      As a direct, foreseeable, and proximate result of IBM's breaches, Carlson sustained injury in excess of $50,000, the actual amount having been previously communicated through a demand letter to IBM prior to the filing of this Complaint.

48.      Carlson has further sustained uncapped monetary injury for breach of contract in the amount of $75.8 million under Section 18.3 (e) of the Agreement for invoiced charges that Carlson was

11

not obligated to pay under this Agreement because such charges are attributable to services not provided by IBM.

## COUNT IV: BREACH OF FIDUCIARY RELATIONSHIP AND FRAUDULENT INDUCEMENT INTO A FIDUCIARY RELATIONSHIP

49.     Carlson restates and realleges all foregoing allegations contained in this Complaint.

50.     IBM knew full well, or should have known as a result of its due diligence, that the work it wanted to and did undertake for Carlson represented the lifeblood of Carlson's business. The power, authority and discretion which IBM induced Carlson to give IBM and which IBM assumed from Carlson placed it in a vulnerable and inferior position as to knowing how its most critical functions were being treated or mistreated. Carlson would never have allowed IBM to assume such a role had IBM told Carlson that it could not be trusted.

51.     The unique nature of the business arrangement created between IBM and Carlson constitutes a fiduciary relationship. As part of this fiduciary arrangement, IBM gained access to and became responsible for the planning, operation, and execution of some of Carlson's most critical business functions and outside relationships. In undertaking these services, IBM replaced hundreds of capable, loyal, honest and trusted employees at Carlson, each of whom was obligated to comply with Carlson's Code of Ethics. To accomplish its takeover of Carlson's business, IBM represented, covenanted and warranted in Section 15.7 (b) of the Agreement that it would comply with the same standards of ethics as the hundreds of Carlson employees it would replace, including the basic code of honesty.

52.     Carlson placed its special trust, confidence, and reliance on IBM in this regard. IBM knowingly accepted this special trust, confidence, and reliance and gave Carlson no reason to believe otherwise. As a fiduciary, therefore, IBM owed Carlson the utmost duty of trust, loyalty, and care in performing its obligations, using its discretion and represented greater knowledge and expertise.

12

53.    IBM not only breached its fiduciary duties to Carlson, but induced Carlson to enter into this fiduciary arrangement with IBM based upon its claims of trustworthiness, capabilities and expertise. IBM pulled Carlson into an arrangement through its fraudulent representations, by commission and by omission, where Carlson trusted IBM and paid them hundreds of millions of dollars based upon that trust. What Carlson received back was a byzantine and myriad series of shocking failures and breaches. IBM's response when confronted with this truth was denial, arrogance and a further abuse of the power it acquired as a fiduciary.

54.    IBM's breach of fiduciary duties includes, but is not limited to, IBM's fraudulent misrepresentations and non-disclosures regarding its capabilities to meet Carlson's specific goals and objectives and IBM's false invoice billings to Carlson for services and products that had not been provided by IBM. The breaches of its fiduciary duties by IBM were willful, wanton and constitute intentional misconduct.

55.    IBM's inducement of Carlson into this fiduciary relationship with the attendant and utmost duties of trust, loyalty, and care, created the utmost duty on IBM to be fully forthcoming and truthful in its representations to Carlson.

56.    As a direct and proximate result of IBM's breach of fiduciary duties and its fraudulent inducement of Carlson into this fiduciary relationship, Carlson has suffered damage in excess of $50,000, and in an amount to be determined by the Court considering the lost value of assets, the profit of which Carlson was deprived, and the improper financial gains and ill-gotten profits of IBM.

**WHEREFORE**, Carlson hereby requests this Court grant the following relief:

1.    Awarding to Carlson and assessing against IBM damages in an amount to be determined at trial in excess of $50,000 as well as an equitable amount to be determined by the Court in its discretion;

13

2.     Awarding to Carlson and assessing against IBM damages in the amount of $75.8 million for overcharges and breach of contract; and

3.     Awarding to Carlson and assessing against IBM interest, costs, disbursements, and reasonable attorneys' fees incurred in connection with this action; and

4.     Awarding Carlson such other and further relief the Court deems just, equitable, and proper.

Dated: May ___, 2010                     **ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

By: _____
      Martin R. Lueck (MN# 155548)
      David W. Beehler (MN# 190792)
      Christopher A. Seidl (MN# 313439)

      2800 LaSalle Plaza
      800 La Salle Avenue
      Minneapolis, MN 55402
      Telephone: (612) 349-8500
      Facsimile: (612) 339-4181

**Attorneys for Carlson Companies, Inc.**