UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Carlson, Inc.,

    Plaintiff/Counter Defendant,

v.

International Business Machines Corporation,

    Defendant/Counter Plaintiff.

Case No. 10-CV-3410 (JNE/TNL)
ORDER

---

Martin R. Lueck, Esq., Seth A. Northrop, Esq., and Christopher A. Seidl, Esq., Robins, Kaplan, Miller & Ciresi L.L.P., appeared for Plaintiff/Counter Defendant Carlson, Inc.

Steven D. McCormick, Esq., Anne McClain Sidrys, Esq., and Christa C. Cottrell, Esq., Kirkland & Ellis LLP, and Benjamin W. Hulse, Esq., Blackwell Burke P.A., appeared for Defendant/Counter Plaintiff International Business Machines Corporation.

---

This is an action by Carlson, Inc., against International Business Machines Corporation ("IBM") for fraud, breach of contract, and breach of fiduciary duties. Carlson also seeks declaratory relief. IBM has brought a counterclaim against Carlson for breach of contract.

The case is now before the Court on four motions: IBM's Motion for Summary Judgment, ECF No. 255; IBM's Motion to Exclude the Expert Opinions of Richard Boulton, ECF No. 272; IBM's Motion to Exclude the Expert Opinions of Professor Stephen J. Andriole, ECF No. 278; and Carlson's Motion to Exclude Evidence at Trial, ECF No. 299.

For the reasons explained below, the Court will deny each of the three motions seeking exclusion of an expert witness and grant in part and deny in part IBM's Motion for Summary Judgment.

**I.   Motions to exclude expert witnesses.**

IBM has moved to exclude the opinions of two of Carlson's experts, Robert Boulton and Professor Stephen J. Andriole. IBM argues that Mr. Boulton's calculation of Carlson's damages is rooted in unreasonable facts and assumptions and that Professor Andriole's opinions regarding various aspects of the parties' arrangement were reached without independent analysis or the relevant expertise.

For its part, Carlson seeks to exclude the opinions of IBM's expert Timothy Clayson, arguing that Mr. Clayson has failed to disclose the bases for his opinions rebutting Mr. Boulton's and Professor Andriole's conclusions.

Federal Rule of Evidence 702 governs the admission of expert testimony and requires the Court to act as a gatekeeper to ensure that proffered expert testimony is both relevant and reliable. *Vasquez v. Colores*, 648 F.3d 648, 653 (8th Cir. 2011) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). Under this rule, an expert's opinion must be excluded if it is "so fundamentally unsupported that it can offer no assistance to the jury . . . ." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001) (internal citations and quotations omitted). However, "[a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Id.* at 929. *See also In re Zurn Pex Plumbing Products Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011) (noting that the application of *Daubert*'s gatekeeping principle may be "less stringent" in a bench trial because the "usual concerns" about exposing a jury to unreliable expert testimony are absent).

Here, where the case will be tried to the Court, nothing raised in the parties' memoranda persuades the Court that the exclusion of the experts' testimony, either in whole or in part, is

required. The Court is confident that the parties, represented ably by counsel, will make good use of the opportunity to highlight any perceived weaknesses in the experts' methodology and opinions at trial.

All three of the motions to exclude expert witnesses will be denied.

**II. IBM's motion for summary judgment.**

IBM has moved for summary judgment on Carlson's fraud (Count II of the First Amended Complaint) and breach of fiduciary duties (Count IV) claims and for partial summary judgment on Carlson's claim for breach of contract (Count III).

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute . . . ." *Id.* (c)(1)(A)–(B). The Court "need consider only the cited materials, but it may consider other materials in the record" not specifically called to its attention by the parties' memoranda. *Id.* (c)(3). In determining whether summary judgment is appropriate, this "evidence and all fair inferences from it must be viewed in the light most favorable to the non moving party . . . ." *Johnson v. Blaukat*, 453 F.3d 1108, 1112 (8th Cir. 2006).

**A. Breach of contract.**

IBM argues that partial summary judgment is warranted on Carlson's breach of contract claim because Carlson released that claim as it pertains to IBM's performance of ITO-related

services prior to October 1, 2006 in Amendment 15 to the parties' Master Services Agreement ("MSA"). That amendment states, in relevant part, that "as of October 1, 2006, the Parties agree that IBM has met all performance obligations with respect to ITO-related Services and IBM is not in breach of the MSA with respect to such Services as of such date."

Carlson contends that this provision of Amendment 15 is either invalid or unenforceable as a release on four grounds. The Court concludes otherwise.

### 1. Intent to release or relinquish.

First, Carlson argues that Amendment 15 lacks language expressly limiting Carlson's rights and remedies. However, Minnesota does not demand formulaic language to create a valid release of claims. *Dykes v. Sukup Mfg. Co.*, 781 N.W.2d 578, 582 (Minn. 2010). Instead, "the agreement must manifest an intent to release, discharge, or relinquish a right, claim, or privilege by a person in whom it exists to a person against whom it might have been enforced to be a release." *Id.* (citing *Gronquist v. Olson*, 64 N.W.2d 159, 163-64 (Minn. 1954)).

To determine the intent of the parties, the Court examines the language of the contract. *Dykes*, 781 N.W.2d at 582. "When the language is clear and unambiguous, [the Court will] enforce the agreement of the parties as expressed in the language of the contract." *Id.* (citing *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 364-65 (Minn. 2009)). *See also Michalski v. Bank of America Arizona*, 66 F.3d 993, 996 (8th Cir. 1995) (observing that, under Minnesota law, whether a contract is ambiguous and the meaning of an unambiguous contract are both questions of law). Here, the Court finds that the language of Amendment 15 clearly and unambiguously manifests Carlson's intent to relinquish its claim for breach of contract against IBM as it pertains to IBM's performance of ITO-related services prior to October 1, 2006.

4

### 2. Consistency with MSA.

Second, Carlson argues that Amendment 15 does not precisely identify the obligations being discharged and is therefore in conflict with § 21.2 of the MSA, which governs release through amendment.  But Amendment 15 contains a clear and unambiguous superseding provision, agreed to by the parties, that "[i]n the case of a conflict or ambiguity between the provisions of this Amendment and the other provisions of the MSA, . . . the provisions of *this* Amendment shall prevail, subject to Sections 21.2 and 21.9 of the MSA (*provided that no reference herein to any specific provision(s) of the MSA shall be required under Section 21.2*)" (emphasis added).

### 3. Consideration.

Third, Carlson argues that the release of its breach of contract claim pertaining to ITO-related services is unenforceable because the consideration IBM provided under Amendment 15 was intended solely as compensation for IBM's delays in delivering ERP services.  However, "[i]t is well-settled that one promise may act as consideration for multiple promises." *Current Technology Concepts, Inc. v. Irie Enterprises, Inc.*, 530 N.W.2d 539, 543 (Minn. 1995) (citing Restatement (Second) of Contracts § 80 cmt. a (1981)).  *See also PMX Indus., Inc. v. LEP Profit Int'l*, 31 F.3d 701, 704 (8th Cir. 1994) (Iowa law).  Furthermore, "[d]etermining whether sufficient consideration exists for an agreement is a question of law," and "Minnesota follows the long-standing contract principle that a court will not examine the adequacy of consideration as long as something of value has passed between the parties." *Brooksbank v. Anderson*, 586 N.W.2d 789, 794 (Minn. Ct. App. 1998) (internal quotations and citations omitted).

Here, in paragraph 2 of Amendment 15, Carlson conceded that IBM was not in breach of the MSA with respect to either ERP-related services prior to the effective date of the amendment or ITO-related services prior to October 1, 2006, while IBM agreed to provide $4.5 million in credits "to increase Carlson's customer satisfaction with the Services." Thus, Carlson did receive consideration in exchange for the promises it made in Amendment 15, including its release pertaining to IBM's performance of ITO-related services.

### 4. Equitable grounds.

Fourth, Carlson argues that the release is unenforceable because IBM withheld information regarding its performance of ITO-related services during the negotiation of Amendment 15. However, to avoid summary judgment on the basis that the release was procured through inequitable conduct or wrongful concealment, Carlson would have to offer specific facts that would demonstrate that IBM kept Carlson in ignorance of the existence of the released claim or that it otherwise induced Carlson to mistakenly release the claim. *Norris v. Cohen*, 27 N.W.2d 277, 281 (Minn. 1947) (discussing *King v. International Lumber Co.*, 195 N.W. 450, 451 (Minn. 1923)); *Sorenson v. Coast-to-Coast Stores (Central Organization), Inc.*, 353 N.W.2d 666, 670 (Minn. Ct. App. 1984) (affirming summary judgment where plaintiff claimed that defendant had "concealed its conduct creating the [released] causes of action" but failed to support that allegation with specific facts). Parol evidence is admissible for this purpose. *Ridgway v. Hennepin County*, 182 N.W.2d 674, 679 (Minn. 1971).

Carlson advances two arguments in this regard, but neither is sufficient to raise a triable issue of fact. First, Carlson points to an email exchange between Steven Garcia of IBM and Wanda Cahill of Carlson on January 31, 2007, the day Amendment 15 was signed, in which they

discuss revisions to the draft amendment. Carlson argues that these emails establish that Mr. Garcia inserted the ITO release into Amendment 15 at the eleventh hour, and thus that it was not reached through robust negotiations.

One difficulty with that characterization is that it is not compatible with the evidence. The email exchange Carlson relies on was in fact initiated by Ms. Cahill's message to Mr. Garcia on the morning of January 31 that "[i]t has apparently been agreed that *we [Carlson] will release IBM from any claim of breach for ITO through October 1, 2006. I've changed the amendment* and am attaching. Do you think we can get this signed today?" (emphasis added). Furthermore, a previous draft of Amendment 15 attached to an email sent from Mr. Garcia to Ms. Cahill on January 20, 2007 includes an earlier, broader iteration of the release in which Carlson would have conceded that IBM was not in breach of contract with respect to ITO-related services as of the amendment's effective date. Mr. Garcia's email to Ms. Cahill indicates that he had inserted that release language on that date, eleven days before the parties executed the amendment, in order to conform the working draft to their discussions. These facts cannot reasonably be construed to demonstrate that IBM acted inequitably or wrongfully in the drafting process.

Second, Carlson points to a Service Management Review ("SMR") that IBM had conducted internally in November 2006 but did not share with Carlson during the negotiation of Amendment 15, as well as to notes from a meeting of IBM's leadership in December 2006 containing an instruction that IBM employees should avoid using "'breach' language" because the "[c]ontract is NOT in breach." However, even construing this evidence for the purposes of this motion to suggest that IBM did conceal its own internal conclusion that it was in breach of the MSA, Carlson has not made the requisite showing that it was unaware of the potential

7

existence of a claim against IBM for its alleged deficiencies in delivering ITO-related services during the negotiation and execution of Amendment 15 in January 2007.

Indeed, the very notes of IBM's leadership meeting from December 2006 that Carlson cites state that "Carlson recognizes there is a problem . . . ." More specifically, Carlson's own recitation of the facts in its memorandum opposing summary judgment demonstrates that Carlson was well aware of a series of problems during the early stages of the contract that it attributes to IBM's deficient performance of ITO-related services, including the crash of Carlson's hotel reservation system in June 2006 and Carlson's failed Payment Card Industry Security audit in November 2006. Carlson also highlights that its executives expressed "no confidence" in IBM's ability to fulfill its obligations under the MSA as early as July 2006. In these circumstances, the facts cannot reasonably be construed to demonstrate that Carlson was wrongfully kept in ignorance of the potential existence of the breach of contract claim it released by IBM's failure to disclose the SMR or its leadership's directive that its employees should avoid using the word "breach."

Giving effect to the clear and unambiguous agreement of the parties, then, the Court will grant IBM's motion for partial summary judgment on Carlson's breach of contract claim as it pertains to IBM's performance of ITO-related services prior to October 1, 2006.

### B. Fraud.

IBM argues that summary judgment is warranted on Carlson's fraud in performance claim because it is an impermissible recasting of its breach of contract claim as a tort. The essence of IBM's argument is that Carlson's fraud claim cannot co-exist with its breach of

8

contract claim because both claims are premised on the same set of alleged facts and would give rise to an identical quantum of damages.

However, neither the inter-relatedness of the facts alleged or the damages sought, nor the existence of a contract between the parties, precludes a plaintiff from bringing a tort claim alongside a contract claim. *See, e.g., AKA Distrib. Co. v. Whirlpool Corp.,* 137 F.3d 1083, 1086 (8th Cir. 1998) (noting that "the presence of a governing commercial contract neither preempts nor eliminates the need for all fraud claims to which the parties' dealings may give rise"); *D&A Development Co. v. Butler*, 357 N.W.2d 156, 158-59 (Minn. Ct. App. 1984) (considering damages as a secondary factor only after analyzing the duties owed by the defendant to the plaintiff).

Under Minnesota law, what is determinative is the nature of the duties alleged to have been breached. Thus, while a plaintiff may not recover tort damages for a defendant's breach of a purely contractual duty, it may recover tort damages "in exceptional cases where the defendant's breach of contract constitutes or is accompanied by an independent tort." *Wild v. Rarig*, 234 N.W.2d 775, 789 (Minn. 1975). *See also Glorvigen v. Cirrus Design Corp.,* 816 N.W.2d 572, 584 (Minn. 2012) (noting that a party may recover for misrepresentation and breach of contract when "there is a breach of [legal] duty which is distinct from the breach of contract"). A tort is independent of the contract when "a relationship [between the parties] would exist which would give rise to the legal duty without enforcement of the contract promise itself." *Hanks v. Hubbard Broadcasting, Inc.*, 493 N.W.2d 302, 308 (Minn. Ct. App. 1992).

Carlson does not rest its tort claim on IBM's alleged failure to deliver the services it had a purely contractual duty to provide. Rather, Carlson claims that IBM committed fraud by knowingly overbilling for those services in violation of its extra-contractual duties to "clarify

9

misleading information already disclosed" and to disclose material facts of which it had "special knowledge [and] to which Carlson did not have access." First Amended Complaint at ¶ 101(a)-(b) (ECF No. 45). *See M.H. & H.L.H. v. Caritas Family Srvs.*, 488 N.W.2d 282, 288 (Minn. 1992) (common law duty to disclose material facts to prevent previous representations from misleading the other party); *L&H Airco, Inc. v. Rapistan Corp*, 446 N.W.2d 372, 380 (Minn. 1989) (common law duty to disclose material facts of which one has special knowledge and other party does not have access).[1]

In this light, IBM's reliance on this Court's decision in *Target Corp. v. LCH Pavement Consultants, LLC*, 2013 WL 2470148 (D.Minn. June 7, 2013) is misplaced. In that case, Target sued a number of defendants on a number of claims, including both fraud and breach of contract, arising out of what it alleged was a bid-rigging and overbilling scheme involving contracts for paving projects at its stores. *Id.* at *1. On a Rule 12(b)(6) motion by several of the defendant paving companies, the Court determined that Target's allegation that the contractors falsely represented that they had performed all of the work they contracted to perform was not cognizable as fraud because "the misrepresentation at issue is not collateral to the contract but is the basis for Target's breach-of-contract claim." *Id.* at *7. Undergirding that decision is the fact that Target had failed to plead that the defendants' overbilling violated a legal duty owed to the plaintiff independent of the contract. The pleading here renders that case inapposite.

The Court will deny IBM's motion for summary judgment on Carlson's fraud claim.

---

[1] IBM does not argue that it did not owe Carlson these legal duties or that the facts would preclude Carlson from establishing that IBM breached them.

### C. Breach of fiduciary duties.

IBM argues that summary judgment is warranted on Carlson's breach of fiduciary duties claim because the facts do not support Carlson's contention that the parties were in a fiduciary relationship.

Under Minnesota law, "a fiduciary relationship exists 'when confidence is reposed on one side and there is resulting superiority and influence on the other; and the relation and duties involved in it need not be legal, but may be moral, social, domestic, or merely personal.'" *Toombs v. Daniels*, 361 N.W.2d 801, 809 (Minn. 1985) (quoting *Stark v. Equitable life Assur. Society*, 285 N.W. 466, 470 (Minn. 1939)). The fiduciary "is required to act for the benefit of another person on all matters within the scope of their relationship." *Swenson v. Bender*, 764 N.W.2d 596, 601 (Minn. Ct. App. 2009) (quoting *Black's Law Dictionary* 658 (8th ed. 2004)).

Minnesota courts impose this duty – "the highest standard of duty implied by law," *D.A.B. v. Brown*, 570 N.W.2d 168, 172 (Minn. Ct. App. 1997) – sparingly. Indeed, only a small number of relationships have been found to be per se fiduciary relationships, including trustee-beneficiary, attorney-client, business partnerships, director-corporation, officer-corporation, and husband-wife. *Thomas B. Olson & Associates, P.A. v. Leffert, Jay & Polglaze, P.A.*, 765 N.W.2d 907, 914 (Minn. Ct. App. 2008) (listing cases).

Carlson concedes the obvious: its outsourcing arrangement with IBM was not one of these per se fiduciary relationships. Instead, Carlson argues that the parties were engaged in a de facto fiduciary relationship.

### 1. De facto fiduciary relationship.

Where the parties' arrangement is not of a type that has been designated a per se fiduciary relationship, the general rule in Minnesota is that it may be found to constitute a de facto fiduciary relationship only where certain "special circumstances" are present. *See St. Paul Fire and Marine Ins. Co. v. A.P.I., Inc.*, 738 N.W.2d 401, 406 (Minn. Ct. App. 2007) (citing *Klein v. First Edina Nat. Bank*, 196 N.W.2d 619, 622-23 (Minn. 1972)). Such "special circumstances" may be found where there is a wide disparity of experience and knowledge between the parties, uneven access to information and resources, invited confidences, and the surrender of financial control. *E.g., Toombs*, 361 N.W.2d at 809; *Murphy v. Country House, Inc*. 240 N.W.2d 507, 512 (Minn. 1976).

In contrast to these "special circumstances," Minnesota courts have been explicit that "reliance on a professional, . . . a certain degree of trust and a duty of good faith" among parties to a business arrangement are merely characteristic of an "ordinary business relationship." *Carlson v. Sala Architects, Inc.*, 732 N.W.2d 324, 331 (Minn. Ct. App. 2007). *See also Olson*, 756 N.W.2d at 914. Further restricting the imposition of fiduciary duties in a commercial context, the Minnesota Supreme Court has determined that, even when there is a substantial disparity in business acumen between the parties to a business relationship, the less sophisticated party's faith and confidence in the other is not sufficient to establish a fiduciary relationship where it "should have known the [other side] was representing adverse interests." *Kennedy v. Flo-Tronics, Inc.*, 143 N.W. 827, 830 (Minn. 1966). *See also Cherne Contracting Corp. v. Wausau Ins. Cos.,* 572 N.W.2d 339, 343 (Minn. Ct. App. 1997) (affirming dismissal of plaintiff insured's fiduciary duty claim against defendant insurer and noting that "reality is that a

relationship created by an insurance contract necessarily involves competing interests, which often generate litigation between the insurer and insured").

### 2. Disclaimer.

IBM first argues that the definition of the relationship in the MSA that the parties negotiated and mutually agreed upon disclaims a fiduciary relationship. Section 21.6 of the MSA reads as follows:

> IBM, in furnishing services to Carlson and the Eligible Recipients hereunder, is acting as an independent contractor, and IBM has the sole obligation to supervise, manage, contract, direct, procure, perform or cause to be performed, all work to be performed by IBM under this Agreement. The relationship of the Parties under this Agreement shall not constitute a partnership or joint venture for any purpose. Except as expressly provided in this Agreement, IBM is not an agent of Carlson or the Eligible Recipients and has no right, power or authority, expressly or impliedly, to represent or bind Carlson or the Eligible Recipients as to any matters, except as expressly authorized in this Agreement. Neither Carlson nor the Eligible Recipients are agents of IBM and none of them has any right, power, or authority, expressly or impliedly, to represent or bind IBM.

IBM asserts that this language is indistinguishable from a disclaimer that was found to preclude a finding of a fiduciary relationship in *Children's Broadcasting Corp. v. Walt Disney Co.*, 245 F.3d 1008 (8th Cir. 2001).

In that case, Children's Broadcasting Corp. had entered into an agreement with ABC Radio for advertising sales, affiliate development, and consulting services. *Id.* at 1013. The contract included the following provision:

> Nothing contained in this Agreement shall create or be deemed to create any association, partnership, joint venture or the relationship of principal and agent or employer and employee between the parties hereto, it being understood that ABC and CBC shall perform all of their obligations hereunder as fully independent parties.

When ABC Radio terminated the contract in order to develop its own children's radio network with Disney (by then its parent company), Children's brought suit asserting several claims,

including breach of fiduciary duties on the theory that ABC Radio acted as its agent. *Id.* at 1014, 1021. The district court granted summary judgment to ABC Radio on the basis that the parties' contract expressly disclaimed that they were entering into a principal-agent relationship. *Id.* at 1022. In affirming, the Eighth Circuit cited to Minnesota Supreme Court decisions that require either express or implied consent to the formation of a principal-agent relationship. *Id.*

Carlson argues that *Children's* does not control because the plaintiffs there "relied strictly on an agency theory" to establish the defendant's fiduciary duties, while Carlson here is "not relying solely on agency principles to establish a fiduciary relationship" and asserts instead that "IBM's fiduciary role is incident to the relationship, not the contract."

### 3. Special circumstances.

Nevertheless, IBM argues that, even if *Children's* is distinguishable on this basis, Carlson has not identified facts that could amount to the sort of "special circumstances" that are required to elevate the parties' arrangement to the level of a de facto fiduciary relationship. The Court agrees.

Carlson points to a number of representations IBM made about its expertise and trustworthiness in the process of bidding for and negotiating the MSA, and it offers a large volume of materials that evince various players' views of the degree of access, control, and responsibility IBM assumed over aspects of Carlson's business. However, the parties specifically and unambiguously agreed that the parameters of their relationship were to be defined solely by the MSA and its amendments. *See* MSA § 21.2 ("This Agreement . . . constitutes the entire agreement between the Parties with respect to the subject matter hereof.

14

There are no agreements, representations, warranties, promises, covenants, commitments, or undertakings other than those expressly set forth herein.")

As the governing document, the MSA contains numerous provisions that are wholly incompatible with the concept of a fiduciary relationship. For instance, while Carlson claims that it was induced to "hand over the keys" to its business to IBM, in fact the MSA assigned strategic control over IBM's performance to Carlson and required IBM to "comply with and implement" a set of "standards, policies, practices, processes, procedures, and controls" set by Carlson. MSA § 9.5(a)-(b). Carlson could also exercise control through other mechanisms, including its right to block IBM's personnel decisions by withholding approval of an individual's assignment to or even removal from a "Key IBM Personnel position." MSA § 8.8(c).

In addition, while Carlson claims that IBM had vastly superior knowledge and access to information regarding the services it was performing, the MSA reserved for *Carlson* the right to audit IBM's performance and challenge its pricing and delivery of services. MSA §§ 9.9, 11.10(a). Under the terms of the parties' agreement, Carlson was granted regular and recurring access to IBM personnel as well as to "complete . . . records of and supporting documentation for all Charges, all Carlson Data and all transactions, authorizations, changes, implementations, soft document accesses, reports, filings, returns, analyses, procedures, controls, records, data or information created, generated, collected, processed or stored by IBM in the performance of its obligations" under the MSA. MSA § 9.9(a). With this broad right of access, Carlson was enabled to conduct operational audits to "examine IBM's performance of the Services [and] verify IBM's reported performance against the applicable Service Levels," as well as financial audits to "verify the accuracy and completeness of Charges [invoiced to Carlson and] examine

IBM's performance of its other financial and accounting obligations . . . ." MSA § 9.9(b)-(c). These audit and oversight provisions are meaningless if Carlson was as helpless as it now claims.

Finally, while Carlson claims that it was left hamstrung and vulnerable because of IBM's exclusive control over the "lifeblood" of its business, the MSA reveals that Carlson entered this important contractual relationship with its eyes wide open. The MSA accounted for the eventuality that deficient performance or abandonment by IBM could – and probably would – cause disruption to Carlson's operations, and provided robust protections against it. Under these protection provisions, Carlson was entitled to terminate the MSA for material breach, MSA § 20.1(a), and to receive "Termination Assistance Services" from IBM for a period of up to 12 months from the notice of termination in order to transition the services smoothly from IBM back to Carlson, MSA § 4.4. IBM's right to terminate the MSA, on the other hand, was restricted to a scenario in which Carlson refused to pay "undisputed amounts properly due and owing to IBM" after two notices. MSA § 20.1(b). If IBM terminated the MSA for any other reason, or if it even threatened to cease performing any of its obligations, including Termination Assistance Services, Carlson was entitled to obtain an injunction ordering IBM to continue performing as required by the MSA. MSA § 19.1(f).

Carlson does not dispute that its business arrangement with IBM was one negotiated at arms-length by two highly sophisticated corporate entities, and it cites no precedent where a de facto fiduciary relationship, or even a triable issue, has been found on facts parallel to these. The Court thus concludes that Carlson cannot establish that its outsourcing arrangement with IBM was the type of relationship to which Minnesota affords special consideration and upon which it imposes the heightened duties of a fiduciary relationship. IBM was a contracting party, not a fiduciary.

The Court will grant IBM's motion for summary judgment on Carlson's breach of fiduciary duties claim.

* * *

Therefore, based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendant/Counter Plaintiff IBM's Motion for Summary Judgment [ECF No. 255] is GRANTED IN PART and DENIED IN PART as described above.
2. Defendant/Counter Plaintiff IBM's Motion to Exclude the Expert Opinions of Richard Boulton [ECF No. 272] is DENIED.
3. Defendant/Counter Plaintiff IBM's Motion to Exclude the Expert Opinions of Professor Stephen J. Andriole [ECF No. 278] is DENIED.
4. Plaintiff/Counter Defendant Carlson's Motion to Exclude Evidence at Trial [ECF No. 299] is DENIED.

Dated: November 13, 2013                  s/Joan N. Ericksen
                                                The Honorable Joan N. Ericksen
                                                United States District Judge