UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Carlson, Inc.,

       Plaintiff,

                              No. 10-cv-3410 (JNE/TNL)

v.                            **CORRECTED**
                                     **FINDINGS OF FACT,**
International Business Machines     **CONCLUSIONS OF LAW,**
Corporation,                     **AND ORDER**

       Defendant.

---

This case arises out of a $646 million outsourcing contract in which Carlson, Inc.
engaged IBM to provide a variety of Information Technology ("IT") and Finance and
Accounting ("F&A") services as well as to build an Enterprise Resource Planning ("ERP")
system for it. Signed in 2005, the contract was slated to run for an initial term of ten years.
Carlson terminated it after little more than four. The fundamental question this case presents is
why.

According to Carlson, the parties' arrangement was undone by IBM's poor performance.
Carlson brought this action alleging that IBM not only materially breached the contract by failing
to perform over 1,000 different IT tasks that the contract assigned to it, but also committed fraud
by invoicing Carlson as if the full scope of those services was being satisfactorily performed.
IBM denied those allegations and brought its own breach of contract counterclaim, asserting that
Carlson actually terminated the contract due to the changed circumstances brought about by the
global financial crisis and its own deteriorating financial condition, and then refused to pay IBM
the early termination fees to which the parties had agreed at the outset.

The parties tried their respective claims to the Court for nine days between March 18 and April 1, 2014.  The evidence adduced at trial overwhelmingly supports IBM's telling of the demise of the parties' relationship.

The parties' original Master Services Agreement ("MSA") reflected the prevailing economic optimism of the pre-recession days in which it was negotiated.  In particular, that outsourcing arrangement was part and parcel of a major corporate transformation that Carlson had recently undertaken, designed to both facilitate and accommodate the substantial growth that Carlson then projected for its businesses.

Relatively soon after the MSA went into effect, however, Carlson – one of the world's largest leisure and hospitality companies – began to experience the effects of the leading edge of what was to become the Great Recession.  In 2007 and 2008, Carlson faced significant and growing net operating losses at the same time as it came under the leadership of a new CEO with a fundamentally different corporate vision than the one that had spurred the company towards its relationship with IBM.  In that new reality, Carlson concluded that it no longer wanted, needed, or could sustain its expanded Corporate Center, the largest part of which was the IBM outsourcing contract.  As a Carlson report put it succinctly in 2007: "Corporate overhead was sized for growth that did not materialize and must now be 'right-sized.'"

Carlson's contract with IBM was terminable at will.  But early termination meant that charges for certain of IBM's start-up services and costs that otherwise would have been amortized over the ten-year life of the contract would come due immediately.  Carlson calculated those costs, and found them to be too substantial to absorb at that time.  In the words of Carlson's Chief Technology Officer in mid-2007, "[e]arly termination is expensive – perhaps prohibitive under any circumstance over the next 18 months."

Accordingly, Carlson embarked on a phased but expedited exit strategy over approximately the next two years, reducing the scope of the contract to the minimum level needed to avoid termination payments until services were finally terminated completely in early 2010.  Although Carlson's litigation position has been that performance problems on IBM's part drove its decision to terminate the contract, the contemporaneous evidence suggests otherwise.  And in fact, Carlson's current Chief Executive Officer testified candidly at trial that Carlson was compelled by its internal financial situation and her predecessor's aggressive cost-cutting initiatives to terminate the IBM contract without regard to IBM's performance.

This is certainly not to say that IBM performed flawlessly.  The outsourcing project the parties designed was a large and complex undertaking that required cooperation and flexibility from both companies, and problems – perhaps inevitably – arose in its execution.  IBM bears responsibility for some of those problems, which were particularly evident early in the term of the contract as IBM took over the in-scope IT and F&A functions from Carlson in a transition that was anything but smooth.

With that said, the effort Carlson made at trial to portray IBM's performance as an unmitigated disaster is not borne out by the evidence.  Indeed, Carlson's contemporaneous assessments of IBM's performance were, on balance, quite positive, and in areas where IBM's performance was lacking, the parties made adjustments using the mechanisms built into the contract.  Furthermore, when problems did occur, Carlson was assertive in demanding compensation, and it received substantial financial concessions from IBM to resolve those complaints.  The case Carlson presented at trial consisted largely of a re-airing of those old grievances.

Between issues resolved through motion practice and those abandoned by Carlson during trial, a single factual issue looms over Carlson's remaining claims. That issue is whether Carlson has met its burden of proving its allegation that IBM failed to perform approximately 1,074 enumerated items from the contract's Statements of Work.  Cast as breach of contract for one time period and fraud for another, this is the only claim for which Carlson presented evidence of damages.  Inexplicably, though, Carlson's trial presentation otherwise all but ignored those Statement of Work items; in consequence of that and for a number of other reasons, the Court cannot find that IBM failed to adequately perform any, much less all, of them.

Based on all the evidence received at trial, the arguments of counsel, and the parties' post-trial submissions, the Court now makes the following findings of fact, conclusions of law, and order.[1]  As explained below, the evidence establishes that Carlson, not IBM, breached the contract, and Carlson therefore owes IBM more than $14 million in early termination payments.

## FINDINGS OF FACT

### I.     Parties.

IBM is a New York corporation with its principal place of business in Somers, New York and its corporate headquarters in Armonk, New York.  IBM provides business infrastructure, consulting, and support services for computer and IT systems.

Carlson is a privately-held Minnesota corporation with its principal place of business and headquarters in Minnetonka, Minnesota.  Carlson owns a number of brands operating primarily in the travel and hospitality industry and has approximately 175,000 employees worldwide.

---

[1]     To the extent that the Findings of Fact state conclusions of law, they are conclusions of law.  To the extent that the Conclusions of Law state findings of fact, they are findings of fact.

## II.   Carlson's decision to outsource.

In 2004, Carlson's operations were divided into six business units – including hotels, restaurants, and travel groups – and a Corporate Center.  IT functions were largely run independently within the individual business units, while the company had begun the process of centralizing F&A functions in a Shared Services organization within the Corporate Center.

At this time, the executive leadership developed the intention to transform Carlson from a collection of affiliated but segregated businesses – the "silo approach" – into an "integrated operating company."  According to Trudy Rautio, who became Carlson's Chief Financial Officer in 2005 and is now the company's President and Chief Executive Officer, the goal was to create "[a] company that could focus on its growth around the world, and a company that could focus on its customer relationships, many of which were common across the businesses."

This vision was to be achieved in part by consolidating certain IT and F&A functions across Carlson's business units, such that information could be shared more freely company-wide, systems and processes could be improved, capabilities could be expanded, and costs could be reduced.  The key to the idea – and the reason it garnered widespread support among the executives at Carlson – was that the money that was expected to be saved through the newfound efficiencies in these "back-office" functions could then be devoted to growing the core of the company, either through re-investment in the existing business units or through acquisitions.

Looming large, however, was the major strategic question of whether this aspect of Carlson's corporate makeover would be accomplished internally or by outsourcing the functions to an outside provider.  That issue inspired sharp differences of opinion.  Then-Chief Operating Officer Curtis Nelson, for one, was seen as a "champion" of outsourcing, while others, including

5

some of the business unit executives who faced the prospect of losing control over their IT and F&A systems, were strongly opposed to it.

With then-Chief Executive Officer Marilyn Carlson Nelson in favor of exploring the company's outsourcing options, Carlson retained TPI, a consulting firm, and the law firm of Mayer Brown to advise it as it moved forward and issued requests for information and proposals. In the first half of 2005, an evaluation team at Carlson performed due diligence on IBM and a joint venture between Accenture and Hewlett Packard, the vendors who had submitted proposals. That evaluation process included a trip to India to investigate the vendors' off-shore operations centers, as it was understood from the outset that a substantial portion of the outsourced services would be performed overseas under either proposal.

In June of 2005, the evaluation team recommended to the executive leadership that Carlson outsource to IBM.  According to the materials produced by the evaluation team for its presentation to the executives, the team "went from skeptical to believers in outsourcing" as they did their assessments, ultimately concluding that Carlson could achieve the transformation that was envisioned and attain its cost-savings goals in a shorter period of time by outsourcing than by keeping the functions in-house.  The evaluation team also outlined for the executives the bid from IBM, which it had "scored higher than Accenture in all categories . . . ."  The scope of the proposed outsourcing encompassed 25% of Carlson's F&A budget and 45% of its IT budget, and also included the building of an ERP system.  The evaluation team also explained that "strategy," "policy setting," "architectures," "decisions," and "governance" responsibilities in these three outsourcing areas would be retained by Carlson.

The evaluation team's recommendation to outsource to IBM was met with some skepticism and dissension among Carlson's executive leadership.  Rautio, for instance, was

initially opposed to outsourcing in the F&A realm, as she felt that the company was seeing a

"steady progression" in the performance of those functions as they were consolidated in the

corporate Shared Services organization.  IBM's proposal, however, was "all or nothing," as the

cost savings that had been projected depended upon outsourcing IT and F&A functions together.

Facing that reality, Rautio was ultimately persuaded, as were the business unit executives, that

outsourcing all of the functions encompassed by IBM's proposal would achieve the desired cost

savings more quickly than if Carlson were to continue to perform them internally.  And as Rautio

put it, "everyone was of one mind that we wanted to reduce costs."

The executives therefore presented the recommendation to Carlson's Board of Directors,

which approved it unanimously in June of 2005.  With the plan to outsource to IBM having thus

received the necessary final approval, contract negotiations began in earnest.

By the end of the summer of 2005, those negotiations produced the parties' Master

Services Agreement ("MSA").  That original MSA was renegotiated twice within the next four

years, with each round producing a progressively smaller version of the MSA.  These three

versions are outlined below.


**III.     2005 Master Services Agreement.**

The original MSA was signed on August 25, 2005 by Curtis Nelson on behalf of Carlson

and by Michael Daniels, Senior Vice President of Information Technology Services, on behalf of

IBM, with an effective date of September 1, 2005.  The contract was to run for an initial term of

ten years, with a total value of $646 million.

**A. Scope.**

The scope of the contract corresponded to the three realms of outsourcing that Carlson's evaluation team had outlined for the executives: IBM was to serve as service provider for certain – but not all – of Carlson's F&A (including Business Process Outsourcing, or "BPO") and IT (including Application Development and Maintenance, or "ADM") functions, as well as to build and implement an ERP system for Carlson.

The MSA called for IBM to gradually assume responsibility in these realms over the course of a transition period, and it also accounted for the eventuality that either party could terminate the agreement before the expiration of its initial ten-year term.  In that scenario, the contract provided for the orderly insourcing of services back to Carlson through Termination Assistance Services.

This scope is set forth succinctly in § 4.1(a) of the MSA:

Commencing on the Commencement Date for the applicable Service (or, if later, the date on which IBM assumes responsibility for the Services in question in accordance with the Transition Plan), IBM (which, for purposes of performing the Services shall include IBM's affiliates) shall provide the Services to Carlson, and, upon Carlson's request, to Eligible Recipients and Authorized Users.  The Services shall consist of the following, as they may evolve during the Term of this Agreement or be supplemented, enhanced, modified or replaced:

(i)     The services, functions and responsibilities described in this Agreement and its Schedules and attachments, which include the Technology and Business Process Evolution and the following:

(1)     the Transition Services, as further described in **Section 4.2** and **Schedule C**;
(2)     the ERP Build Services, as further described in **Section 4.3** and **Schedule D**;
(3)     the Services, as further described in **Schedule E**;
(4)     Projects, as further described in **Section 4.7**; and
(5)     the Termination Assistance Services, as further described in **Section 4.4**.

8

With regard to the IT portion of the agreement, IBM's expert Timothy Clayson explained that IBM was to provide certain services across the following seven domains, or "towers," of Carlson's environment:

- **Servers and Mainframe:** Carlson had an IBM mainframe already in place before the MSA was executed, as well as approximately 1,700 midrange servers.  The midrange servers spanned three primary server platforms and were located in three primary data centers, as well as ten to twelve other locations.

- **End User Computing:** Carlson had approximately 8,400 PCs and laptops in use, running about 256 different end-user applications.

- **Voice (Telephony):** Carlson had approximately 10,000 voice ports, over 6,000 handsets, 6,400 routing vectors, and 264 Interactive Voice Response ports.

- **Data (Network Communication):** Carlson had approximately 2,500 network components.

- **Applications:** Carlson had approximately 1,600 business applications that operated on the servers and mainframe.  Over the course of the contract, IBM had responsibility for about 180 of those applications.

- **Cross-Functional Equipment and Services:** Carlson had over 340,000 individual licenses to track and manage, as well as 25 million user IDs in 600 different ID management systems.

- **Cross-Functional General Services:** Carlson had a help desk that handled approximately 13,000 calls per month, maintenance of approximately 30,000 email boxes, coordination with 200 different technology vendors and products, and about 180 third party service contracts.

At Schedule E, the contract contained Statements of Work ("SOWs") corresponding to each of these towers.  Within each Statement of Work, the parties listed a number of functions and tasks related to the corresponding tower and, for each one, indicated whether responsibility for it was to fall to IBM or remain with Carlson.

The content of these SOW line items varies widely.  Some assign a specific task to one party or the other, while others are written in exceedingly general language.  Many also assign to one party a responsibility that is explicitly contingent upon the occurrence of an event that may

or may not come to pass or an action that could only be initiated by the other party.  For instance, as but three examples from among a multitude of similar line items in the SOWs, IBM's responsibilities within the Servers and Mainframe tower included: "[r]unning or terminating utilities depending upon the impact to Authorized Users and only with Carlson approval," MSA Sched. E3-1 SMS-36; "[p]roviding consultation support as Carlson reasonably requests," *id.* SMS-91; and "[w]orking with the operations group as required," *id.* SMS-336.

The Schedule E SOWs therefore did not obligate IBM to rotely and uniformly perform each line item that is marked as an IBM responsibility on any particular timetable.  Rather, the Statements of Work defined the contours of the parties' relationship and mapped in detail the division of responsibility between the two companies within each tower.

### B.  Contractual relationship.

With the scope of their arrangement thus defined, in § 21.6 of the MSA, Carlson and IBM expressly disavowed that they were embarking on a joint venture or partnership and disclaimed any agency relationship between the two companies.  Instead, the parties memorialized their common understanding that IBM was an "independent contractor" that was to be engaged in "furnishing services" to Carlson.

Carlson and IBM also set forth their shared goals and objectives for this arrangement in § 1.2 of the MSA, and they agreed in § 1.3 that any unclear or ambiguous contractual terms should be construed in light of them.  These goal statements are consistent both with IBM's role as an independent contractor and with the vision that had initially inspired Carlson's executive leadership to explore outsourcing the company's IT and F&A functions, including that such a

move would allow for the transformation of processes and improve capabilities in those "back office" areas.

By the same token, the parties' goals and objectives are wholly inconsistent with the assertions made by certain of Carlson's witnesses that Carlson outsourced the "lifeblood" of its business to IBM or "handed over the keys" when it signed the MSA.  Far from these overwrought and retrospective characterizations of the arrangement, the MSA itself evinces the parties' contemporaneous understanding that IBM would occupy a supporting, even a subordinate, role with respect to Carlson.  As the parties themselves expressed in the contract, the outsourcing agreement they reached was designed to "[s]upport Carlson's . . . current and future business strategies and needs, . . . including Carlson's desire to expand globally and through mergers and acquisition[s]," and to "[l]ower Carlson's . . . overall capital investment in back office functions[,] thereby providing an opportunity to focus investments into revenue generating front-office activities."  *Id.* §§ 1.2(a), (h)(iv).

The manner in which the parties divided their rights and obligations in the MSA is consistent with the nature of their relationship.  IBM was assigned responsibility for providing the services outlined in § 4.1(a) as they may be required, for developing and implementing quality controls to ensure that those services were "performed in an accurate and timely manner," and for reporting to Carlson on that performance in accordance with Schedule R of the MSA.

Carlson, however, retained "strategic control" and supervision over the arrangement at all times.  Indeed, the MSA granted Carlson "final authority to determine and promulgate Carlson Standards and Strategic Plans," which IBM was required to "comply with and implement . . . in providing the Services . . . ."  MSA  § 9.5(b).  These Carlson Standards were "standards, policies,

11

practices, processes, procedures, and controls to be adhered to and enforced by IBM in the performance of the Services[, and] the associated IT technologies architectures, standards, products, and systems to be provided, operated, managed, supported and/or used by IBM in connection therewith . . . ."  MSA § 9.5(a).  Carlson's Strategic Plans, in turn, set the "appropriate direction for such Carlson Standards in light of business priorities, business strategies, competitive market forces, and changes in technology . . . ."  *Id.*

Concomitant with this strategic authority, Carlson was assigned significant oversight responsibilities, with broad rights to audit the full extent of IBM's performance and to use the results to challenge its pricing and delivery of services.  MSA §§ 9.9, 11.10(a).  The MSA granted Carlson regular and recurring access to IBM personnel as well as to "complete . . . records of and supporting documentation for all Charges, all Carlson Data and all transactions, authorizations, changes, implementations, soft document accesses, reports, filings, returns, analyses, procedures, controls, records, data or information created, generated, collected, processed or stored by IBM in the performance of its obligations . . . ."  MSA § 9.9(a).  These access rights were designed to enable Carlson to conduct operational audits to "examine IBM's performance of the Services [and] verify IBM's reported performance against the applicable Service Levels," as well as financial audits to "verify the accuracy and completeness of Charges [invoiced to Carlson and] examine IBM's performance of its other financial and accounting obligations . . . ."  MSA § 9.9(b)-(c).

Under the contract governance structure outlined in Schedule B of the MSA, primary responsibility for exercising these audit rights rested with Carlson's Contract Manager.  MSA Sched. B § 2.1.4.

### C.  Standards of performance.

The MSA also assigned "primary responsibility to monitor and support IBM's performance of the Services" to Carlson's Service Delivery Managers.  MSA Sched. B § 2.1.8.

The standards to which IBM was expected to perform the Services are set forth in § 7 of the MSA.  As described there, IBM was to "perform the Services so as to meet or exceed the Service Levels set forth in Schedule G."  MSA § 7.1(b).  Service Levels (or "SLAs," for Service Level Agreements) are "quantitative performance standards for the Services."  MSA Sched. A.

If, however, a particular Service that IBM was obligated to perform was not encompassed by one or more SLAs, the parties agreed that IBM would provide that Service in accordance with "general performance standards."  MSA § 7.1(a).   Where those general standards applied, IBM was required to perform "at levels of accuracy, quality, completeness, timeliness, responsiveness and resource efficiency that are at least equal to those received by Carlson or the Eligible Recipients in the twelve (12) months prior to [the] date" on which IBM assumed responsibility for the Service, and "at levels of accuracy, quality, completeness, timeliness, responsiveness, resource efficiency and productivity that are equal to or higher than the accepted industry standards of first tier providers in services that are similar to the Services."  *Id.*

Though Carlson at trial attempted to make much of the language regarding "industry standards" in § 7.1(a), the parties contemplated, and the structure and content of the MSA itself attests, that SLAs were to be the primary measure of IBM's performance within and across the functional service areas of the contract.  Michael Rockhold, Carlson's Senior Director of Strategy and Analysis and its lead negotiator of the IT SLAs, testified that he worked during the contract negotiations with the Carlson managers who were responsible operationally for the IT service towers, as well as with an adviser from TPI, in an effort to ensure that the SLAs the

parties established would comprehensively cover the Services that IBM was undertaking to provide in each tower.  At the same time, Carlson was cognizant that the number of SLAs had to be manageable for both IBM and Carlson.  As Rockhold explained, using SLAs to measure performance imposes overhead costs for collecting and processing the data on which they are calculated.  Those costs are ultimately reflected in the price of the contract and therefore would have been borne by Carlson, which was driven to outsourcing in large part by its goal of "[l]ower[ing its] overall capital investment in back office functions and thereby [gaining] an opportunity to focus investments into revenue generating front-office activities."  MSA § 1.2(h)(iv).

Establishing an SLA to correspond to each of the line items in Schedule E for which IBM assumed responsibility – even assuming it were possible – would thus have been wildly impractical and counterproductive for both Carlson and IBM.  Instead, the parties, wherever possible, set "higher level" SLAs in Schedule G; in other words, they agreed to measure IBM's performance using SLAs that each encompassed a number of discrete tasks that fell within IBM's realm of responsibility. As Rockhold put it, "there would be a lot more activities than there would be service levels," and this was by design.  Therefore, while meeting the SLAs set forth in Schedule G was certainly not IBM's only responsibility under the MSA, the SLA results were to be the primary, comprehensive measure of whether IBM was satisfactorily providing the full scope of the Services to Carlson.

In addition, Schedule G granted to Carlson the right to adjust the SLAs as the parties moved forward with the outsourcing – whether by adding, deleting, or modifying them, MSA Sched. G § 8 – so that they would continue to provide an accurate picture of IBM's performance as circumstances inevitably changed.

14

The method for measuring IBM's performance that the parties set forth in Schedule G thus reflects the emphasis that is evident in the MSA as a whole on building a flexible, cooperative relationship between the two companies. Anticipating the advances in technology and business processes that were bound to occur over the term of the contract, the parties agreed on a framework that would allow them to adapt to those developments as they arose. Indeed, IBM explicitly "acknowledge[d] and agree[d] that its current technologies and business processes shall continue to evolve and change over time, and at a minimum, shall remain consistent with (i) the established best practices of leading providers of services that are the same as or similar to the Services, and (ii) the evolution in the objectives of Carlson . . . reasonably related to the Services." MSA § 9.12(a).

Significantly, the MSA contemplated that those evolutions and improvements – in effect, keeping pace with changing "industry standards" – would be incorporated into, and therefore measured by, the SLAs:

> Carlson and IBM shall periodically review the Service Levels and the performance data collected and reported by IBM in accordance with Schedule G and relevant industry data and trends on an annual basis (or more frequently if requested by Carlson). As part of such review process, the Parties shall, at no additional cost to Carlson, increase the Service Levels to reflect the higher performance levels actually attained or attainable by IBM in accordance with Schedule G. In addition, . . . the Parties shall agree, to the extent reasonable and appropriate, to (i) increase the Service Levels to reflect improved performance capabilities associated with advances in the proven processes, technologies and methods available to perform the Services; (ii) add new Service Levels to permit further measurement or monitoring of the accuracy, quality, completeness, timeliness, responsiveness, cost-effectiveness, or productivity of the Services; (iii) modify or increase the Service Levels to reflect changes in the processes, architecture, standards, strategies, needs or objectives defined by Carlson; and (iv) modify or increase the Service Levels to reflect agreed upon changes in the manner in which the Services are performed by IBM.

MSA § 7.4(b).

**D.  Invoicing.**

The primacy of the SLAs as the measure of IBM's performance is further confirmed by the parties' straightforward agreement that "Carlson is paying IBM to deliver the Services at specified Service Levels" and "to provide certain Critical Deliverables by the time and in the manner agreed by the Parties."  MSA § 7.2(a)-(b).  ("Critical Deliverables" and their due dates are set forth in Schedule G-2; these items include, for example, timely delivery to Carlson of transition plans for each tower, drafts of sections of the Policy and Procedures Manual, and monthly SLA reports.)

In the face of this plain statement, Carlson's claims are built on the unfounded supposition that, when it paid the monthly invoices over the course of the contract, it was paying IBM to perform each line item in the Schedule E Statements of Work each month.  Not only do the nature of the Statement of Work items themselves make this assertion implausible on its face, but Carlson presented no evidence whatsoever that the invoices were either understood or calculated in that manner by anyone in Carlson or IBM at any time during the life of the contract.

What the evidence does reveal is that the amounts for which IBM invoiced Carlson each month were in fact tied closely to IBM's monthly attainment of the SLAs established in Schedule G, which sets forth a detailed formula for calculating Service Level Credits.  Those credits are compensation that would be awarded to Carlson and deducted from the invoice in the event that IBM committed a "Service Level Failure."  *See* MSA Sched. G §§ 5-7.  Indeed, the MSA specifies that "[i]f IBM fails to meet [the] Service Levels, then, in addition to other remedies available to Carlson, IBM shall pay or credit to Carlson the performance credits specified in **<u>Schedule G</u>** ("**Service Level Credits**") in recognition of the diminished value of the Services resulting from IBM's failure to meet the agreed upon level of performance, and not as a

penalty." MSA § 7.2(a). (The MSA contains a similar provision for crediting Carlson in the event that IBM missed a deadline for a Critical Deliverable. MSA § 7.2(b).) The invoices themselves indicate that IBM did in fact provide more than $3.5 million in total Service Level Credits to Carlson for SLA misses in the IT realm of the contract.

Nowhere in the MSA, and never in practice, did the parties connect the monthly invoices to the Statements of Work in the way that Carlson urged at trial.

## IV. Amendment 15.

The parties agreed at the outset that IBM would assume responsibility for the Services gradually over the course of a transition phase, which was to run from the contract effective date of September 1, 2005 through March 1, 2006, the "cut-over" or "go live" date. Due to gaps in the transfer of institutional knowledge from Carlson to IBM and other factors, that transition and the period immediately following it were marked by a series of problems attributable to IBM in all three phases of the contract, including a delay in the launch of the ERP system, the crash of Carlson's hotel reservation system in June 2006, and Carlson's failed Payment Card Industry Security audit in November 2006.

With the contract off to such a poor start, the parties negotiated Amendment 15 to the MSA, which became effective on January 31, 2007. In the preamble to that amendment, the parties acknowledged the ERP delay, as well as "their mutual desire to increase Carlson's overall satisfaction with various Services, including the ERP Services."

In light of those problems, and "solely to increase Carlson's customer satisfaction with the Services," IBM credited Carlson $4.5 million under Amendment 15. MSA Am. 15 ¶ 2. At the same time, the parties explicitly agreed that

the ERP Delay is not and will not be deemed to constitute a breach of the MSA and that, as of the Amendment No. 15 effective date, IBM is not in breach of the MSA with respect to any ERP Services, and IBM has met all ERP related performance obligations required to be performed as of the Amendment No. 15 effective date. . . . Furthermore, as of October 1, 2006, the Parties agree that IBM has met all performance obligations with respect to ITO-related Services and IBM is not in breach of the MSA with respect to such Services as of such date. The foregoing sentence does not suggest that IBM has or has not met its ITO obligations following the date of October 1, 2006. Nothing in this paragraph shall be construed to establish a standard for a material or non-material breach of the MSA.

MSA Am. 15 ¶ 2. The Court has previously found this to be a valid and enforceable release by Carlson of all breach of contract claims relating to IBM's performance of IT Services prior to October 1, 2006. *See* Summary Judgment Order at 3-8, ECF No. 422.

Amendment 15 did not otherwise alter the MSA. MSA Am. 15 ¶¶ 3-4.

## V.    Amendment 30.

Following the execution of Amendment 15, IBM's performance improved and stabilized. Nevertheless, after conducting a "detailed review of all in-scope services" in early 2007, Carlson moved to exercise its contractual right to reduce the scope of the outsourced services, which the MSA specified it could do at any time and for its own convenience. *See* MSA § 20.2. The MSA simply required, in the event that Carlson exercised that right, that the parties "equitably adjust" the scope, pricing, and other terms of the contract. MSA § 11.7(b). The negotiations on those points proceeded over several months in mid- to late-2007 and ultimately produced Amendment 30, by which Carlson brought all of the F&A and one-third of the IT Services that had been outsourced to IBM back in-house.

It is clear that Carlson's decision to reduce the scope of the MSA in 2007 was driven primarily by the rapidly worsening economic conditions the company faced, rather than by any

genuine dissatisfaction with IBM's performance.  The problems that had occurred during the first

year of the MSA no doubt soured some within the leadership at Carlson on the outsourcing

arrangement.  In addition, one of the major proponents of the IBM contract, COO Curtis Nelson,

had left the company in 2006, and an individual who would come to figure prominently in

Carlson's decision-making process over the next several years, Chief Technology Officer Steve

Brown, had admittedly "never [been] a big fan of outsourcing or of IBM."

However, the companies had just  resolved the problems by which Brown and other of

Carlson's witnesses claimed to have been so irked to Carlson's satisfaction in Amendment 15,

and in so doing had committed themselves to moving the contract forward successfully.  And

those efforts did succeed, as IBM's performance trended steadily upward after Amendment 15

was finalized.

What deteriorated in the immediate aftermath of Amendment 15 was not IBM's

performance, but rather Carlson's own financial outlook.  In fact, by the summer of 2007,

Carlson was already considering the need to contract, rather than expand, its operations.  As

noted above, Carlson had entered into the MSA in 2005 as part of its transformation into an

integrated operating company.  At the time, Carlson anticipated that it would experience

significant growth in the coming years, both through investment in its existing business units and

via acquisitions.  Carlson believed that the MSA would "[e]nable [that] future growth" by

providing cost-savings and an "[i]ncreased ability to scale for acquisitions," such as with the

ERP system that IBM was to build and implement.  What made that ERP system attractive to

Carlson was that it could be "scaled to much bigger size businesses" than what Carlson was then

operating.

Before the cost-savings from the MSA and the forecasted growth in Carlson's business were ever realized, however, Carlson began to feel the effects of what would develop into the Great Recession, which struck the travel and leisure industry particularly hard.  In 2007, for example, only two years into the MSA, Carlson suffered a $53 million loss from operations.  As a result, Carlson began to explore the sale of its business units, several of which were indeed sold by early 2008.

As these new realities set in, Carlson also began positioning itself for an early termination of the MSA, whose value to Carlson diminished significantly with the contraction of its business.  As a Carlson executive-level presentation put it at the time, "[c]orporate overhead" – of which the MSA was a substantial part – "was sized for growth that did not materialize and must now be 'right-sized.'"

In May of 2007, Brown sent a memo broadly throughout Carlson asking for information on "any direct damages you believe have occurred as a result of IBM failing to perform," for use in "the likely negotiation."  Subsequently, as part of the negotiations that produced Amendment 30, Carlson sought damages from IBM totaling $5.4 million relating to IBM's performance of IT Services and $8.3 million relating to IBM's performance of F&A Services.

The following month, Brown informed Jeff Balagna, Carlson's Chief Information Officer and its lead negotiator on Amendment 30, that he had "gathered info on implication of early termination charges and conditions" and concluded that "[e]arly termination is expensive – perhaps prohibitive under any circumstance over the next 18 months" due to the charges that Carlson would be obligated to pay IBM under the MSA.  In lieu of early termination for convenience, Brown told Balagna that he was "exploring our rights further in the event we can pursue a breach strategy" – in other words, a termination for cause, for which Carlson would owe

20

IBM less in termination fees – as "termination charges do appear to be material if one of our scenarios requires a substantial reduction or elimination of the IBM sourcing agreement."

Brown's "breach strategy" accelerated the next month, when Carlson began "short paying" IBM's monthly invoices.  In all, Carlson withheld over $2 million dollars from the amounts IBM invoiced for the months of July through November of 2007, asserting, in Brown's words, that it would not "continue paying for contracted services that are not delivered or continued to be delivered at a quality level below reason and contract."  Along with the allegations of direct damages that Brown had marshalled, these short pays became the subject of the ongoing negotiations through which Carlson hoped to achieve an immediate, significant reduction in the scope of the MSA as well as to position itself favorably for an early termination of the entire contract in the near future.

Carlson achieved those goals with Amendment 30, which was signed on December 13, 2007 and went into effect on January 1, 2008.  With that amendment, Carlson took back all F&A Services and approximately one-third of IT Services, and IBM provided the following compensation to Carlson:

- a $3 million credit, reflected on the December 2007 invoice, to settle Carlson's performance claims for damages with respect to F&A services;

- a credit of $3.8 million over two years, to reflect forgiveness of the F&A termination payments that were due to IBM as a result of Carlson's early termination of the F&A portion of the MSA;

- a $3 million reduction in future IT services over a two-year period;

- resolution of the disputed amounts that Carlson had withheld from IBM's 2007 invoices, whereby Carlson retained approximately $0.9 million of the withheld amounts related to F&A services, and $0.9 million of the withheld amounts related to IT services; and

- a $5 million reduction in future IT termination payments if Carlson terminated the contract for convenience between January 2010 and June 2010.

21

In recognition that the parties had thus ended the F&A portion of the contract and resolved all of their otherwise outstanding disputes, Amendment 30 included a mutual release, whereby

> [e]ach Party hereby release[d] the other Party . . . from all actions, proceedings, accounts, rights, claims, demands, liabilities, costs and expenses arising out of or relating to the F&A Services (and Charges therefor) and the Dispute (as defined above) that it now has or that may hereafter accrue and that are based on, arising from, or related to events or failures occurring prior to the date of execution of this Amendment.

MSA Am. 30 § 3(d).  The parties defined their settled "Dispute" as a "dispute regarding the F&A Services, certain Charges, and amounts withheld by Carlson," *id.* § 3(a), and placed claims for the tort of fraud outside the scope of the release, id. § 3(d)(ii).

Unlike all other amendments – with the exception of Amendment 45, discussed below – Amendment 30 scrapped the original MSA and its schedules and replaced them with new ones, to reflect the reduced scope of the parties' arrangement.  MSA Am. 30 § 5.  The portions of the original MSA specifying that IBM's performance of the Services were to be measured by SLAs and providing for early termination payments to IBM were replaced by identical provisions in the Amendment 30 contract.


**VI.     Amendment 45.**

After the reduced-scope Amendment 30 version of the MSA went into effect on January 1, 2008, the global economic crisis deepened, and Carlson's financial condition deteriorated with it.  In response, Carlson's then-CEO Hubert Joly imposed rigid cost-cutting targets that could only be met by terminating the contract with IBM entirely.  A heading to one section of a May 2008 Carlson presentation states (caps in original): "IN ORDER TO ACHIEVE DESIRED

COST REDUCTION OBJECTIVES, CARLSON MUST EXIT THE IBM SOURCING

ARRANGEMENT."

Carlson's current CEO, Trudy Rautio, confirmed that these cost-cutting guidelines

required termination of the IBM contract without regard to IBM's performance:

**Court:** So the cost cutting that was directed by the new CEO could not have been accomplished without exiting the IBM contract, right?

**Rautio:** The goals that he set could not have been accomplished without exiting.

**Court:** And is that with or without regard to the quality of the performance of IBM under the contract? Was it a cost?

**Rautio:** It was simply a target that he had set of I think it was a 20 percent reduction in overall G&A, and so that was not in regard to the quality, no, Your Honor.

**Court:** So that just couldn't be met no matter what the quality, his targets couldn't be met without exiting the contract?

**Rautio:** Correct.

Despite these cost pressures, Carlson was unable to terminate the MSA immediately, due

to concerns over the amount of its termination obligations.  Carlson had, however, negotiated

and won the $5 million reduction in termination payments if it terminated the contract for

convenience in the window between January and June of 2010.

In the meantime, Carlson decided to withdraw from as much of what remained of the

outsourcing agreement as possible without violating the MSA's Minimum Revenue Commitment

("MRC") and thereby triggering termination payment obligations; that threshold was "50% of

Services."  This phased reduction strategy can fairly be characterized as "managing to the

minimum," or "managing to the contract."

IBM's Robert Zapfel, the General Manager of IBM's Services business in the Americas

who had been a principal negotiator of Amendment 30, learned about Carlson's intention to take

23

back additional services in a June 2008 phone call from Carlson's Jeffrey Balagna, who told

Zapfel that Carlson was "downsizing . . . corp[orate] functions" and had to "throttle back IT

accordingly."  Balagna urged Zapfel to identify the parts of the contract IBM would be most

willing to surrender because he (Balagna) "care[d] less about the what and more about getting

their total costs down . . . ."  In a subsequent call with Zapfel, Balagna expressed his concern

"that Carlson was in no position to pay [termination for convenience] charges [and that Carlson]

had not budgeted for them."

     In July of 2008, pursuant to Carlson's efforts to stay just above its MRC, Carlson issued a

"Contract Change Request," reducing the remaining scope of work by about half.  A

contemporaneous Carlson "Position Paper" made clear once again that this decision was driven

by Carlson's need to cut costs: "Due to economic downturn, Carlson is aggressively pursuing

cost savings opportunities.  The largest IT Infrastructure cost for GBIS is the IBM contract, so it

has become necessary to look at reducing the services we obtain from IBM."

     In response to Carlson's Contract Change Request, the parties once again renegotiated

the scope, pricing, and Service Levels of the contract.  Repeating his pattern from the

Amendment 30 negotiations, Carlson's Steve Brown voiced complaints about IBM's

performance and "suggest[ed] that IBM consider its pricing demands very carefully and in this

light."  Brown also began, again, to short pay the IBM invoices.

     On June 19, 2009, the parties reached agreement on all issues relating to the renegotiated

contract, including the "Invoice Dispute" initiated by Brown, in Amendment 45.  IBM forgave

all but $93,751 of the $4.749 million that Carlson had short paid between January and May of

2009.  Amendment 45, like Amendment 30, completely replaced the previous MSA, but

preserved the provisions specifying that the SLAs would serve as the measure of IBM's

performance of the Services and providing for early termination payments to IBM.


**VII.    Termination of MSA.**

On July 6, 2009, just 17 days after the parties signed Amendment 45, Carlson served

IBM with notice of final termination, effective no later than June 30, 2010, in a letter penned by

Brown.  A second Carlson notice of termination, sent September 28, 2009, accelerated the

effective termination date to January 4, 2010.

Neither of Carlson's termination letters makes any reference to termination for cause, and

both call for termination within the window for which Carlson had negotiated a $5 million

reduction in the termination payments it would owe to IBM in the event of termination for

convenience as part of Amendment 30.

By January 2010, Carlson had taken back nearly all Services from IBM, and IBM began

invoicing Carlson for the termination payments that it was due under the terms of the MSA.

Instead of paying those fees in full, Carlson instructed a team of its employees to assess IBM's

performance of IT Services under the MSA, dating all the way back to 2006.[2]  The resulting

document consisted in large part of a spreadsheet listing "Carlson's Requirements" under the

MSA from 2006 through the end of 2009, corresponding precisely to the more than 3,000 line

items for the IT towers set forth in the MSA's Schedule E Statements of Work.  For each of

---

[2]      Carlson's 2010 Services Assessment was excluded under Federal Rule of Evidence 802, as it is a document that was prepared in anticipation of litigation.  Order of March 14, 2014, ECF No. 475.  It is addressed here only to provide context for the discussion of Carlson's Amended Complaint, its breach of contract theory, and the report of its expert, Stephen Andriole, that follows.

those items, the Carlson employees retrospectively rated IBM's performance on a scale of 0 to 1, with 0 indicating "not performing," .5 partially performing, and 1 "performing."

## VIII.  Litigation.

Based on the results of that 2010 Services Assessment, Carlson took the position that IBM had failed to perform 1,074 Statement of Work line items over the life of the contract. Carlson claimed that, by so doing, IBM had materially breached the contract and committed fraud, such that it was not entitled to the termination payments it was requesting.

On May 14, 2010, Carlson sent IBM a letter reflecting that assessment and those claims. While Carlson claimed to have been attempting to initiate an informal dispute resolution under § 19.1 of the MSA, Carlson conditioned its participation in an expedited process on IBM's abandonment of its demand for payment of the termination fees Carlson had withheld.  Carlson's approach was far more consistent with its litigation strategy than a good faith effort to resolve the dispute without the courts.

And when IBM balked at Carlson's posturing, Carlson commenced this action in Hennepin County, Minnesota by serving IBM with a summons and Complaint.  On August 10, 2010, IBM removed the case to this Court, invoking 28 U.S.C. § 1332(a) as the jurisdictional basis, and soon moved to dismiss the Complaint.  In response, Carlson sought, and the Court granted, leave to amend the pleading.

Carlson filed its First Amended Complaint on January 18, 2011.  More than 90 pages of Carlson's 141-page Amended Complaint were essentially cut-and-pasted from the 2010 Services Assessment, as they are comprised of a list of the 1,074 line items from the Statements of Work that Carlson alleged that IBM had not performed from 2006 through 2009.

This Amended Complaint – the operative one here – asserts five causes of action against IBM: (1) fraudulent inducement; (2) fraud in performance; (3) breach of contract for failure to provide agreed upon IT services and products, for breach of Carlson's Code of Ethics and best practices, and for overcharges; (4) breach of fiduciary duties through fraud; and (5) declaratory judgment, relating to set off and escrow of the disputed termination payments.

IBM moved to dismiss the Amended Complaint.  On July 8, 2011, the Court granted the motion in part and denied it in part, which resulted in the dismissal of Carlson's fraudulent inducement count.

Subsequently, on August 15, 2011, IBM filed a Counterclaim asserting two counts of breach of contract against Carlson.  The first count relates to amounts allegedly due and owing to IBM as termination charges pursuant to the MSA, while the second relates to Carlson's alleged failure to utilize the informal dispute resolution process called for by the contract before bringing suit.

Discovery proceeded over the next two years, at the close of which IBM moved for summary judgment.  On November 13, 2013, the Court granted that motion in part and denied it in part, dismissing Carlson's breach of fiduciary duties through fraud claim and, on the basis of Amendment 15, the portion of its breach of contract claim arising from IBM's performance of ITO-related services prior to October 1, 2006.

At trial, Carlson abandoned its contract theory that IBM had breached the Carlson Code of Ethics.  Carlson also abandoned its fraud in the performance claim, except as it relates to the pre-October 2006 time period: as Carlson's counsel stated in his closing argument, "On the fraud in the performance, just so that we're clear on what we're claiming, we're claiming fraud in

27

performance up to October 1 of 2006, the date of [A]mendment 15 . . . . [W]e are only going on fraud for that period."

Therefore, the only remaining claims before the Court for which Carlson seeks damages from IBM are: (1) breach of contract from October 1, 2006 through December 31, 2009, for IBM's alleged failure to perform 1,074 IT Statement of Work items (Count III of the Amended Complaint); and (2) fraudulent invoicing for the period up to October 1, 2006, for IBM's allegedly fraudulent misrepresentations with the monthly invoices that all Statement of Work items were being performed (Count II of the Amended Complaint).

Also before the Court is Count I of IBM's Counterclaim, in which it seeks to collect the unpaid early termination payments it alleges it is owed by Carlson for terminating the contract for convenience.

Each of these three remaining claims is discussed below.

## CONCLUSIONS OF LAW

### I.    Carlson's breach of contract claim.

Under Minnesota law, the elements of a breach of contract claim are: "(1) formation of a contract; (2) performance by plaintiff of any conditions precedent; (3) a material breach of the contract; and (4) damages." *General Mills Operations, LLC v. Five Star Custom Foods, Ltd.*, 703 F.3d 1104, 1107 (8th Cir. 2013) (quoting *Parkhill v. Minn. Mut. Life Ins. Co.,* 174 F.Supp.2d 951, 961 (D.Minn. 2000)).

Regarding the third element, "[t]he materiality of a breach is a question of fact." *Skogberg v. Huisman*, No. C7-02-2059, 2003 WL 22014576, at *2 (Minn. Ct. App. Aug. 19, 2003).  "The [Minnesota] supreme court has held that even when express conditions of the

contract are violated, the breach is not necessarily material." *BOB Acres, LLC v. Schumacher Farms, LLC*, 797 N.W.2d 723, 728-29 (Minn. Ct. App. 2011) (citing *Boatwright Constr., Inc. v. Kemrich Knolls*, 238 N.W.2d 606, 607 (Minn. 1976)).  To be material, a breach must "go[] to the root or essence of the contract." *Id.* at 728 (quoting 15 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 44:55 (4th ed. 2000)).  Put another way, a material breach is one that defeats "one of the primary purposes" of the contract.  *Skogberg*, 2003 WL 22014576, at *2 (quoting Steller v. Thomas, 45 N.W.2d 537, 542 (Minn. 1950)).

The only breach of contract theory on which Carlson presented any evidence of damages was its claim that IBM materially breached the MSA by failing to perform the tasks assigned to it in 1,074 Statement of Work ("SOW") line items from the 2005, Amendment 30, and Amendment 45 versions of the MSA.

This claim fails because Carlson has not satisfied its burden of proving that a material breach occurred.  First, even assuming for the sake of argument that deficient performance or non-performance of some or all of the 1,074 line items Carlson pulled from the Statements of Work (and, in reality, from its unreliable 2010 Services Assessment) constitutes a material breach of the MSA, Carlson fell woefully short of meeting its burden of proving that IBM actually did fail to perform those tasks.  Second, while Carlson did prove that IBM performed poorly in certain instances, particularly early in the term of the contract, those instances do not amount to a material breach of the MSA.

## A.  Statement of Work line items.

Carlson did not introduce sufficient evidence on which it could be found that IBM failed to perform any of the Statement of Work items enumerated in the Amended Complaint, much

less all of them.  No Carlson witness addressed the SOW line items (except Carlson's technical

expert, Stephen Andriole, whose unpersuasive analysis is discussed below), nor did any of

Carlson's witnesses (including Andriole) connect Carlson's trial exhibits or the testimony that

was offered to the individual SOW items.

Aware of this glaring hole in its case, Carlson suggested in its closing argument that it did

not have sufficient time at trial to introduce evidence that IBM failed to perform each of the

1,074 SOW items as it alleged in the Amended Complaint.  That statement is outlandish.

Carlson's case in chief was remarkable for what it lacked: namely, any testimony from any

individual who was actually responsible for or personally involved with performing the tasks that

Carlson alleged were not done.  With its 2010 Services Assessment having been ruled

inadmissible for the truth of the matter asserted therein – i.e., its central claim that IBM did not

perform the 1,074 SOW items – Carlson did not call any of the employees who made that

assessment.  Carlson did not even offer the testimony of its own Service Delivery Managers.

Those managers, referenced at trial as "tower leads," were Carlson's subject matter experts on

the functional service areas encompassed by the MSA and oversaw IBM's performance within

each tower on a daily basis.  *See* MSA Sched. B § 2.1.8.

Instead, Carlson spent a good deal of its time at trial mining for innuendo in an

inordinately long series of emails and Sametime chats among managers and executives at IBM,

and between them and their counterparts at Carlson.  Those exhibits and the accompanying

testimony perhaps provided some insight into the personalities and at times tense working

relationships among those in governance positions at the two companies.  And Carlson certainly

went out of its way to highlight those instances in which the stress that comes with an

undertaking as large and complex as this outsourcing found expression in colorful language.  But

they certainly do not amount to persuasive evidence that the 1,074 SOW tasks were not performed by those whose job it was to perform them.

In fact, only two IT workers who were actually involved in providing IT Services under the contract were heard at trial: Ed Carrigan and Dan Lamont, two long-time and current Carlson employees who had been "re-badged" as IBM employees during the term of the MSA.  Those two witnesses were called by IBM, and they both testified credibly that the IT tasks for which they were responsible had been performed as required.

A review of the SOW line items from the original 2005 MSA demonstrates that, for the vast majority of the 1,074 of them at issue, not even the general topic – much less a specific enumerated task – was the subject of evidence at trial.  As examples that illustrate the dearth of evidence to support Carlson's breach theory, the following is a look at the first Statement of Work line item for the seven IT towers, each of which Carlson alleges that IBM did not perform:

- **Application Development & Maintenance Services, 2006/2007:**
  MSA Sched. E2 (ADM) - 12: "*Installing and monitoring source control tools*." Carlson did not even offer an explanation of what is meant by "source control tools," much less demonstrate that IBM failed to install and monitor such tools, whatever they may be.

- **Servers and Mainframe Services, 2006/2007:**
  MSA Sched. E3-1 (Servers and Mainframe) - 14: "*Monitoring the performance of on-line interactive traffic opening trouble tickets and taking appropriate action to resolve on-line system-related problems, including escalating (as appropriate) the problem to the proper Level 2 Support group*." Carlson presented no evidence regarding what "interactive traffic" consists of, what monitoring of interactive traffic entails, what constitutes "the proper Level 2 Support group," or when "escalating (as appropriate)" would be appropriate, much less that IBM did not perform this item.

- **Data Network Services, 2006/2007:**
  MSA Sched. E3-2 (Managed Network) - 16: "*Analyzing and proposing cost effective Network Service alternatives*." Carlson presented no evidence that IBM failed to analyze and propose such alternatives, or what those alternatives might have been.

31

- **Voice Network Services, 2006/2007:**
  MSA Sched. E3-4 (Voice) - 5: "*Configure, support, operate, monitor and coordinate the maintenance of all Voice Networks currently under support of Carlson as of the Effective Date and managing the Carlson Voice Network contracts in accordance with Schedule F.4 to agreed upon commitment levels for voice calls including local, intrastate, interstate, in-country, international, and inbound voice calls including mobile phone calls.*"
  Although Carlson introduced fragmentary evidence reflecting complaints about IBM's management of the "Voice" tower, no Carlson witness explained the meaning of the many terms in this Statement of Work entry, or testified that IBM did not perform the stated functions.

- **End User Computing Services, 2006/2007:**
  MSA Sched. E3-3 (End User Computing) - 10: "*Aligning the Procurement Catalog with Carlson strategic direction, technical architecture, refresh strategy and product evaluation and test results as approved by Carlson.*"
  Carlson provided no evidence of what a "Procurement Catalog" might be or, if one exists, how IBM failed to "align" it with Carlson's strategic direction or conduct tests for Carlson's approval.

- **Cross-Functional Equipment and Software Services, 2006/2007:**
  MSA Sched. E3-5 (Cross-Functional Equipment and Software) - 6: "*Assisting in development and updating of the long-range plan for Carlson information technology ("IT") systems, processes, technical architecture and standards ("Long Range IT Plan"). While Carlson will be primarily responsible for this plan, IBM will serve as a key collaborator. The Long Range IT Plan will be developed on an annual basis, and will include the annual technology plan as well as a rolling three (3) year projection of anticipated changes (subject to Carlson business and planning requirements).*"
  Carlson did not offer in evidence, nor did any Carlson witness discuss, any "long-range plan" for Carlson's IT environment (for which Carlson, not IBM, had primary responsibility under this item), nor did Carlson offer any evidence that IBM failed to serve as a "key collaborator" on such a plan, if indeed such a plan existed.

- **Cross-Functional General Services, 2006/2007:**
  MSA Sched. E4 (Cross-Functional General)- 6: "*Emphasizing the elimination or quick resolution of problems; maintaining clear accountability; and meeting specified Service Levels.*"
  While some evidence relates generally to the topic of problem resolution, Carlson presented no evidence regarding whether IBM did or did not "emphasize" elimination or quick resolution of problems, whether or not "clear accountability" was maintained, or what specified Service Levels are referenced in this task.

In lieu of providing evidence that would prove that IBM failed to perform the 1,074 SOW tasks as alleged, Carlson rested the foundation of its breach of contract claim almost entirely on the reports of its technical expert, Stephen Andriole, which were admitted in light of his unavailability at trial due to illness. Carlson essentially proposed that the Court cede its fact-finding responsibilities to its expert witness. Showing its hand, Carlson went so far as to contend that Andriole's analysis – in which he purports to scrutinize IBM's performance of a handful of "representative Services" from each service tower – "obviates the need for the Court to 'decide whether the remaining 1000+ tasks were performed sufficiently.'" Carlson Mem. in Opp'n to IBM's Rule 52(c) Mot. at 10, ECF No. 497.

Carlson cannot meet its burden of proof by relying on Andriole's reports, for a number of reasons. Chief among them is that Andriole himself does not provide a meaningful analysis of the 1,074 SOW items. He does not link any evidence (whether record evidence or otherwise) with IBM's alleged failure to perform any of the SOW line items. Instead, for each of the service towers, Andriole lists the SOW tasks that Carlson's 2010 Services Assessment (and therefore its First Amended Complaint) claims were not performed, followed by excerpts from fragmentary documents and deposition testimony relating in general terms to that particular service area. Then, without tying any of the cited evidence to any individual SOW item, Andriole offers the rote recitation that "Carlson's Service Assessment findings are *consistent with* the evidence."

The only portion of Andriole's reports that involves a line-by-line analysis of the SOW items is a section of his rebuttal report in which he responds to IBM's technical expert, Timothy Clayson. Unlike Andriole, Clayson did perform a line-by-line analysis of the 1,074 SOW items, and in so doing identified evidence that IBM in fact performed those items. In his rebuttal

report, Andriole argues that Clayson's evidence that each SOW task was performed is not persuasive, ignoring that neither Andriole himself, nor Carlson, has presented evidence that would satisfy *Carlson's* burden to prove that IBM did *not* perform the tasks.

The deficiencies in Andriole's rebuttal analysis are illustrated by examining the single example Carlson chose to highlight in its briefing during trial.  In its response to IBM's Rule 52(c) motion, Carlson chose the Data Network task cited above – line 16 of Schedule E3-2 – as an example of how the Court should utilize Andriole's reports to arrive at the conclusion that the SOW tasks were not performed.  Under this line in the SOW, IBM was responsible for "[a]nalyzing and proposing cost effective Network Service alternatives."  Carlson concedes in its brief that IBM did in fact propose such an alternative network solution to Carlson, but argues that, in Andriole's opinion, IBM's proposal was "unworkable due to IBM's lack of understanding of the Carlson environment."  Andriole's report shows that this sweeping proposition is actually an inaccurate paraphrasing of fragments of an email purporting to reflect the concern of someone at IBM (perhaps named Yolanda Dickinson) that Carlson was "loosing [sic] faith" in IBM's understanding of the environment on July 2, 2007.  Andriole offers no independent analysis of the solution that IBM actually proposed and does not explain how or why it did or did not work in Carlson's environment.  In short, Andriole does not bring his technical expertise to bear on this item.  The Court rejects his opinion.

Beyond the fact that Andriole's reports do not link any evidence to the SOW items that Carlson claims were not performed, the evidence and argument of counsel at trial establish that those reports are unreliable and lack meaningful analysis.  Much of Andriole's analysis consists of cutting-and-pasting excerpts from the same type of evidence that Carlson spent its case in chief combing through – primarily emails and Sametime instant messages among IBM managers

34

– followed by a brief summary or observation.  These anecdotal, disjointed, and sometimes offhanded communications do not represent the type of evidence reasonably relied on by IT experts to form an opinion regarding the performance or non-performance of IT services.

In any event, Andriole's opinion is based on the type of evidence the Court is fully capable of weighing without expert opinion.  Andriole provides no meaningful or helpful analysis.

**B.  Instances of poor performance.**

While the evidence that Carlson offered at trial was out of step with the breach of contract claim it pled and said it was litigating – that IBM failed to perform the 1,074 SOW items – it does establish that IBM performed its IT responsibilities under the MSA poorly at times.  Carlson insisted that IBM's performance was a consistent and systematic failure, but that is an overstatement of the evidence.  After a particularly troublesome transition period, the parties utilized the MSA's remedial provisions to address the problems that had become apparent.  Thereafter, IBM's performance markedly improved and the instances of poor performance were isolated.

Even setting aside that Carlson did not plead that the problems caused by IBM's poor performance constitute a material breach of the MSA independently of its SOW theory, Carlson nonetheless has not met its burden.  With an undertaking the magnitude of this outsourcing project, the parties anticipated and accounted for the inevitability that IBM would not perform flawlessly in all areas at all times.  The MSA's informal dispute resolution processes, its Service Level Credit calculations, and other mechanisms were well used during the term of the contract to adjust and improve the arrangement.  Against those facts, the instances of IBM's poor

performance between October 2006 and December 2009 discussed below, whether individually or collectively, do not amount to a material breach of the MSA.

### 1. Outages.

Carlson offered evidence of system outages during the MSA, with emphasis on the outage of Carlson's Curtis-C hotel reservation system in June 2006 and the iWin outage in June 2008.  As an initial matter, the Curtis-C outage is not relevant to Carlson's breach of contract claim, as it occurred during the pre-October 1, 2006 time frame for which Carlson released all IT breach claims in Amendment 15.  In addition, through the use of the MSA's dispute resolution procedure, Carlson received compensation from IBM for both the 2006 Curtis-C and the 2008 iWin outages.

Moreover, Carlson's evidence of outages is, again, fragmentary and anecdotal.  In contrast, the MSA contained extensive systematic measures of system availability in the form of both Critical and Key SLAs.  These included an entire section on "ITO Infrastructure Availability," which contained 17 Critical SLAs.   From October 2006 through the end of the contract, IBM missed only one of these 17, for only a single month – SLA 1.1.11, "Single Application Outage not to exceed 8 hrs" – for Carlson's restaurant group for the month of August 2007.

Likewise, against a parallel set of 18 Key SLAs that measured the availability of certain lower-priority "Group 2" or "Group 1" applications, IBM missed only one SLA, for only a single month, between October 2006 and December 2007, when the parties removed these lower priority SLAs from the scope of the contract with Amendment 30.

### 2.  Backups.

While the evidence reflects periodic problems with backup of Carlson's systems, insufficient backup capacity – which, under the MSA, Carlson was responsible for purchasing – was a primary cause of such problems.  For instance, a December 2008 Carlson internal report on the condition of its infrastructure identified Carlson's own failure to install adequate backup capacity as the primary cause of backup problems, and recommended a $1.9 million capital project to upgrade its backup devices.

### 3.  Monitoring.

Although Carlson suggested in broad terms that IBM failed to monitor the operation and status of Carlson's IT infrastructure, IBM implemented multiple tools to monitor Carlson's mainframe, servers, and databases.  These systems produced voluminous reports each day, used by both parties as a primary tool in the capacity planning function.

The evidence does include fragmentary references to failures in the monitoring systems.  However, the failures that Carlson did show do not amount to a material breach of the parties' agreement.  The Court also agrees with IBM that, given the complexity of the Carlson IT infrastructure, it is no surprise that monitoring would fail from time to time for individual devices among the thousands in the system.

### 4.  Hardware refresh and software currency.

Carlson alleges that IBM failed to adequately "refresh," or keep current, Carlson's hardware and software, but the evidence does not support that claim.  In order to perform any hardware or software refresh – a process that could potentially disrupt Carlson's business

37

operations – IBM was required to obtain Carlson's approval and involvement.  A contemporaneous document establishes that IBM and Carlson worked together to refresh Carlson's systems throughout 2006 and 2007, after which Carlson assumed full responsibility for refresh.  Carlson introduced no evidence that IBM ever failed to carry out a hardware or software refresh that the parties had agreed to perform.

### 5.  Security.

Carlson alleges that there were lapses in the security systems designed to protect Carlson's data from unauthorized intrusion.  However, Carlson's December 2008 internal audit in fact reported that "IBM has succeeded in applying Carlson's security policies to the infrastructure services that it supports.  In areas where policies were not applied to the servers, the exceptions were explicitly stated in a mutually agreed contractual document (GSD331) between Carlson and IBM."  Further, Carlson introduced no evidence of any actual breach by an unauthorized person of any Carlson system at any point during the MSA.

### 6.  Staffing.

Carlson claims that IBM had insufficient staff to carry out its responsibilities. Carlson's evidence on this issue focuses primarily on IBM staffing reductions in mid-2007, in connection with what IBM called "Project Lean," and in particular on a May 31, 2007 presentation suggesting that proposed staffing reductions could impact IBM's attainment of three specific SLAs.  However, there is no evidence that such reductions actually resulted in diminished IBM performance generally, or a failure to meet any SLA specifically.  From July through December

of 2007, IBM met the minimum acceptable levels of performance set by the contract for all three

SLAs identified as at risk in the IBM internal presentation – 1.3.2, 1.4.1, and 1.4.2.


### 7.  Performance against the SLAs.

Finally, Carlson alleges that IBM's performance fell short as measured by the SLAs. But

neither the SLA results themselves, nor Carlson's contemporaneous evaluation of them, support

the claim that IBM's SLA misses constitute a material breach of the MSA.


### a.  2006–2007.

From October of 2006 (when Carlson's breach of contract claim starts) through

December of 2007 (when the parties replaced the original MSA with the reduced-scope

Amendment 30 version), IBM met the contractually defined "acceptable" target for 96 percent

(396 of 413 total measured) of Critical SLAs and 88 percent (943 of 1077 total measured) of Key

SLAs.  During this period after the rough transition, Carlson regularly cited IBM's SLA

performance in positive terms in status reports to Carlson senior executives.

In a February 2007 report for the Board of Directors, for example, Carlson's Steve Brown

wrote that "ITO Service Level performance is trending positive due to focused 4Q06 tactics,"

and that "[a]ll leading delivery measures are trending positive."  A year later, in February of

2008, Carlson's CIO Jeff Balagna reported to others in Carlson's senior management that in

measuring "Critical ITO Service Level Performance from April through December [2007]," the

parties "did not meet [the] target attainment goal of 92%, but . . . achieved a cumulative

attainment of 90% delivery of expected ITO operating performance against 2006 performance of

85%."  And with respect to Key SLAs from April through December of 2007, the parties

"[e]xceeded [their] 2007 cumulative attainment target of 80%, improved 23% over 2006, and moved from 63% attainment in 2006 to 86% in 2007."

There is no suggestion in these contemporaneous reports that Carlson viewed IBM's SLA performance – or performance by any other measure, for that matter – as anything less than acceptable and improving.

### b.   2008–2009.

And IBM's performance did indeed continue to improve in 2008 and 2009.  In those years, IBM met 98 percent of both Critical SLAs (102 of 104 total measured) and Key SLAs (385 of 393 total measured).  As it had in previous periods, Carlson at the time acknowledged IBM's successful performance against the 2009 Service Level metrics.

One incident in particular provides some useful insight into the discrepancy between Carlson's contemporaneous evaluation of IBM's performance and its litigation posture.  In March 2009, through an annual process known as "Set/Met," Carlson "set" three overarching goals for IBM to accomplish during the remainder of the year.  The first of these goals, under the heading of "Quality of Service," was to "[e]nsure IBM meets SLA Attainment across all areas of responsibility, scope."

In December 2009, IBM's Ray Ramirez asked Carlson's Vice President of Technology Joe Terhaar, who was second in command to Steve Brown, for Carlson's agreement that IBM had "met" the 2009 goals that Carlson had set, including SLA attainment.  After initially challenging Ramirez on a number of performance points, and hearing Ramirez's further explanations, Terhaar concluded in a memo to other Carlson executives that IBM had met all 2009 performance goals that Carlson had set for it, including SLA attainment "across all areas of

responsibility, scope." Accordingly, Terhaar told his colleagues that "I am comfortable with the explanations and overall ratings [of Met, Met, and Met]."

Two other Carlson executives responded to Terhaar's memo, one of whom concurred unequivocally while the other raised one issue that Terhaar himself concluded was Carlson's responsibility to resolve, not IBM's. But before Terhaar could convey the Carlson executives' unanimous agreement that IBM had met all 2009 goals to Ramirez, however, Terhaar's superior, Steve Brown – who by that point was well underway implementing Carlson's "breach strategy" – intervened. Brown sent an email to Terhaar and the others with the subject line "2009 IBM Set/Met Objectives." The substance of that email from Brown is obscured in the version admitted at trial with the legend "REDACTED PRIVILEGE." Carlson's Privilege Log lists Brown's "REDACTED PRIVILEGE" email as a "[c]onfidential communication between employees of client reflecting confidential communication with an attorney for purposes of providing ongoing legal advice and services re: IBM performance reviews."

Shortly after Brown sent his email, Terhaar reversed course and wrote to Ramirez that Carlson was "not comfortable with the ratings" – the exact opposite of what he and his colleagues had in fact concluded before Brown's intervention.


### c.   Carlson claims of SLA unreliability.

Although Carlson itself cites the SLA results, particularly during the first two years of the contract, Carlson also suggests for various reasons that those same SLAs results are unreliable indicators of IBM's performance. Carlson claims that IBM manipulated the numbers through the use of "SLA Holds" – an issue investigated and resolved by the parties in 2007 – and that the SLAs in place during the Amendment 30 and 45 versions of the MSA set such low standards that

they did not meaningfully reflect IBM's performance of the Services.  The latter claim is self-contradictory, since according to the contract the parties agreed to, it is the SLAs "against which IBM's performance of the Services shall be measured."  It is also a position that is irreconcilable with Carlson's decision to base its number one "Set/Met" goal for IBM in 2009 – Quality of Services – on achievement of those SLAs.

But most importantly, despite Carlson's intense scrutiny of the reported SLAs throughout the contract term, and despite having full pre-trial discovery on this issue, Carlson offered no objection to the admission of IBM's Rule 1006 summary of all of the SLA results, and did not challenge a single one of the numbers in that summary.

## II.      Carlson's fraud claim.

Under Minnesota law, the elements of the tort of fraud are:

(1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer[ed] pecuniary damage as a result of the reliance.

*Hoyt Properties, Inc. v. Production Resource Group, L.L.C.*, 736 N.W.2d 313, 318 (Minn. 2007).

*See also Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 368 (Minn. 2009).

The only remaining fraud claim to which Carlson ascribes any damages is its claim that IBM's monthly invoices "constitute[d] a [false] representation of material fact by IBM of the Services" – by which it means the Schedule E SOWs items – "IBM was going to perform during that month."  As noted above, Carlson at trial limited the scope of this claim to the period before

October 1, 2006 – in other words, to the time frame for which it released any breach of contract claims against IBM related to the performance of IT Services in Amendment 15.

This fraud claim fails at every turn.

### A. False representation.

First, Carlson has not satisfied its burden of proving that, by sending Carlson the monthly invoices, IBM made the false representation that the 1,074 IT Statement of Work items were being performed.  Carlson's claim fails on this element in two different ways.

One, even assuming for the sake of argument that the monthly invoices did contain or amount to a representation that every one of the 1,074 SOW line items at issue was being performed monthly, Carlson has failed to prove that those items were not performed for the very same reasons that are explained above with respect to its breach of contract claim.  Carlson simply did not prove that IBM failed to perform the enumerated SOW items, either in whole or in part, and whether before October 1, 2006 or after.

Two – and equally fatal to the claim – there is no evidence to support Carlson's theory that the invoices actually were representations that each of those SOW items were being performed monthly.  In the MSA itself, Carlson agreed to "pay IBM the applicable Charges set forth in Schedule J . . . [i]n consideration of IBM's performance of the Services . . ."  MSA § 11.1(a).  Schedule J, in turn, "describes the methodology for calculating the Charges for the Services being provided by IBM to Carlson  . . . pursuant to the Agreement."  MSA Sched. J § 1. The "Charges" are defined as "the amounts set forth in **Section 11 (Charges)** of the Agreement and Schedules J1, J2 and J3 in support of the Services described in **Section 4** of the Agreement and the Statements of Work, Work Orders or otherwise set forth in the Agreement as charges due

43

to IBM in return for providing the Services."  MSA Sched. J § 2.  Schedules J1, J2, and J3 set

forth monthly base charges corresponding, among other things, to each of the seven IT towers.

Those base charges are not broken down by SOW line items, either in the J Schedules or in the

invoices themselves.

To put it simply, just as there is no one-to-one correspondence between the SOW items

and the SLAs, there is no one-to-one correspondence between the SOW items and the monthly

invoices.  The parties did not value the contract by pricing out each of the thousands of SOW

items.  Instead, IBM charged Carlson a monthly base rate for the Services it performed with

respect to each of the IT towers.  Its responsibilities within a particular tower were delineated in

the SOWs, and the quality of its performance was captured by the monthly SLA results.  Those

results were then rolled into the invoice in the form of credits that may be owing to Carlson due

to any Service Level Failures that had occurred.

Carlson's own damages expert, Richard Boulton, perhaps said it most succinctly when he

admitted in his deposition, with which he was confronted at trial, that "I looked for any evidence

whether the base charges were calculated by reference to the statement of work tasks.  I could

find no evidence that they were."


**B.  Reliance.**

Second, even if Carlson had proven that IBM made false representations in its invoices

regarding its performance of SOW line items, Carlson has not met its burden of proving that,

when it paid those invoices, it was acting in reliance on those misrepresentations.  No witness

testified and no document showed that Carlson ever relied on the invoices as a representation

that all of those items were being performed in a particular month.  To the contrary, the evidence

demonstrated that Carlson always scrutinized, and frequently challenged, IBM's performance of IT Services and the invoices IBM submitted for them.  This, in fact, was a large part of Michael Rockhold's job for Carlson, and others worked in complementary capacities.

Further belying its claim of reliance, Carlson short paid a series of invoices.  Steve Brown asserted at the time that Carlson was doing so in light of its contention that "contracted services . . . are not delivered or continue to be delivered at a quality level below reason and contract."  Carlson cannot now plausibly claim that it blindly paid the invoices in reliance on IBM's representations.

Further, when confronted with the fact that he had never reported to Carlson's senior management on what he claimed at trial to be IBM's "disastrous" performance, Brown testified forcefully that "the entire company knew the situation things were in."  This is true.  Carlson was fully aware of the state of affairs at all times throughout the term of the contract.  Carlson attempted to bolster its fraud claim by pointing to some IBM internal documents that Carlson claims it was not provided by IBM.  As an initial matter, nearly all such documents post-date October 1, 2006 – in particular, the Service Management Review (referred to as the "Overacre Report" by a number of witnesses) that was completed in November of 2006 and which Carlson reviewed exhaustively at trial – and therefore are irrelevant in light of Carlson's abandonment of its post-October 1, 2006 fraud claim.

Moreover, whether or not Carlson had access to IBM's internal comments on its own performance, Carlson indisputably had access to the voluminous data and measurements reflecting that performance, including all of the various reports required by the contract.  Carlson does not claim that IBM ever failed to produce that information as required by the contract.

In addition, all three versions of the MSA afforded Carlson expansive audit rights that are described above, including the "right to audit all … performance metrics and reporting procedures," MSA §7.5, the right to conduct "audits and inspections to . . . examine IBM's performance of the Services [and] verify IBM's reported performance against the applicable Service Levels," *id.* § 9.9(b), and the right to "unrestricted access to . . . all computer or other files containing Carlson Data, as well as all systems and network logs, system parameters and documentation," *id.* § 13.5.  *See also id.* §§ 9.9(c), 9.12(b), 9.14, 11.10(a), 13.2(e).  Indeed, under the MSA, Carlson accepted as a *responsibility*, not simply a right, "monitoring all IBM deliverables and commitments" and "assuring the audit ability of IBM processes."  MSA Sched. B at 6.  Carlson's witnesses agreed that IBM never refused a Carlson request for access to any information, to the facilities and equipment under its control, or to the personnel under its employ.

Carlson – a sophisticated company with a team of its own of seasoned IT experts – was an active and knowing participant with IBM at every step in the outsourcing project, not the hoodwinked spectator it attempted to portray at trial.  There was no reliance.


### III.   Carlson's damages.

Even were Carlson's breach of contract and fraud claims to have merit, Carlson also failed to prove its damages.  Carlson claims that it was "overcharged" $67.4 million – $16.4 million attributed to IBM's alleged failure to perform the 1,074 SOW tasks before October 1, 2006 on the fraud theory, and the remaining $51 million attributed to IBM's alleged failure to perform those same SOW tasks after October 1, 2006 on the breach of contract theory.

Even had Carlson prevailed on either or both of its claims, Carlson's damages calculations would be unsustainable, for the following reasons. First, Carlson's damages expert, Richard Boulton, mathematically derived this $67.4 million calculation from Carlson's 2010 Services Assessment, which he wrongly believed to be an unbiased, contemporaneous document not prepared with a view towards litigation. As noted above, Carlson did nothing to bolster the reliability of that assessment at trial, failing to call a single one of the 2010 assessors as a witness. For this reason alone, Boulton's damage estimate would be suspect.

Second, Boulton reached his damages figures by computing the percentage of the total number of SOW items that IBM supposedly failed to perform for each service tower, in each year of the contract, and then applying that percentage to the total base price that Carlson paid for that tower and year. This presents two insurmountable problems for Carlson.

One, it is based on the arbitrary assumption that the monthly base price negotiated by the parties was derived from, or correlates to, the number and value of SOW items. As explained above, it does not.

Two, Boulton presented the Court with a take-it-or-leave-it damages figure of $67.4 million, based on the assumption that IBM failed to perform every one of the 1,074 enumerated SOW items. But if, for instance, the Court determined that some but not all of those 1,074 items were not performed, there is no record evidence that would allow the Court to calculate the value of that subset of SOW items. There is also no record evidence on which to calculate the damages if the Court were to find that the SOW items were performed in some months, but not others.

While Boulton's formula for valuing each SOW item was included in his report and displayed in court during his testimony, it was not offered into evidence, nor were the actual

Schedule E Statements of Work, other than from the original 2005 MSA which was in effect for only about half of the total contract term.  Thus, even if the Court had found that IBM did not perform a given SOW task at some point during the term of the contract (and found, somehow, that such failure constituted a material breach of contract), the Court has no means whatsoever of knowing even what Carlson contends the value of that item to be.

Boulton's damages assessment is not only an invitation to gross oversimplification, but it is inconsistent with the record evidence.  Carlson has therefore not met its burden of proving damages, on either a contract or a fraud theory, to a reasonable certainty.  "[A] party cannot recover speculative, remote, or conjectural damages," *Children's Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1016 (8th Cir. 2001) (citing *Leoni v. Bemis Co.*, 255 N.W.2d 824, 826 (Minn. 1977)), and they will not be awarded here.

## IV.    IBM's breach of contract claim.

IBM's counterclaim for breach of contract seeks termination payments owed to IBM as a result of Carlson's early termination of the MSA.  The Court determines that Carlson's termination of the contract was for convenience, not for cause, and that Carlson breached the MSA by withholding from IBM the $14,232,000 in termination payments it is owed under the contract.  IBM is entitled to an award of that amount, plus prejudgment interest to be calculated as simple interest per annum at the rate of 10% from the date on which this action commenced through the date of judgment pursuant to Minn. Stat. § 549.09.[3]  Postjudgment interest would accrue according to the terms of 28 U.S.C. § 1961.  *Swope v. Siegel–Robert, Inc.*, 243 F.3d 486,

---

[3]     Carlson commenced this action in state court on July 22, 2010 with service of a summons and Complaint on IBM.  *See* Minn. R. Civ. P. 3.01.  July 22, 2010 through July 25, 2014, the date of this order, is 1,464 days.  Simple interest at a rate of 10% per annum for 1,464/365 years comes to $5,708,397.

497 (8th Cir. 2001) ("Although *postjudgment* interest is a procedural matter governed by federal

law, . . . state law determines the rate of *prejudgment* interest.") (citations omitted); *Happy Chef*

*Sys., Inc. v. John Hancock Mut. Life Ins. Co*., 933 F.2d 1433, 1435 (8th Cir.1991) ("In a diversity

action, state law governs prejudgment interest; federal law governs postjudgment interest.").


**A. Termination payments.**

In the event of early termination, whether for cause or convenience, the MSA required

Carlson to reimburse IBM unpaid amounts for services previously rendered or costs incurred.

MSA Am. 45 §§ 20.1(c), 20.2.

Schedule N to the MSA defines three categories of these early termination payments:

- **"ERP Build" Charges**: As the final, Amendment 45 version of the MSA
  memorialized: "For historical purposes, IBM has completed the build of an ERP
  system for Carlson as part of the Services, the 'ERP Build Services'. . . . For
  clarification purposes, the monthly steady state 'Build Charges' include financing
  that was provided to Carlson from IBM" for that ERP system.  MSA Am. 45 §
  4.3(i).  The "ERP Build" payments authorized under Schedule N are equivalent to
  and compensate IBM for the remainder of the amortized ERP system build costs
  incurred by IBM that Carlson had not yet repaid at the time of the termination.

- **"Balance Sheet" Charges**: These compensate IBM for "capital and equipment
  expenditures" and "transition investments" that IBM had earlier made on the
  Carlson contract but that had not yet been fully billed back to Carlson through the
  monthly charges.

- **"Other" Charges**: The third termination payment category under Schedule N is
  related to wind-down costs that the parties expected IBM would incur on early
  termination.  These expected charges are fixed in Schedule N.1 according to the
  month in which the contract is terminated (the amounts declining over time), and
  are to be reduced by any costs or other financial obligations assumed at
  termination, which IBM would otherwise have incurred to wind down the
  contract.

49

The amounts owed for the "ERP Build" and "Balance Sheet Charges" termination payment components are due in the case of either a termination for convenience or a termination for cause. The "Other" charges are due only under a termination for convenience.

There was little difference in the amount of contractual termination payments calculated by the parties' respective experts, Louis Dudney for IBM and Boulton for Carlson:

| Unpaid termination payments due to IBM | Dudney calculation | Boulton calculation | Difference |
|---|---|---|---|
| For convenience | $14,232,000 | $13,287,000 | $945,000 |
| For cause | $11,868,000 | $11,598,000 | $270,000 |

The record supports Dudney's calculation.  On January 5, 2010, IBM invoiced Carlson its first installment of termination payments due, amounting to $14.773 million. On February 2, 2010, IBM invoiced Carlson for additional termination charges of $3.667 million. On May 21, 2010, IBM invoiced Carlson an additional $623,594, the final installment of termination charges. Subsequently, the parties agreed to a $187,880 reduction to the termination payments due to additional wind-down costs that IBM avoided.

Net of credits, then, IBM invoiced Carlson a total of $18.876 million in termination payments.  To date, Carlson has paid IBM $4.644 million of the invoiced termination payment amounts, a number which neither Carlson nor its damages expert dispute.

Therefore, $14.232 million in termination payments remains unpaid.  That total can be broken down into the three Schedule N categories as follows:

| Termination payment category | Amount invoiced | Amount paid | Amount owing |
|---|---|---|---|
| "ERP Build" charges | $11,988,000 | $744,000 | $11,244,000 |
| "Balance Sheet Charges" | $4,524,000 | $3,900,000 | $624,000 |
| "Other" charges (minus wind-down expenses avoided) | $2,364,000 | $0 | $2,364,000 |
| **TOTAL** | **$18,876,000** | **$4,644,000** | **$14,232,000** |

Two differences separate this termination payment calculation by Dudney from the one offered by Boulton, Carlson's expert. The first is $270,202 relating to the Balance Sheet Charges, which Dudney includes but Boulton does not. This amount is for additional transition costs incurred by IBM related to the "Applications on Demand" Functional Service Area associated with the MSA. That $270,202 charge is therefore a permissible "Balance Sheet Charge" under § 1.2(a) of Schedule N to the MSA. As Dudney explained, "it was an amount of money that was spent up front that was effectively capitalized, if you will, and then it was allocated into future periods, so it had the same characteristics as the balance sheet charges" as defined in Schedule N. Carlson recognized that it is liable for this charge in contemporaneous documents. This $270,202 charge is appropriately included in the termination payments owed to IBM.

The second difference between the parties' calculations concerns a $674,756 reduction in termination payments that Carlson claims represent wind-down costs avoided by IBM during the transition of services back to Carlson. Carlson claims that by hiring certain of IBM's

51

subcontractors, it allowed IBM to avoid early termination payments to those subcontractors, and that Carlson's payments to IBM should be reduced by that amount.  However, the uncontroverted record evidence is that IBM had the right to terminate the contractors at will, and at no cost to IBM.  Therefore, this $674,756 amount should not be deducted from the amount of termination payments due to IBM.

**B.  Carlson's defenses.**

Carlson contends that IBM should not be awarded the termination payments called for by the MSA on the grounds that: (1) IBM materially breached the MSA itself, thereby excusing Carlson from its termination obligations ("excused performance"); (2) IBM committed fraud ("unclean hands"); and (3) the termination payments are an unenforceable penalty.

Because IBM committed neither material breach nor fraud, the first two of Carlson's defenses are not applicable.

Nor would the "excused performance" defense apply even if IBM had materially breached.  Carlson cited the Black's Law Dictionary definition of "material breach" as "usu[ally] excusing the aggrieved party from *further* performance and affording it the right to sue for damages."  *LeMond Cycling, Inc. v. PTI Holding, Inc.*, No. Civ. 03-5441, 2005 WL 102969, at *4 (D. Minn. Jan. 14, 2005) (emphasis added) (quoting BLACK'S LAW DICTIONARY 183 (7th ed. 1999)).  But Carlson is not seeking relief from *further* performance.  Rather, Carlson seeks relief from obligations it had already incurred.  And Carlson had agreed in the MSA itself that even in the case of material breach (and termination for cause), it would pay the "Balance Sheet" and "ERP Build" balances (excusing only the "Other" fee).  MSA Am. 37 Sched. N § 2.1(f).

Carlson's "unclean hands" defense also would be without merit even if IBM had committed fraud.  The equitable defense of unclean hands is available only in response to a claim for equitable relief.  *Foy v. Klapmeier*, 992 F.2d 774, 779 (8th Cir. 1993) ("Under Minnesota law, the doctrine of unclean hands will be invoked only to deny equitable relief to a party whose conduct has been unconscionable . . . .").  The cases Carlson cited do not suggest otherwise.  *See, e.g., Earle R. Hanson & Assocs. v. Farmers Coop. Creamery Co.*, 403 F.2d 65, 70 (8th Cir. 1968) ("One who seeks equitable relief must approach the court with clean hands."); *Lincoln Benefit Life Co. v. Edwards*, 243 F.3d 457, 462 (8th Cir. 2001) (unclean hands defense not discussed; no offset allowed for amounts that counter-plaintiff never received).

Finally, Carlson's "penalty" defense is also unavailing.  Penalty analysis is applicable only to liquidated damage provisions, which in any event "are presumed valid" under Minnesota law, *Bowles Sub Parcel A, LLC v. CW Capital Asset Mgmt. LLC* (*In re Bowles Sub Parcel A, LLC*), No. BR 12-42765, 2013 WL 6500130, at *4 (D. Minn. Dec. 11, 2013) (citing *Gorco Constr. Co. v. Stein*, 99 N.W.2d 69, 74 (Minn. 1959)), but which may be unenforceable if "greatly disproportionate" to actual damages, as stated in the case Carlson cited, *Priester Constr. Co. v. Hansen*, No. A09-1845, 2010 WL 3000183, at *3 (Minn. Ct. App. Aug. 3, 2010).

The termination payment provisions here are not "damage" provisions at all, liquidated or otherwise.  They are not triggered by a Carlson breach, but rather by the termination of the contract – even if done pursuant to Carlson's termination rights – and are simply payment to IBM for services rendered or expenses incurred.  Such provisions are valid under Minnesota law.  *Advantage Consulting Grp., Ltd. v. ADT Sec. Servs., Inc.*, No. 00-424, 2001 WL 1640062, at *4 (D. Minn. Sept. 6, 2001) (enforcing contractual termination fee effective upon cancellation "for any reason other than non-performance" and finding that "[t]ermination clauses such as this one

are permitted by Minnesota law."), *aff'd in relevant part sub nom. Advantage Consulting Grp., Ltd. v. ADT Sec. Sys., Inc.*, 306 F.3d 582 (8th Cir. 2002).

Finally, Carlson mis-cited *Lake River Corp. v. Carborundum Co.*, a Seventh Circuit decision applying Illinois law, for the proposition that the penalty nature of a termination provision can be assessed by looking at a hypothetical "day one" termination.  In fact, the *Lake River* court examined a damages provision at three points (day one, the middle of the contract, and the end of the contract) and refused to enforce it because at *any* time, it would give the plaintiff "more than its lost profits from the breach."  769 F.2d 1284, 1290–91 (7th Cir. 1985). There is no contention that, as of the termination date, the amounts Carlson owed were anything but amounts IBM had earned or expended.

Based on the evidence received and the findings of fact and conclusions of law set forth above, IT IS ORDERED THAT:

1.  Carlson recover nothing from IBM.

2.  IBM recover from Carlson the amount of $14,232,000, plus prejudgment interest to be calculated as simple interest per annum at the applicable rate of 10% from the date this action commenced through the date of judgment pursuant to Minn. Stat. § 549.09.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: July 30, 2014                                      s/Joan N. Ericksen
                                                         JOAN N. ERICKSEN
                                                         United States District Judge